1
2
3
4
5
6
7

Allan J. Cory SBN: 224289
Email: cory@sonic.net
LAW OFFICE OF ALLAN J. CORY
740 4th Street,
Santa Rosa, CA 95404
Office: 707-527-8810
Fax:     707-569-1547

Attorney for Plaintiff,
Jose Vera

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE VERA | ) Case No: CV 09-03626-CW |
| | ) |
| Plaintiff, | ) Honorable Claudia Wilkin |
| | ) Courtroom: A – 15th Floor |
| vs. | ) |
| | ) **FIRST AMENDED COMPLAINT FOR** |
| AURORA LOAN SERVICES LLC; | )   1.  **VIOLATION OF CAL. CIV. CODE** |
| CAL-WESTERN RECONVEYANCE | )        **§1632;** |
| CORPORATION; | )   2.  **BREACH OF FIDUCIARY DUTY;** |
| DEUTSCHE BANK TRUST COMPANY | )   3.  **FRAUD** |
| AMERICAS, IN TRUST FOR, RESIDENTIAL | )   4.  **CONCEALMENT;** |
| ACCREDIT LOANS, INC. MORTGAGE | )   5.  **VIOLATION OF RESPA;** |
| ASSET-BACKED PASS-THROUGH | )   6.  **VIOLATION OF CAL. FIN.** |
| CERTIFICATES, SERIES 2005-QO4; | )        **CODE§22100 et seq.;** |
| MORTGAGE ELECTRONIC | )   7.  **VIOLATION OF ECOA;** |
| REGISTRATION SYSTEMS, INC.; | )   8.  **VIOLATION OF CAL. BUS. &** |
| HOMECOMINGS FINANCIAL, LLC; | )        **PROF. CODE 17200 et seq.  & 17500** |
| HOMECOMINGS FINANCIAL NETWORK, | )        **et seq,;** |
| INC., a business organization, form unknown; | )   9.  **VIOLATION OF CAL. BUS. &** |
| TRIMERICA MORTGAGE CORPORATION, | )        **PROF. CODE 17200 et seq.;** |
| a business organization, form unknown. | )  10.  **VIOLATION OF CAL. BUS. &** |
| | )        **PROF. CODE 17200 et seq. ;** |
| | )  11.  **VIOLATION OF CAL. BUS. &** |
| | )        **PROF. CODE 17200 et seq.;** |
| | )  12.  **VIOLATION OF CAL. CIV. CODE** |
| | )        **§2924;** |
| | )  13.  **VIOLATION OF CAL. CIV. CODE** |
| | )        **§2923.5;** |
| | )  14.  **SLANDER OF TITLE;** |
| | )  15.  **PROFESSIONAL NEGLIGENCE** |
| | ) |
| | ) Complaint Filed: July 1, 2009 |
| | ) Removed: August 7, 2009 |
| | Trial Date: None |

-1-
COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

**I.**

**<u>JURISDICTION</u>**

1.   This Complaint was originally filed in the Superior Court of California and then subsequently removed to this Court with the stated basis for removal being that Plaintiff had made a claim arising under the Truth in Lending Act (15 U.S.C. § §1601-1667(f).  Although the basis for removal was improperly stated (Plaintiff's original Complaint contained no allegation or inference of a violation of the Truth in Lending Act) jurisdiction is still proper because the Complaint prior to removal, (and as amended), contains claims arising under the Equal Credit Opportunity Act (15 U.S.C. §§1691-1691f) and claims arising under the Real Estate Settlement and Procedures Act (12 U.S.C. §§ 2601, et seq.).

2.   Because both the original Complaint and this First Amended Complaint raise claims that depend on the resolution of substantial federal questions, original jurisdiction is conferred to this Court pursuant to 28 U.S.C. §1331.  Removal is proper pursuant to 28 U.S. C. § 1441 (a).

3.   Supplemental jurisdiction exists for all remaining claims pursuant to 28 U.S.C. § 1367.

**II.**

**<u>VENUE</u>**

4.   Plaintiff originally filed a civil action with the Superior Court of California for the County of Sonoma. Sonoma County is within the Northern District of California and therefore venue is proper upon removal to this Court pursuant to 28 U.S.C. § 1441 (a).

**III.**

**<u>INTRODUCTION</u>**

5.    This is an action concerning two distinct but necessarily related matters: The first portion of this Complaint challenges the very nature of a mortgage loan Plaintiff was induced to purchase without having the opportunity to understand its predatory nature, its true cost, or its onerous terms—a loan designed to secret from Plaintiff the actual parties who were transacting the loan and to insulate these parties from the misdeeds committed in coordination with a separate "loan storefront" used in part only to affect a legal distance from the true supplier of the purposely misrepresented loan product.

6.    The second part of the Complaint challenges the attempt to foreclose on the very property Plaintiff was seduced into providing as security for the predatory loan: This portion of the Complaint exposes a fatal lack of adherence to procedure and details a purposeful attempt to circumvent the safeguards which ensure that any forfeiture not be sanctioned lightly or sanctioned at all without absolute and strict compliance to well established California law.

## IV.

## PRELIMINARY ALLEGATIONS

7.    Jose Vera ("Plaintiff") is now, and at all times relevant to this Complaint, the owner of the real property that is the subject of this Complaint, commonly known as 142 Elm Street, Cloverdale, California in the County of Sonoma ("Property").  The Sonoma County assessor's parcel number for Property is 001-085-010.

8.    Plaintiff and Maria Vera ("spouse") are both Hispanic and are original citizens of Guadalajara, Mexico. English is a second language to both Plaintiff and his spouse.

9.    While Plaintiff and his spouse are hardworking and gainfully employed, they both

lack higher-level education: Plaintiff stayed in school in his native Mexico only through the

fourth-grade; Plaintiff's spouse finished the sixth-grade. Approximately 13 years ago Plaintiff

attempted to better his English comprehension by enrolling in a local Junior College's English

course. Plaintiff's spouse underwent sufficient training in her native Mexico to obtain what is

comparable to a Beauty School certificate. Despite these later-in-life education effort(s) both

Plaintiff and spouse are severely limited in their ability to read and comprehend the written

English language. They are somewhat stronger in their understanding of spoken English.

      10.  Both Plaintiff and spouse have become naturalized citizens of the United States.

      11.  Through hard work and determination Plaintiff and spouse were able to purchase

property in the new country they now call home.

      12.  Plaintiff owns Property that is the subject of this Complaint as a Joint Tenant with

Maria Vera ("spouse").

      13.  Plaintiff obtained a refinance loan ("Refinance Loan") for Property which recorded

as secured by a new Deed of Trust on October 25, 2005.

      14.  Plaintiff did not undertake any of the initial affirmative steps to seek the Refinance

Loan but was instead contacted by telephone and solicited ("cold-called") several months prior

to engaging in the process of refinance by an individual who identified himself as Steve Preciado

("Preciado") and representing himself to Plaintiff as a loan broker who worked for defendant

TRIMERICA MORTGAGE CORPORATION ("TRIMERICA"). The majority of these calls

occurred on or before September 1, 2005, the date where it is known by Steve Preciado's own

admission in the "Borrower's Disclosure Statement (Division 9, Chapter 2, Article 3, Section

22338 (a) (b) )" a true copy of which is attached and incorporated herein as EXHIBIT A   which

was provided to Plaintiff at time of  loan signing by TRIMERICA (via the mobile notary) that an

"Agreement" was reached  (on approximately one third down on page "Date of Agreement: 09/01/2005"). Plaintiff does not deny that conversations with Preciado regarding the Refinance Loan occurred on or before 09/01/25 but denies that Preciado disclosed the broker fees and rebates contained within EXHIBIT A.

15.  Preciado told Plaintiff that as a "broker" Preciado could obtain for Plaintiff the "best possible loan."

16.  Plaintiff resisted Preciado's initial advance(s) but Preciado followed-up with multiple phone calls over the span of several months and in each conversation Preciado would assure both Plaintiff and Plaintiff's spouse that he was still striving to get them that "best possible loan."

17.  Preciado continually preached to Plaintiff and spouse the benefits of refinancing.

18.  Preciado made Plaintiff and spouse feel as though failing to refinance was a huge mistake, especially given Preciado's ability to secure the "best possible loan."

19.  Preciado had successfully invited himself into Plaintiff's life prior to the do-not-call act of 2006 and continued to call Plaintiff without any encouragement.

20.  Preciado spoke to Plaintiff and to Plaintiff's spouse at all times only in Spanish.

21.  Plaintiff and Spouse eventually informed Preciado that the only type of loan they might consider as beneficial would be a fixed-rate loan for a term of 30-years that was lower than the rate of interest on their current loan.

22.  Preciado answered that this condition wouldn't present a problem; the interest rate would be lowered and fixed-rate payment could be achieved of under $1000.00.  Preciado offered to send "papers" to begin the process.

23.  Plaintiff and spouse, relying on Preciado's  specific agreement and representation and Preciado's consistent promises that the Refinance Loan would be the very best possible,

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

, assented and allowed Preciado to take the application for the loan.

24.  Plaintiff and spouse trusted Preciado's stated position as a broker and relied on Preciado's represented superior position (a broker) to be utilized for their benefit.

25.  Plaintiff was promised peace of mind and future security by the benefit Preciado offered: the Refinance Loan was to be less costly on a monthly basis than any other available loan, a lower fixed rate interest than their current loan, a fixed payment of less than $1000, no mention of negative amortization, and no fluctuating payment possibility over the term of the Refinance Loan.

26.  Preciado, aware of Plaintiff's comfort with only the Spanish language and likely aware of Plaintiff's inability to comprehend the confusing amount of loan documents in any language without assistance, made no effort to provide a less challenging burden by providing any documentation to Plaintiff in Spanish.

27.  Preciado caused the loan documents for the Refinance Loan to be delivered to Plaintiff and spouse by use of a mobile notary; a notary that Plaintiff or spouse did not participate in selecting or hiring for this task, and with whom they had no familiarity.

28.  The mobile notary from a company called "Angels on the Run" came to Plaintiff's home with all the documents required to sign for the Refinance Loan in the evening on a date between October 15th 2005 and October 20th, 2005. (Plaintiff pleads a range of dates for the singular appearance of the mobile notary because Plaintiff, while uncertain of the exact date, is informed and believes that evidence will likely support that the date of signing occurred within this date range.)

29.  Preciado through an earlier phone conversation, had instructed Plaintiff's to sign

the documents delivered by the mobile notary upon receipt and assured Plaintiff that the documents reflected the verbal representations Preciado had made regarding the loan's fixed rate and lower payments. Preciado underscored the importance of signing the documents when delivered in order to obtain the best loan possible.

30.  Preciado made no arrangement to be available during the actual signing and did not provide Plaintiff any contact information for reaching him after normal business hours in case the mobile notary arrived in the evening.

31.  Preciado was notably absent in the most important part of the loan application process—the actual signing of the loan obligation and disclosure documents. Plaintiff was left alone and without any assistance by the broker who had enlisted himself as Plaintiff's confidant.

32.  Plaintiff and spouse, overwhelmed with Refinance Loan documents written only in English and beyond their comprehension, turned to the mobile notary as the party most naturally in position to provide guidance about the nature and content of the documents.

33.  When asked for document explanation assistance the mobile notary responded that she could not provide this kind of guidance and that any such questions had to be directed to the broker arranging the loan. She stated that she could only point out which documents needed to be signed but that she was not able to help Plaintiff or spouse understand what the document to be signed contained or concerned.

34.  Plaintiff and spouse, although now feeling abandoned and not at ease, relied on Preciado's earlier reassuring statements and promises and signed all the documents where the mobile notary indicated their signatures were required.

35.  The next morning Plaintiff and spouse awoke uneasy, feeling that at a critical part of

a confusing the process they had been left to fend completely on their own. Other than promising a certain payment amount and a lower interest rate Preciado had never discussed the Refinance Loan with Plaintiff in more than a generalized and promising manner, always assuring Plaintiff that he had arranged the best possible loan. The absence of Preciado when it was most needed to correlate his promising statements with the actual loan documents made Plaintiff and spouse distrustful. His lack of presence at the finish line raised a warning flag in their minds. With fear beginning to grip them and no place to turn for an explanation Plaintiff and spouse perceived the surest course to certain safety was to completely cancel the transaction and the loan.

   36.  On the morning following Plaintiff's signing of the loan documents, during business hours, Plaintiff placed a call to the Southern California office of Preciado. An aide or co-worker of  Preciado received the call and responded that Mr. Preciado was not available to speak with Plaintiff because he was too busy.  Preciado, who had once been so eager to speak with Plaintiff about this "best possible loan" could not take Plaintiff's  all at this critical juncture and no promise of a return call was communicated on his behalf. This lack of attention reinforced the growing apprehension and fear shared by Plaintiff and spouse. A short while later on the same day Plaintiff anxiously called Preciado again; this time Preciado answered. Plaintiff stated he wished to cancel "the papers" because he did not understand them and was now worried they concealed something less than the best possible loan. Preciado responded curtly that it was "too late" because Plaintiff and spouse had already signed the papers. When Plaintiff began to explain his concern that the documents were never correlated properly to demonstrate they contained all of Preciado's earlier promises, Preciado repeated that it was too late for Plaintiff to do anything and terminated the conversation without offering any explanation.

   37.  Preciado's behavior caused Plaintiff and spouse to experience elevated anxiety.

Preciado had made no effort to allay any of their fears and sounded like he wished only to be free of them. They felt a collective pit deepen in their stomach and suspected the earlier smiling voice of Preciado, this stranger who before had always spoke so easily and encouragingly in the trusted tones of their native language, had duped them and taken advantage of their lack of acumen.

38.  Plaintiff's spouse determined to make an effort to verify or disaffirm their newfound fear made a strong effort to decipher the signed loan documents and while not certain of the effect, noted language within the "Adjustable Rate Note" (a true copy of which is attached as EXHIBIT B and incorporated herein) stating the initial payment amount of $985.24 "may change" [Id. at ¶ 3 (B)] and also that the interest rate of 1.375% "may change" [Id. at ¶ 2 (C)]. Unable to further interpret the loan documents in order to glean what condition created the opportunity for this "may change" language to become effective, Plaintiff's spouse, concerned and believing she was also a party to the Refinance Loan (this belief turned out to be false and is discussed later within the Complaint) decided to call TRIMERICA again on the afternoon of the day immediately following Plaintiff's signing of the loan document, but this time to speak only with a supervisor of Preciado.

39.  Plaintiff's spouse called TRIMERICA asking for a supervisor and was connected to an individual claiming that capacity. Spouse explained the reason(s) for newly developed feelings of distrust and the concern she and Plaintiff had about the potential meaning of terms that were never explained. She said she wished to cancel the loan unless she had certain assurance that these terms that she read as possibly allowing change in payment in rate did not apply in this loan. The individual identified as supervisor asked her to wait on hold while the matter was looked into. After an unknown amount of time leaving spouse on hold the supervisor

returned to the phone and stated, "It's too late—all the documents have been signed." Supervisor

then terminated the call without any further advice or potential recourse.

40.  In reality the Refinance Loan did not close and record for at least another four-days

(on October 25, 2005). Plaintiff was not made aware of the delay (or its potential) and relied on

the representations by Preciado and Preciado's supervisor. These representations were made to

necessarily mean the loan had already closed or would close very near in time to the calls made

by Plaintiff  on the day following the signing of the loan documents and therefore no interruption

of the closing process was otherwise available to Plaintiff. TRIMERICA and Preciado were

motivated to declare the timeline as "too late" because the unexplained predatory loan

documents making it possible for them to take their unconscionable fee (discussed infra) were

indeed signed.

## V.

## PLAINTIFF'S LOAN IS PREDATORY

41.  Predatory lending in California is not statutorily defined. However, this lack of

pre-cut cloth doesn't mean the practice doesn't exist, it may simply mean that the practice has no

consistent shape and must be tailored fit. Courts have also struggled to universally define

predatory lending but several have expressed opinion: In *Commonwealth v. Fremont Investment

& Loan*, 2008 WL 5122699 (Mass. Dec. 9, 2008), at *11 the court determined certain loans were

offered despite the near certainty that the buyer would default and the property would be subject

to foreclosure and identified four factors making these type of loans inherently unfair—these

factors were described by the court as:

"1)Adjustable rate mortgage loans with introductory period of three years or less,
2) introductory rate for the initial period which was at least three percent below
fully indexed rate;

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

3) borrower's debt-to-income ratio exceeding fifty percent once the fully indexed rate applied, and
4) the loan-to-value ratio was one hundred percent, or the loan carried a substantial prepayment penalty, or a prepayment penalty that extended beyond the introductory rate period."

42.  The Refinance Loan sold to Plaintiff by TRIMERICA had an initial payment (a "teaser" rate) for only the first month with an introductory rate of 1.375% while the fully indexed rate  at the time of loan issuance was approximately was offered only for the first month. The introductory rate was 1.375% at the time of loan issuance while the fully indexed rate at the time of loan issuance was 8.145% (yielding a difference much greater than the 3% deviation the court above set as a minimum threshold).

43.  The Refinance Loan was made with Plaintiff as sole obligor (by TRIMERICA's preparation; not at plaintiff's insistence or understanding ). Plaintiff's W2 income as reported to the I.R.S. for the year preceding the loan (2004) was $37,882.74, which provides a gross monthly income of approximately $3,157.00. The payment for the Refinance Loan at the loan amount ($290,500.00) amortized over the period of the loan (30-years) using the fully indexed rate would be $2,161.00—or 68% of Plaintiff's unadjusted or total debt, handily exceeding the 50% threshold established by the court.

44.  The Refinance Loan carried a substantial prepayment penalty and the penalty extended beyond the introductory rate period.

45.  Therefore Plaintiff's loan satisfies all the criteria established by the above court as indicative of a presumptively unfair loan transaction.

46.  A California court striving to define unfair or predatory loans supplied a less stepped-analysis was nevertheless able to define a range of components found in predatory loans that are contradictive of the findings made by the court above :  In *American Financial Services*

*Association v. City of Oakland*, 34 Cal. 4th 1239 (2005), the court's opinion opened with the following statement:

> ""Predatory lending" is a term generally used to characterize a range of abusive and aggressive lending practices, including deception or fraud, charging excessive fees and interest rates, making loans without regard to a borrower's ability to repay, or refinancing loans repeatedly over a short period of time to incur additional fees without any economic gain to the borrower….."

47. Plaintiff and spouse were aggressively pursued. They had no prior relationship with TRIMERICA or any of its employees.

48. They were abused by the total lack of involvement by their loan broker at a critical juncture in the process (loan signing); not provided any documents they had a reasonable chance of comprehending (adhesion and legalese contract language written in English, a language they can read only slightly); and abandoned when they attempted to cancel the transaction they had become a part of without effective guidance.

49. They were deceived by fraudulent representations upon which they relied.

50. Excessive fees were charged and also paid by others to TRIMERICA for selling the Refinance Loan to Plaintiff and spouse (as will be demonstrated later in this Complaint).

51. The Refinance Loan was made with only the Plaintiff as the sole obligor (discussed more fully later in this Complaint ) clearly making it a loan that with little regard for an ability to repay.

52. The Refinance Loan was made not long after Plaintiff and spouse obtained a loan on the same property which they were jointly obligated to pay (serial refinance).

53. When all the costs of the Refinance Loan are factored together, it offered little or no economic advantage to Plaintiff and spouse.

54. Therefore Plaintiff's loan satisfies all the criteria as indicative of a presumptively

unfair or predatory loan transaction as established by both courts above.

55. The Ninth Circuit has also grappled with a definition for predatory lending: In *Henry v. Lehman Commercial Paper, Inc.,* 471 F.3d 977, 984 (9th Cir. 2006); the court stated;

> "Predatory lending includes "the practice of making loans containing interest rates, fees or closing costs that are higher than they should be in light of the borrower's credit and net income, or containing other exploitative terms that the borrower does not comprehend." "

56. The Refinance Loan sold to Plaintiff by TRIMERICA had a higher interest rate than Plaintiff might have otherwise obtained. This statement is made upon Plaintiff's information and belief and will likely be supported by evidence.

57. Plaintiff and spouse had both believed they were applying for and would be obligated to the Refinance Loan jointly. Although spouse had to sign multiple documents associated with the loan she did not sign the "Note" (EXHIBIT B). The significance of spouse not being on the Note was never explained to Plaintiff by Preciado—indeed Plaintiff and spouse were surprised to discover spouse's status as a non-obligor long after the Refinance Loan was transacted and only because spouse at some date distant called the loan servicer with a question and was told she could not access the account.

58. Plaintiff is informed and believes and upon that bases alleges that evidence will likely support there was no proper reason to exclude Plaintiff's spouse as an obligor on the Refinance Loan while at the same time combining her income with that of Plaintiff on the Uniform Residential Loan Application ("URLA") a true copy of which is attached as EXHIBIT C and incorporated herein (which at the top of page 2 of 4 states that Plaintiff's "Base Empl. Income" is $7,995); or in the alternative that if there were a bases for omitting spouse from the Note that Plaintiff should have been made aware of this condition and how it may have affected loan availability.

59.  As previously stated Plaintiff's W2 income for the year prior to the issuance of the loan (2004) was approximately $3,157 per month and during the same year the W2 reported income for spouse was approximately $43,500, or $3,625 per month; there is an additional entry of $559 per month for rental income —added together these three numbers total $7,350 and while not exactly matching the entry of $7,995 are the only way to closely approximate Plaintiff's stated income. Additionally Plaintiff is informed and believes and upon such basis alleges that evidence will likely support that the "net rental income" entered by Preciado was computed against the ability to pay only the "teaser rate" and not founded with any regard to true predictable income potentially available for loan repayment.

60.  Plaintiff did not inform Preciado that Plaintiff had the equivalent of a 12th grade Education (as previously alleged Plaintiff completed his education only through the fourth-grade) nor did Plaintiff instruct Preciado to make this entry on  the "Yrs. School" portion of the URLA (see EXHIBIT C, page 1, section III "Borrower Information").  Plaintiff did not see this entry of "12 yrs." at the hurried time of loan documentation signing (where Plaintiff was first exposed to the application) and now believes that evidence will likely support that this false information about Plaintiff was included purposefully by Preciado in order to make Plaintiff appear more capable and educated so that Preciado would escape unwanted transaction scrutiny. (Preciado admits he completed the URLA by telephone interview —see EXHIBIT C, page 3, section X "Information For Government Monitoring Purposes.")

61.  Plaintiff is informed and believes and upon such basis alleges that evidence will likely support the fact that TRIMERICA was paid and encouraged to place Plaintiff in a loan with terms more onerous than what Plaintiff may have otherwise obtained and that this placement was purposeful and motivated by profit. This assertion is further supported by facts

provided later in this Complaint regarding the incentive paid to TRIMERICA for selling the loan to Plaintiff.

62.  The loan contained exploitive terms that Plaintiff could not understand. Plaintiff now knows understanding these exploitive terms would not have been made much easier even if the documents had been provided in Spanish—a language the Plaintiff can read more competently than English—although it is likely that a Spanish translation might likely have provided some degree of warning to the falsity of  Preciado's representations.

63.  One example of an exploitive term incapable of any true understanding is the statement that the initial payment amount of $985.24 "*may change*" when in fact this payment "MUST CHANGE." (Unless Plaintiff opted to pay off the entire note exactly at the termination of the loan's very first month of obligation—highly improbable and counter to the obvious purpose of the loan.) [See: ¶ 3 (B) in the Adjustable Rate Note (EXHIBIT B)]

64.  The documents involved in obtaining the Refinance Loan are voluminous, the broker and the lender waste no ink or ration any words where they guard their interest (as typical in any adhesion contract) but here, where it would be very simple to state the truth, the wealth of words available suddenly becomes impoverished. Instead of the inaccurate, misleading, and purposefully exploitive disclaimer stating that the "payment *may* increase" a more forthright statement not intended to beguile could have been made. A statement as simple as; "***If you do not completely pay-off your loan immediately after making the first payment your payment will definitely increase.***" An assertion similar to this is much closer to the truth than anything lender or broker actually presented to Plaintiff regarding the true nature of the Refinance Loan. Plaintiff, without assistance from Preciado, and unable to comprehend documents contrary to

what was promised by broker, did not have a reasonable opportunity, or any assistance to understand the deceptive wording used by the lender.

65.  Plaintiff was never given a reasonable opportunity to understand various other exploitive terms regarding the Refinance Loan (e.g. the rebate paid to TRIMERICA for soliciting the Refinance Loan in addition to the fees TRIMERICA charged Plaintiff for arranging the Refinance Loan)  and further frustrated by the failure of the broker and the original funding lender—self identified as HOMECOMINGS FINANCIAL NETWORK, INC. ("HOMECOMINGS NETWORK")—to provide early and adequate disclosures about the Refinance Loan.

66.  Therefore Plaintiff has met the test and definitions of at least three different courts:  Courts who have faithfully endeavored to find a reasonable construct allowing a determination that a loan is predatory or unfair. While these definitions for predatory and unfair are not in unison they are without contradiction to each other. Plaintiff's Refinance Loan meets the various tests whether applied alone or applied in total. Therefore Plaintiff asserts that Refinance Loan is properly described as predatory and unfair for at least these reasons.

67.  The loan Plaintiff was induced to obtain instead of the loan requested by Preciado's false representations and the conditions Preciado promised to meet in undertaking to arrange the loan (one with a fixed interest rate, no negative amortization,  and a stable and unchanging payment)  has an adjustable rate, changing payments, and negative amortization (allowing up to 115% increase in the principal amount) all of which are contrary conditions which are not even close to the "best possible loan" Preciado promised.

## VI.

## AGENCY RELATIONSHIP

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

68. Because TRIMERICA acted as an agent for Homecomings Financial, LLC ("HOMECOMINGS LLC") or HOMECOMINGS NETWORK (when there is no need for distinction between the entities they shall henceforth be referred to collectively as "HOMECOMINGS LLC/NETWORK") all acts and omissions committed by TRIMERICA are properly imputed to HOMECOMINGS LLC/NETWORK.

69. Defendant TRIMERICA did not fund Plaintiff's Refinance Loan but acted instead as an agent for the entity to whom Plaintiff was ostensibly obligated to for repayment, in this instance HOMECOMINGS LLC/NETWORK.

70. HOMECOMINGS LLC/NETWORK had actual and/or constructive knowledge of the acts or omissions of  TRIMERICA, and financially induced, ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of TRIMERICA, and/or retained the benefits of said wrongful acts.

## VII.

## CLOSELY CONNECTED PARTIES

71. Plaintiff alleges that all acts and omissions committed by Mr. Preciado and the the individual identified only as supervisor were necessarily done within the normal course and scope of employment and under the supervision of TRIMERICA and that any such acts or omissions suffered or experienced by Plaintiff in interacting with Mr. Preciado or with the individual who self-identified as a supervisor for TRIMERICA are properly imputed as acts or omissions of defendant TRIMERICA.

72. Plaintiff alleges that TRIMERICA committed fraud in arranging Plaintiff's

Refinance Loan and that while previous allegations within this Complaint already support this assertion, facts supporting this claim will be stated with more particularity later within this Complaint.

73. Plaintiff is informed and believes and upon such information and belief alleges that there is a likelihood evidence will support TRIMERICA operated in concert with several of the other named defendants and that TRIMERICA served primarily in the capacity of a storefront purposefully engaged primarily to solicit loan origination(s) that were onerous in terms despite representations to the contrary and did in fact solicit the Refinance Loan without any attempt to secure more favorable terms that were available to Plaintiff. In short, Plaintiff alleges that TRIMERICA was financially incented to dupe Plaintiff into accepting a loan that was more costly and less beneficial to Plaintiff than what Plaintiff qualified to obtain at the time of the Refinance Loan solicitation and issuance, and that TRIMERICA was enabled to make such an undertaking by acting in concert with several of the other named defendants.

74. In "Borrower's Disclosure Statement (EXHIBITA) which was provided to Plaintiff at time of loan signing by TRIMERICA (via the mobile notary) the Refinance Loan was disclosed as brokered to "Homecomings Financial" at 4350 Von Karman Avenue in Newport Beach, California. No distinction is made in this disclosure between Homecomings Financial, LLC ("HOMECOMINGS LLC) or defendant HOMECOMINGS NETWORK, it is simply truncated to state Homecomings Financial without any corporate entity qualifier. Plaintiff is informed and believes and upon such information and belief alleges at the time of Refinance Loan issuance HOMECOMINGS LLC was registered with the California Department of Corporations ("DOC") as a California Finance Lender located at the Von Karman address and therefore was the entity to whom the Refinance Loan was meant to be disclosed as brokered.

Plaintiff is informed and believes and upon such information and belief alleges at the time of Refinance Loan issuance HOMECOMINGS LLC was a wholly owned subsidiary of ResCap, a division of GM.

75.  Plaintiff is informed and believes and upon such information and belief alleges that despite the above referenced "Borrower's Disclosure Statement" provided by TRIMERICA, that Plaintiff's Refinance Loan was in actuality brokered to HOMECOMINGS NETWORK. Plaintiff bases this belief on HOMECOMINGS NETWORK inclusion as the lender in (among other documents) the "Adjustable Rate Note" (EXHIBIT B). Plaintiff is informed and believes and upon such bases alleges that HOMECOMINGS NETWORK was also a wholly owned subsidiary of ResCap, a division of GM at the time of loan issuance[1].

76.  Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support HOMECOMINGS NETWORK sold Plaintiff's loan and servicing prior to the loan closing ("forward sale"). Plaintiff makes this allegation in part based on the statement made by HOMECOMINGS NETWORK in a document Plaintiff received at the time of signing the loan documents (before the loan closed). A true copy of this untitled document is attached and incorporated herein as EXHIBIT D. The purpose of this document seems to be twofold; (i) to notify Plaintiff the Refinance Loan had been sold along with its servicing rights and, (ii) to provide Plaintiff temporary payment coupons. In the second full paragraph of this document HOMECOMINGS NETWORK tells the Plaintiff  "…your loan has been sold…." This statement is made in no uncertain terms: HOMECOMINGS NETWORK does not resort to breezy usage of the word "may" as it did so easily when discussing the potential for the loan

---

[1]  Plaintiff pleads this as a truthful representation based on defendant's own statement within the document: However; defendant HOMECOMINGS LLC has contended that HOMECOMINGS NETWORK did not exist at the time of loan issuance which if true, raises a separate question of assignment, capacity, and contract enforceability.

payment amount to change but instead definitively states that the sale is complete. The loan has been sold.  However, the document does not state to whom the loan has been sold—therefore all that can be ascertained for certain from this statement is that prior to the Refinance Loan's closing, the loan had been sold.  Plaintiff is informed and believes and upon such basis alleges there is likelihood that evidence will support the loan had been sold either directly or indirectly into a securitized trust. The document also states that the loan's servicing has been sold. The entity identified as purchasing the servicing is "GMAC Mortgage Corporation." Plaintiff is informed and believes and upon such information and belief alleges at the time of Refinance Loan issuance GMAC Mortgage Corporation was a wholly owned subsidiary of ResCap, a division of General Motors Corporation ("GM").

77.  Attached as EXHIBIT E  and incorporated herein are true copies excerpts of various SEC filings ("SEC EXCERPTS") for the Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("The Trust"), which Plaintiff is informed and believes and upon such bases alleges there is a likelihood that evidence will support that this is the securitized trust to whom Plaintiff's loan had been sold.

78.  Paragraph #1 of EXHIBIT E ("The Trust Structure Paragraph") establishes Residential Accredit Loans, Inc. Loans, Inc. ("RALI") as The Trust depositor and states RALI is an affiliate of Residential Funding Corporation ("RFC").  Plaintiff is informed and believes and upon such information and belief alleges that RFC at the time of Plaintiff's Refinance Loan issuance was a wholly owned subsidiary of ResCap, a division of GM which therefore also links RALI to ResCap and thus to GM at the time of Refinance Loan issuance.

79.  The Trust Structure Paragraph lists RFC as the "Master Servicer" for The Trust. Plaintiff is informed and believes and upon such information and belief alleges that RFC at the

time of Plaintiff's Refinance Loan issuance, was a wholly owned subsidiary of ResCap, a division of GM.

80.  Paragraph #2 of EXHIBIT E establishes that the Master Servicer has complete authority on its own or through others to service and administer loans within The Trust.

81.  Paragraph #3 of  EXHIBIT E allows the Master Servicer to enter or honor subservicing agreements (assumedly these agreements entitle Master Servicer to some form of compensation) and, if a nonsubservicing agreement is utilized, to otherwise be compensated.

82.  Paragraph #4 of  EXHIBIT E establishes that despite any agreement with any other servicer, the Master Servicer (RFC) remains liable to the Trustee.

83.  Paragraph #5 of  EXHIBIT E establishes that defendant Mortgage Electronic Registration Systems, Inc ("MERS") is a party to the structure of The Trust.

84.  The Trust Structure Paragraph of  EXHIBIT E establishes that defendant Deutsche Bank Trust Company Americas, In Trust For, Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("DEUTSCHE BANK") is the Trustee for The Trust.

85.  Attached as EXHIBIT F is and incorporated herein is a true copy of the relevant portion of response to Plaintiff's Qualified Written Request ("QWR") issued by defendant Aurora Loan Services LLC dated May 2, 2009. Page 2 of 12 of EXHIBIT F states the current owner of the debt for Refinance Loan is defendant DEUTSCHE BANK.

86.  Based upon the facts and allegations and or information and belief contained within paragraphs 68 through 85 inclusive of this Complaint, Plaintiff alleges that the parties involved in the arranging, selling, servicing of the Refinance Loan shared or share a primary and common unity by virtue of; (A) an affiliation with ResCap and GM as the companies and/or defendants

HOMECOMINGS NETWORK, HOMECOMINGS LLC, RFC, RALI, GMAC MORTGAGE, all have a common ResCap/GM pedigree or (B) an initial tie to ResCap/GM or (C) an agency relationship with a GM company.

87.   DEUTSCHE BANK sits as the guest of honor at the head of the ResCap/GM table in The Trust and has done so before the Refinance Loan was solicited to Plaintiff in contemplation of sale into The Trust and is therefore connected to the GM/ResCap companies.

88.   AURORA,  as a hired servicer,  stands in the shoes of GMAC Mortgage corporation via an arrangement with GM company RFC with a mind for profit and although may possibly safely assert it is somehow remote by its late arrival, is still connected by its agency relationship with RFC. However; AURORA in attempting to improperly foreclose (as alleged later with this Complaint)  has actual or constructive knowledge of  the infirmities alleged in the foreclosure attempt and Plaintiff is informed and believes and upon such bases alleges that evidence will likely support AURORA is a sophisticated party and well aware of defendant MERS tenuous beneficiary claim. (AURORA as an entity owned by Lehman Brothers—a company actively involved in the formation of mortgage backed securitized trusts),

89.  Based upon the facts and allegations contained with paragraphs 68 through 88 inclusive of this Complaint, Plaintiff alleges that the parties involved in the arranging, selling, servicing, incenting, and profit derived or intended to be derived from Refinance Loan either lent aid or encouragement to each other or ratified and adopted the acts of each other for their own benefit by express agreement or by a tacit understanding, and did so in furtherance of a desire to obtain profit while knowing such profit was in many instances, like that of Plaintiff's Refinance Loan, the fruit of fraudulent or unfair practice.

90.  Based upon the facts and allegations contained within paragraphs, 68 through 88

inclusive of this Complaint, Plaintiff alleges that any claim Plaintiff may bring against TRIMERICA is also properly imputed to HOMECOMINGS NETWORK, HOMECOMINGS LLC, DEUTSCHE BANK.

91.  Based upon the facts and allegations contained with paragraphs 68 through 88 inclusive of this Complaint, Plaintiff alleges that any claim Plaintiff may bring against MERS is also properly imputed against AURORA.

## VIII.

## NO HOLDER IN DUE COURSE

92.  Preciado intentionally represented to Plaintiff that Refinance Loan was the best possible and was at a fixed rate with a payment of less than $1000 per month.

93.  Preciado accepted and promised to meet Plaintiff's condition that any new loan be one with a fixed rate only. Preciado understood this condition to be a primary factor and necessary for Plaintiff to consider any new loan or refinance.

94.  In truth the loan arranged by Preciado was an adjustable rate loan with fluctuating payment. The only payment amount that satisfied Preciado's representation about the loan terms was the very first payment, or the teaser rate.

95.  Plaintiff, although becoming wary at the time of loan document signing when no assistance or explanation was provided to help Plaintiff correlate the contents of the Refinance Loan documents with Preciado's promises, relied on Preciado's earlier representation that the documents matched the fixed rate and lower payment promise—that this was the best possible loan—and based on those promises Plaintiff signed the loan documents.

96.  Preciado made false promises regarding the terms of the Refinance Loan and made

them recklessly and without regard for their truthfulness in order to sell Plaintiff a loan that Plaintiff did not otherwise endeavor to obtain.

97.  Preciado spoke to Plaintiff in a reassuring manner and in Spanish—Plaintiff's native language. Preciado represented himself to plaintiff as a "broker."

98.  Plaintiff has little years of formal education and relied on Preciado's proclaimed ability, expertise, and promises.

99.  Plaintiff has been harmed by Preciado's false representations, obtaining a loan with an adjustable rate and fluctuating payment higher than what Plaintiff required to have an assurance of well being and financial stability. The Refinance Loan that Preciado actually arranged for Plaintiff overcommitted Plaintiff and during the time Plaintiff was able to make the unexpectedly higher than promised payments, Plaintiff lost the ability to utilize the extra money needed for these higher payments as a medium for investment or lifestyle, and Plaintiff was denied or dissuaded from seeking a real opportunity to find a loan that was a fixed rate without fluctuating payments and negative amortization.

100.  Plaintiff's reasonable reliance on Preciado was the cause of this harm.

101.  California Commercial Code §3305 (a) (1) (C) limits the rights of a party to enforce the obligation to pay on a negotiable instrument (the Note) where there is fraud that induced the obligor to sign the instrument (the Note) with neither the knowledge nor reasonable opportunity to learn of its character or its essential terms.

102.  The test for whether this section of the code applies is excusable ignorance of the contents of the writing signed (the Note) : factors to be considered include the education and the ability to read English of the signer. Also relevant are the reasonable reliance on representations

made prior to signing, the presence or absence of any third person who might read or explain the document to the signer, and the necessity of acting without delay.

103.     Preciado instructed Plaintiff to sign the Refinance Loan documents (including the Note) when delivered and that their signing at that time was necessary to obtain a loan containing the favorable terms Plaintiff had made a pre-condition of loan acceptance (fixed rate at low payment). Preciado misrepresented the contents of the documents (actually containing an adjustable rate, negative amortization, and higher payments) and made no arrangement to have anybody available to explain the documents at the time of signing. Plaintiff's spouse, as the only present third party other than the mobile notary, was no better equipped to adequately interpret the documents than Plaintiff—both lacked any higher level education and were unable to read and comprehend the most basic of words written in English. When the mobile notary was asked for assistance by Plaintiff to explain the documents, the request was denied. Moreover, the day following Plaintiff's signing of the loan documents when Plaintiff's unease and suspicion continued to mount due to the lack of any support and Plaintiff's limited ability to understand the documents so Plaintiff called both Preciado and a TRIMERICA supervisor, yet no further opportunity or explanation was offered—Plaintiff and spouse were simply told it was too late— they had signed the documents.

104.     Because Plaintiff had an excusable ignorance of the documents signed and was fraudulently induced to sign them, claims against TRIMERICA and/or HOMECOMINGS LLC/NTWORK are properly imputed against the current owner of the debt (DEUTSCHE BANK) without any Holder In Due Course immunity.

**FIRST CAUSE OF ACTION: VIOLATION OF CALIFORNIA CIVIL CODE § 1632**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

105.    Plaintiff incorporates by reference and re-alleges each and every allegation Contained in this Complaint as though fully set forth herein.

106.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support Plaintiff was solicited by Preciado based partly if not completely on Plaintiff's Hispanic ethnicity.

107.    Preciado represented himself to Plaintiff as a "loan broker" working with TRIMERICA, who Plaintiff is informed and believes and upon such bases alleges, was an entity at the time of Refinance Loan issuance licensed to broker loans under both California Department of Real Estate and California Department of Corporations regulation.

108.    Plaintiff is informed and believes and upon such bases alleges, that defendant HOMECOMINGS NETWORK, the entity in who's name the Refinance Loan was issued, was at the time of loan issuance, registered with the California Department of Real Estate (DRE) and able to broker loans under that license but not registered with the California Department of Corporations as a California Finance Lender.

109.    Cal. Civ. Code 1632  was enacted in 1976 to increase consumer information and protections for the state's sizeable and growing Spanish-speaking population.

110.    Cal. Civ. Code 1632 (b) (4) applies when a loan or extension of credit is for use primarily for personal, family or household purposes where the loan or extension of credit is subject to the provisions of  section 10240 of the California Business and Professions code, which includes loans secured by real property that are negotiated by real estate broker.

111.    Cal. Civ. Code Section 1632(b) (2) requires "[a]ny person engaged in a trade or business who negotiates primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean" to deliver a translation of certain contracts in the language in which that contract was negotiated. The section  applies to anyone "who negotiates primarily in Spanish ... in the course of entering into any" of a number of specified types of contract. It applies to any broker who negotiates a

112.    Plaintiff has a very limited ability to read the English language and little formal

Education.   TRIMERICA negotiated the terms of the loan entirely in Spanish (although the results of this negotiation were not accurately depicted or explained to Plaintiff prior to Plaintiff's signing the documents).

113.   Plaintiff received no assistance in interpreting the Refinance Loan documents when they were delivered by a mobile notary and had been previously assured that these documents contained terms which were not actually present. None of the documents provided were in Spanish.

114.   Plaintiff's nearly immediate later attempts to obtain a loan cancellation or seek explanation were rebuffed when Plaintiff was told the documents Plaintiff had signed without comprehending (relying on previous representations and written only in English) that  "it was too late." No later effort was made to provide any documentation explaining the loan in Spanish.

115.   Defendant TRIMERICA solicited Plaintiff and arranged for Plaintiff the Refinance Loan as either a broker licensed by the DRE or the DOC and held itself out to Plaintiff to be a mortgage loan broker, a representation upon which Plaintiff relied.

116.   In "Borrower's Initial Disclosure Statement (Division 9, Chapter 2, Article 3, Section 22338 (e) )" a true copy of which is attached and incorporated herein as EXHIBIT G, which was provided to Plaintiff at time of  loan signing by TRIMERICA (via the mobile notary) Defendant TRIMERICA states at the bottom of the page *" I/We certify that no one has acted as broker on this transaction (with the exception of Trimerica Mortgage Corporation, acting as broker to HOMECOMINGS FINANCIAL)"*  a statement admitting that (i) TRIMERICA acted as a broker and (ii) that TRIMERICA acted as an agent for defendant HOMECOMINGS LLC/NETWORK. The agency intended to be declared by TRIMERICA as to which HOMECOMINGS entity it actually brokered the loan is uncertain because "Homecomings Financial" is without a corporate identifier (i.e. INC. or LLC) and the lender referred to within the Refinance Loan documents is defendant HOMECOMINGS NETWORK while the license number for HOMECOMINGS provided within TRIMERICA disclosures infer its relationship is with   HOMECOMINGS   LLC.   While   the   actual   Note   is   executed   in   the   name   of

HOMECOMINGS NETWORK the address provided by NETWORK in fact belonged to the LLC. Therefore it is not clear which HOMECOMINGS entity TRIMERICA intended to disclose or assert. Plaintiff avers that while a determination is uncertain on the face of this document that the totality of circumstance and the shortened language with a "HOMECOMINGS" root as stated within EXHIBIT G is sufficient to establish that TRIMERICA wished to assert an agency relationship existed with either or both entities in whatever disclosed or undisclosed capacity these entities operated and that an agency existed between TRIMERICA and either or both HOMECOMINGS entities within the context of the Refinance Loan.

117.   Because Refinance Loan was negotiated with Plaintiff by a mortgage broker completely in Spanish and because Plaintiff received documents obligating Plaintiff to the loan written only in English, the defendants violated the statute.

118.   HOMECOMINGS LLC/NETWORK had actual or constructive knowledge for the potential that Plaintiff's native language may not be English and therefore reading the language difficult or impossible. In the URLA (EXHIBIT C) on page 3 of 4 in section X. "Information For Government Monitoring Purposes" Plaintiff's ethnicity is stated as "Hispanic or Latino."

119.   HOMECOMINGS LLC/NETWORK, enlisting TRIMERICA as its agent and as the true issuer of the loan and the loan documentation, had a separate and independent duty to ensure §1632 compliance.   HOMECOMINGS LLC/NETWORK is also properly liable to Plaintiff by virtue of its close connection to TRIMERICA as alleged above and incorporated herein.

120.   DEUTSCHE BANK is properly held liable by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to enforce otherwise by its lack of Holder In Due Course status as alleged above and incorporated herein.

121.   Because Plaintiff had no reasonable opportunity to learn of the violation of Cal.

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

Civ. Code 1632 requirements and protection, and in fact was likely to have been purposefully preyed upon solely because of Plaintiff's relative lack of education and unfamiliarity with the English language, any potential bar to a claim of the statute that may be asserted by a running of a statute of limitations, may nonetheless properly be deemed timely by an extension for claim under the doctrine of equitable tolling and may also be proper for purposes of recoupment when a foreclosure is threatened.

122.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### SECOND CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY
### (Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)

123.    Plaintiff incorporates by reference and re-alleges each and every allegation Contained in this Complaint as though fully set forth herein.

124.    Preciado and TRIMERICA held themselves out to Plaintiff as a mortgage loan broker and Plaintiff is informed and believes and upon such bases alleges that there is a likelihood evidence will support that at the time of the Refinance Loan solicitation, arrangement of the loan, and at loan issuance, TRIMERICA was licensed to conduct business within the State of California as both a broker for loans regulated by the California Department of Real Estate, and as a broker for loans regulated by the California Department of Corporations.

125.    A mortgage loan broker owes the borrower fiduciary duties of highest good faith and fullest disclosure of all material facts concerning the transaction that might affect the borrower's decision.

126.    When the essential terms of an agreement are materially different from those represented to the signer, and the signer neither knows nor has a reasonable opportunity to know those essential terms, the agreement is a legal nullity and void ab initio.

127.    TRIMERICA breached their duty to Plaintiff by:

    a.   Failing to offer Plaintiff a choice of loans.

b.  Failing to discuss rates with Plaintiff and instead "locking the loan" at a rate unilaterally selected by the loan broker without any discussion.

c.  Recommending and arranging loan that was less advantageous than other loans for which Plaintiff qualified.

d.  Subordinating Plaintiff's interests to their own by recommending a loan that primarily benefitted them rather than Plaintiff.

e.  Failing to explain the essential terms of the loan to Plaintiff.

f.  Failing to disclose that the loan they arranged was not a fixed-rate loan, as Plaintiff had conditioned a necessary term, but instead a variable rate loan.

g.  Falsifying Plaintiff's income and expenses on the loan application.

h.  Failing to provide early disclosures about the Refinance Loan.

i.  Failing to disclose that the loan's cited 1.375% interest rate was not the actual interest rate; the actual rate was much higher.  Thus, Plaintiff's payment did not cover all of the interest.  The additional, unpaid, interest was added to the principal, creating a negative amortization.

j.  Failing to disclose that the loan's cited 1.375% interest rate was only a "teaser" and that Plaintiff's payments would increase dramatically after the teaser period ended.

k.  Failing to advise that the language within the note stating the initial payment amount and interest rate "may change" would instead "certainly change."

l.  Failing to inform Plaintiff that he could not afford the loan payments that would be required after the teaser period ended.

m.  Failing to inform Plaintiff that his debt-to-income ratio alone was insufficient to justify the loan.

n.  Failing to inform Plaintiff that he would be sole obligor of the debt.

o.  Failing to disclose that when the principal balance of the loan exceeded 115% of the loan amount, the loan would automatically "reset" to a fully-amortized

–30–

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

loan requiring payments of over $2323. 77 per month, more than double the amount represented to Plaintiff as the amount he would have to pay.

p.   Failing to disclose that the loan included a prepayment penalty and that the amount of that penalty was so exorbitant that it made it economically impracticable for Plaintiff to refinance the Property out of the loan.

q.   Failing to timely disclose the existence, type, and amount of points and other brokerage fees paid to TRIMERICA.

r.   Failing to disclose that the points and other brokerage fees paid to TRIMERICA were unreasonably high and not reasonably related to the services rendered or the facilities provided, and therefore violated RESPA.

s.   Failing to attend the final settlement as Plaintiff's agent or representative when the settlement agent selected by broker and not by Plaintiff was geographically distant from Plaintiff (Southern California) thereby denying Plaintiff the opportunity to receive a final settlement statement before the loan closed.

t.   Failed to arrange an accommodation signing with an office of the settlement agent located more geographically near to Plaintiff thus depriving Plaintiff of the opportunity to receive and review a final settlement statement at or before the time of settlement.

u.   Failing to inform Plaintiff of the right to review the final settlement statement the day before settlement or to arrange the opportunity for this review.

v.   Failing to advise Plaintiff to seek legal advice when Plaintiff wished to cancel the loan.

w.   Failing to advise Plaintiff of the possibility of issuing instructions to escrow not to close the Refinance Loan while time remained to do so by instead falsely stating to Plaintiff that it was too late to cancel any commitment.

100.   When the essential terms of an agreement are materially different from those

represented to the signer, and the signer neither knows nor has a reasonable opportunity to know those essential terms, the agreement is a legal nullity and void ab initio.

128.    Preciado breached his fiduciary duty to Plaintiff by failing to appear or to be available by phone at the document signing and by falsely representing that the Refinance Loan documents contained the essential loan terms required by Plaintiff.

129.    At the time of the loan transaction, Plaintiff lacked knowledge or experience with loan practices, procedures, and terms beyond that of a typical homeowner and was further burdened by his inability to comprehend the written English language.

130.    Plaintiff reasonably relied upon TRIMERICA as a licensed loan broker, to to apprise him of all of the essential terms, conditions, advantages, and disadvantages of the Refinance Loan and TRIMERICA was aware or should have been aware of Plaintiff's reasonable reliance on TRIMERICA to comport itself in a manner that fulfilled all of its fiduciary duties to Plaintiff.

131.    As a result of TRIMERICA's breach of its fiduciary duties to disclose and explain the essential terms of the predatory Refinance Loan agreement, and TRIMERICA's conduct depriving Plaintiff of a reasonable opportunity to learn those essential terms, the loan agreement is a legal nullity and void ab initio or in the alternative voidable.

132.    Both TRIMERICA's conduct, as alleged herein, and HOMECOMINGS LLC/NETWORK ratification and failure to correct such acts, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

133.    TRIMERICA acted as an agent for HOMECOMINGS LLC/NETWORK. HOMECOMINGSLLC/NETWORK is properly liable by virtue of its close connection to TRIMERICA as alleged above and incorporated herein.

134.    DEUTSCHE BANK is properly held liable by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to enforce otherwise by its lack of Holder In Due Course status as alleged above and incorporated herein

135.   Because Plaintiff had no reasonable opportunity to learn of the this breach of duty, and in fact was likely to have been purposefully preyed upon solely because of Plaintiff's relative lack of education and unfamiliarity with the English language, any potential bar to a claim of the statute that may be asserted by a running of a statute of limitations, may nonetheless properly be deemed timely by an extension for claim under the doctrine of equitable tolling and may also be proper for purposes of recoupment when a foreclosure is threatened.

136.   WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### THIRD CAUSE OF ACTION: FRAUD
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

137.   Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

138.   When the essential terms of an agreement are materially different from those represented to the signer, and the signer neither knows nor has a reasonable opportunity to know those essential terms, the agreement is a legal nullity and void ab initio.

139.   TRIMERICA intentionally misrepresented, either affirmatively or by failing to correct a reasonable assumption by Plaintiff, the material terms and conditions of the Refinance Loan, including but not limited to:

a.   It was the most advantageous loan for which Plaintiff qualified.

b.   It was a fixed-rate loan, as Plaintiff had made a condition.

c.   The cited 1.375% interest rate was the actual interest rate.

d.   Plaintiff's payments would cover all of the interest.

e.   Making the stated payments would not result in negative amortization.

f.   The cited 1.375% interest rate was the regular rate, not merely a "teaser."

g.   Plaintiff could afford to make the required payments.

h.   Plaintiff would be sole obligor of the debt.

i.   That Plaintiff's debt-to-income ratio was sufficient to justify the loan.

–33–
COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

j.   The loan would not automatically "reset" when the principal balance of the loan exceeded 115% of the loan amount, triggering payments of more than double the amount Plaintiff expected to pay per month.

k.   The amount of the prepayment penalty was not so exorbitant that it made it economically impracticable for Plaintiff to refinance the Property.

l.   The existence, type, and amount of points and other brokerage fees paid to TRIMERICA and that the points and other brokerage fees paid to TRIMERICA were lawful and reasonable.

m.   The loan satisfied generally accepted underwriting standards.

n.   Falsifying or improperly combining income on the loan application.

140.   TRIMERICA knew that these representations were false or made the representations recklessly and without regard for their truth.

141.   TRIMERICA intended that Plaintiff to rely on the representations.

142.   Plaintiff, lacking any real formal education and unable to competently read the English language, and with little knowledge or experience with loan practices, procedures, and terms beyond that of a typical homeowner outside the home loan business, reasonably relied upon defendants' representations.

143.   Plaintiff was harmed and his reliance upon defendants' representations was a substantial factor in causing this harm.

144.   Plaintiff would not have accepted the Refinance Loan had its essential terms and conditions been disclosed and explained to him.

145.   As a result of defendants' fraudulent misrepresentation of the essential terms of the loan agreement, and Defendants' conduct depriving Plaintiff of a reasonable opportunity to learn those essential terms, the loan agreement is a legal nullity and void ab initio.

146.   Defendants' misrepresentation of the essential terms of the predatory Refinance Loan caused Plaintiff to execute an agreement which she would not have otherwise executed. Since Plaintiff neither knew nor had a reasonable opportunity to know of those essential terms,

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

and in fact was actively denied and discouraged any opportunity to understand the Refinance Loan essential terms, the fraud goes to the "factum" or "execution" rather than merely the "inducement" and renders the loan agreement "void" rather than merely "voidable." In the alternative the fraud is one of calculated inducement and renders the loan agreement voidable.

147.    Preciado's unlawful conduct, as set forth in this Complaint, occurred within the scope of his employment by TRIMERICA and thus properly imputed to TRIMERICA as alleged above and incorporated herein.

148.    HOMECOMINGS LLC/NETWORK solicited the Plaintiff's Refinance Loan through its agent TRIMERICA and had a separate and independent duty to issue early disclosures regarding the Refinance Loan and is therefore liable to Plaintiff.  HOMECOMINGS LLC/NETWORK is also properly liable to Plaintiff by virtue of its close connection to TRIMERICA as alleged above and incorporated herein.

149.    TRIMERICA acted as an agent for HOMECOMINGS LLC/NETWORK who had a separate and independent duty to issue early disclosures regarding the Refinance Loan and HOMECOMINGSLLC/NETWORK is properly liable by virtue of its close connection to TRIMERICA as alleged above and incorporated herein.

150.    DEUTSCHE BANK is properly held liable by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to enforce otherwise by its lack of Holder In Due Course status as alleged above and incorporated herein.

151.    Both TRIMERICA's conduct, as alleged herein, and HOMECOMINGS LLC/NETWORK ratification and failure to correct such acts, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

152.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### FOURTH CAUSE OF ACTION: CONCEALMENT
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

153.   Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

154.   When the essential terms of an agreement are materially different from those represented to the signer, and the signer neither knows nor has a reasonable opportunity to know those essential terms, the agreement is a legal nullity and void ab initio or in the alternative voidable.

155.   TRIMERICA owed Plaintiff a fiduciary duty of the highest good faith and were charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect Plaintiff's decision to obtain the Refinance Loan.

156.   TRIMERICA failed to completely disclose to Plaintiff that:

    a.   The loan they recommended was not the best loan for which Plaintiff qualified.

    b.   They recommended and arranged the Refinance Loan, and only that loan, because it was more lucrative for them.

    c.   The loan was not a fixed-rate loan, as Plaintiff had conditioned, but a variable rate loan.

    d.   The cited 1.375% interest rate was not the actual interest rate.

    e.   Plaintiff's payments would not cover all of the interest.

    f.   Paying only the stated amounts would cause negative amortization.

    g.   The cited 1.375% interest rate was merely a "teaser."

    h.   Plaintiff could not afford or would have voluntarily elected to obligate payments at the amounts expected after the teaser period ended.

    i.   Plaintiff's debt-to-income ratio was insufficient to justify the loan amount.

    j.   The loan would automatically "reset" when the principal balance of the loan exceeded 115% of the loan amount, requiring Plaintiff to pay more than double the amount Plaintiff had been mislead to expect.

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

k.  The loan included a prepayment with a penalty so exorbitant that it made it economically impracticable for Plaintiff to refinance the Property.

l.  That Defendants combined Plaintiff's income with Plaintiff's spouse on the loan application yet never told Plaintiff he would be the sole obligor of the debt.

m.  The existence, type, and amount of points and other brokerage fees paid to TRIMERICAS were unreasonable and unlawful.

n.  The loan failed to satisfy generally accepted underwriting standards.

157.  TRIMERICA intentionally failed to disclose the above important facts to Plaintiff.

158.  TRIMERICA intentionally failed to faithfully and honestly disclose these Important terms and facts, thereby making any related disclosure ineffective deceptive and misleading.

159.  TRIMERICA intentionally failed to disclose one or more of the above important facts that were known only to defendants and could not have been discovered by Plaintiff.

160.  TRIMERICA actively concealed one or more of the above important facts from Plaintiff and /or prevented Plaintiff from discovering said fact.

161.  Plaintiff did not know of the above concealed facts and had no reasonable opportunity to discover the truth about the above concealed facts.

162.  TRIMERICA intended to deceive Plaintiff by concealing the above facts.

163.  Plaintiff reasonably relied on TRIMERICA deception.

164.  Plaintiff was harmed and TRIMERICA's concealment was a substantial factor in causing that harm.

165.  Plaintiff would not have entered into the Refinance Loan agreement had he known its essential terms and these concealed facts.

166.  As a result of TRIMERICA's concealment of the essential terms of the loan

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

agreement, and defendants' conduct depriving Plaintiff of a reasonable opportunity to learn those essential terms, the loan agreement is a legal nullity and void ab initio, or in the alternative voidable.

167.    HOMECOMINGS LLC/NETWORK solicited the Plaintiff's Refinance Loan through its agent TRIMERICA and had a separate and independent duty to issue early disclosures regarding the Refinance Loan and is therefore liable to Plaintiff.  HOMECOMINGS LLC/NETWORK is also properly liable to Plaintiff by virtue of its close connection to TRIMERICA as alleged above and incorporated herein.

168.    TRIMERICA was closely connected and acted as an agent for HOMECOMINGS LLC/NETWORK who have an imputed duty as is alleged above and incorporated herein.

169.    DEUTSCHE BANK is properly held liable by virtue of the imputed liability alleged above by its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to enforce otherwise by its lack of Holder In Due Course status as alleged above and incorporated herein

170.    Defendants' conduct, as alleged herein, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

171.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**FIFTH CAUSE OF ACTION: VIOLATION OF RESPA**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS**
**FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

173.    RESPA is the Real Estate Settlement Practices Act under 12 U.S.C. § 2601, et seq. as implemented by Regulation X, 24 C.F.R. § 3500 et seq. ("Reg. X").

174.    RESPA regulations apply to any "federally related mortgage loan" secured by a

residential property of one to four units on less than 25 acres and is either: 1) made by a federally insured lender; 2) made by any lender that is regulated in any manner by any agency of the federal government; 3) made by the Secretary of Treasury or assisted in any way by any agency of the federal government ; 4) Eligible for purchase by Fannie Mae, Ginnie Mae or Freddie Mac; or 5) made by any creditor as defined in section 103 (f) of the Consumer Protection Act who makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

175.    Plaintiff alleges that the Refinance Loan is a qualifying property that meets one or more of the criteria above and is therefore subject to RESPA regulation.

176.    RESPA requires that the lender and mortgage broker provide to the borrower an early disclosure called a good faith estimate ("GFE") with the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement.'' 12 U.S.C. § 2604(c); 24 C.F.R. § 3500.7.  This statement must contain a dollar amount or a good faith range of costs based on experience for the items that will ultimately be entered in section "L" of the settlement statement ("HUD-1"). Section L of the HUD-1 contains line entries broken into categories that are labeled and numbered 700 through 1400.

177.    On the GFE and the settlement statement, lender payments to mortgage brokers must be shown as "Paid Outside of Closing" (P.O.C.), and are not computed in arriving at totals. (See 24 CFR 3500.7(a) (2).)

178.    The GFE must disclose estimated direct and indirect fees no later than 3 days after loan application. (See 24 CFR 3500.7(a) and (b).)

179.    In EXHIBIT A (Borrowers Disclosure Statement) TRIMERICA admits the "Date of Agreement" as 09/01/2005" meaning the GFE must have issued on or before 09/04/2005 to comply with RESPA.

180.    Fees were paid to the mortgage broker by lender in the Refinance Loan that were never properly disclosed.

181.    The first failure regarding the existence of these fees paid to the mortgage broker occurred when Plaintiff received no GFE as required from the mortgage broker (TRIMERICA) on or before 09/04/2005 which disclosed a lender-paid rebate to the broker for selling Plaintiff the predatory Refinance Loan.

182.    If the mortgage broker fails to provide the GFE it is the lender's separate and independent responsibility to ensure that the GFE is timely provided, thus the second failure regarding the disclosure of these paid fees occurred when Plaintiff received no GFE as also required from the lender (either HOMECOMINGS NETWORK or HOMECOMINGS LLC) disclosing the rebate the lender planned to pay to the broker for selling Plaintiff the predatory Refinance Loan.

183.    The requirement that Plaintiff receive a timely GFE and that all fees be disclosed is intended to assure that consumers are shown the full amount of compensation to brokers and others early in the transaction.

184.    TRIMERICA and HOMECOMINGS LLC/NETWORK failure to provide the GFE violated RESPA and deprived Plaintiff an early look at a vital document which if supplied when required, while not enough to otherwise cure the misrepresentations made by defendants and relied upon by Plaintiff, may have assisted in providing an indication of the predatory nature of the Refinance Loan.

185.    In addition to the GFE another disclosure must also be provided to consumers with a final exact figure for specific settlement service charges at or before loan closing and called a settlement statement. (24 CFR 3500.8; 24 CFR part 3500, Appendix A.) It is the

settlement agent's duty to provide this document but the settlement agent as a neutral party takes instruction from the principals. Therefore any costs attributed with the loan would necessarily have been communicated to the settlement agent by the lender and/or mortgage broker.

186.    RESPA as set forth under 12 U.S.C. § 2601, et seq. and as implemented by Reg. X states that unless there is an exemption, the borrower must receive a copy of this settlement statement (/a/k/a/ "HUD-1") at or before the date of settlement. Some exemptions that apply if: (a) the borrower or their agent did not attend the settlement; or (b) the borrower executed a written waiver for HUD-1 delivery at or before settlement; or (c) the Secretary of HUD grants an exemption to an area where such settlement documents are not customary. Plaintiff did not attend the settlement and therefore an exception applied.

187.    Plaintiff did not have any practical opportunity to attend the settlement as the agent unilaterally selected by TRIMERICA to provide settlement services was located at a TRIMERICA's convenience (both located in Orange County, CA) and not conveniently located to Plaintiff (some 400 miles north in Sonoma County, CA).

188.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support no member of TRIMERICA attended the settlement on Plaintiff's behalf.

189.    When neither the borrower (Plaintiff) or their agent (TRIMERICA) attends the settlement, RESPA requires that the HUD-1 be mailed or delivered to the borrower as soon as practicable. Although the settlement agent (Investors Title Company) may have mailed the settlement statement on the date of the loan's close, the document mailed contained errors and incorrectly reflects the fees paid to TRIMERICA by a third party  (discussed below) and these errors were known both to TRIMERICA and HOMECOMINGS LLC/NETWORK who as the parties responsible for issuing instructions regarding loan costs, tacitly approved the errors and

made no effort to correct the settlement agent's inevitable continued erroneous reporting on the final HUD-1.

190.    On a date between October 15 and October 20, 2005, a mobile notary came to Plaintiff's home with a stack of documents to effect Plaintiff's settlement of the Refinance Loan. Plaintiff did not execute a written waiver for HUD-1 delivery; Plaintiff is unaware of any exemption granted by the Secretary of HUD for the area in which Plaintiff lives: Therefore Plaintiff argues in the alternative that this mobile notary signing served as the actual settlement and therefore Plaintiff should have been provided a HUD-1 at or before October 20, 2005. Plaintiff was not provided a HUD-1 at or before October 20, 2005, but was instead provided a document titled "Buyers/Borrowers Closing Statement—Estimated" A later mailed copy of the HUD-1shows an original print date of October 25, 2005 by Steven R. Waters (see "Settlement Statement" a true copy of which is attached as EXHIBIT H and incorporated herein and is alternatively referred to as "HUD-1") which was the date the loan actually closed.

191.    TRIMERICA and HOMECOMINGS LLC/NETWORK were aware of  the incorrect and ambiguous entry regarding a rebate fee paid to TRIMERICA that was contained in the only document Plaintiff reflecting loan costs supplied to Plaintiff prior to the loan closing and failed to undertake any effort to correct.

192.    On both the GFE and the HUD-1, lender payments to mortgage brokers must be shown as "Paid Outside of Closing" (P.O.C.), and are not computed in arriving at totals. [24CFR 3500.7(a) (2).] The requirement that all fees be disclosed on the GFE and HUD-1 is intended to assure that consumers are shown the full amount of compensation to brokers.

193.    In paragraph "C. NOTE" at the top of page one of HUD-1(EXHIBIT H)  it states "This form is furnished to give you a statement of actual settlement costs. Amounts paid to

and by the settlement agent are shown. Items marked "(P.O.C.)" were paid outside the closing: *they are shown here for informational purposes and are not included in the totals.*"

194.    On Page two of HUD-1 on line 857 there is an entry that reads "Loan Origination Fee % to Trimerica Mortgage Corporation 5,083.75."  Plaintiff alleges that this fee, although not reflected as a "%" –an error in its own right—was among the costs for the Refinance Loan that TRIMERICA charged directly to Plaintiff for arranging the extension credit. On line 859 of HUD-1 there is an entry that reads "(Buyer $400.00 POC)".  This entry tracks with the meaning of the language in paragraph C of the HUD-1and  meant to denote a payment made outside of closing, i.e.  a payment for an appraisal paid by Plaintiff to a third-party.  On an unnumbered line of the HUD-1 (directly below line 865) there is an entry that reads: "Broker Fee From HF to Trimerica Mortgage Corporation ($8,715)." Plaintiff alleges that this entry reflects a payment made by defendant HOMECOMINGS LLC or in the alternative defendant HOMECOMINGS NETWORK to defendant TRIMERICA for selling Plaintiff the predatory Refinance Loan and was made as a "payment outside the closing" to a third-party although the entry does not carry the notation "POC" required for "informational purposes" as stated in paragraph C of the HUD-1and as required by RESPA.

195.    Because Plaintiff did not receive the HUD-1 at or before the time of settlement as required by RESPA, and because Plaintiff even upon receiving the HUD-1 after the loan closed was never provided a meaningful opportunity to discover the rebate payment made to TRIMERICA by virtue of its incorrect and ambiguous inclusion without any POC reference, Plaintiff was denied a lawful chance to determine TRIMERICA was incented by HOMECOMINGS LLC/NETWORK. This failure combined with the lack of a timely supplied GFE is the second failure to disclose this rebate payment, a payment, when combined with the

charges by TRIMERICA directly to Plaintiff, yielded to TRIMERICA fees of approximately $14,943.75— an amount equal to 5.14% of the total amount of the predatory Refinance Loan.

196.    The $8,715 in fees paid by HOMECOMINGS LLC or in the alternative HOMECOMINGS NETWORK to TRIMERICA served as an illegal kickback to incent the brokering of the predatory Refinance Loan and therefore violated RESPA.

197.    RESPA is a remedial statute that was designed to eliminate such kickback fees.

198.    Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support that HOMECOMINGS LLC/NETWORK circulated rate sheets that increased the amount paid to brokers as a rebate or kickback for placing borrowers into certain type of loans and that this financial incentive was a key factor in TRIMERICA's arranging the predatory Refinance Loan. These payments were commonly referred to in the industry as a "Yield Spread Premium" or "YSP".

199.    Although the YSP or kickback fee was not a per se violation of RESPA it created a perverse system of reverse competition where unscrupulous brokers shopped  for the best YSP rather than the best loan for borrowers.

200.    Unscrupulous brokering may be partly inferred by a failure to provide adequate disclosures regarding the payment of an excessive YSP: Disclosures that might have operated to provide a warning to an unaware borrower which defendants did not provide.

201.    Even when adequately disclosed the YSP must have a reasonable basis for such payment in order not to be considered a kickback in violation of  RESPA.

202.    Section 8(a) of RESPA prohibits any person from giving and any person from accepting any fee, kickback, or other thing of value pursuant to any agreement or understanding that business shall be referred to any person. [12 USC 2607 (a) and (b).]  HUD provides

illustrative factors to be considered when weighing the propriety of any YSP payment; these

factors include (among others):

> c) "Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;
>
> i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;
>
> n) Participating in the loan closing"

203.    Defendants failed to educate Plaintiff, truthfully describe the loan product, offer

alternative loan products, or to explain how closing costs and monthly payments may vary.

Defendants failed to provide adequate disclosures and did not participate in a key part of the loan

closing—Plaintiff and spouse document signing. Moreover TRIMERICA received direct

payment from Plaintiff for Refinance Loan charges that were already at a reasonably high

without the additional YSP fees. TRIMERICA did not offer to credit any YSP to Plaintiff in

order to lessen the impact of any closing or loan cost or make the obtaining of the loan more

affordable by lessening fees.

204.    In the past several years, a number of courts and commentators have described the

industry practice of payment of loan broker compensation. One such summary is set forth below:

> "One traditional way brokers are compensated is through direct payments of various fees from their customers. For example, a mortgage broker might receive an origination fee of one percent of the loan amount. In addition, brokers sometimes supplement their income with various other fees, such as document preparation fees, application fees, and processing fees. All of these fees would typically be paid directly by the borrower at or before closing.
> Yield spread premiums constitute a separate and less well known way that mortgage brokers are compensated for their services. Yield spread premiums are paid from lending institutions to mortgage brokers. A number of factors influence the setting of yield spread premiums, but the most significant is the rate of interest on the borrower's loan. In the mortgage banking industry, a "par loan" is a loan

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

that a lending institution funds at 100 cents on the dollar. An "above par" loan is one that bears a somewhat higher rate of interest and for which the lending institutions are willing to pay more than 100 cents on the dollar, for example 102 cents. Typically, the excess over par is paid to the mortgage brokers in the form of a yield spread premium. The average amount of yield spread premiums is typically in the range of $1000 to $2000 per loan and, when present, is usually the largest component of broker compensation. The more an interest rate charged on an above par loan exceeds the rate for a comparable par loan, the greater the yield spread premium payment to the mortgage broker.[2]"

The Eighth Circuit Court of Appeals has further explained:

"In determining the amount of [yield spread premium] to pay, wholesale lenders... establish a wholesale price for originating loans and communicate this pricing schedule to brokers through daily rate sheets. Rate sheets set forth the amount that the wholesale lender will pay brokers for various types of mortgage loans, taking into account a number of variables. These rate sheets discuss loans in terms of "above par," "at par," and "below par." . . . If "the mortgage carries a higher interest rate, the lender is able to sell it to an investor at a higher price. In turn, the lender pays the broker an amount reflective of this price difference." Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53054 (October 18, 2001) (hereinafter "HUD Policy Statement II").

Regardless of how the broker compensation is handled, all costs are ultimately paid by the borrower, whether through direct fees paid to the broker, through the loan principal or through the interest rate arranged with the lender. So, when a mortgage broker originates a loan above par, the broker receives a YSP payment from the mortgage lender which is based upon the daily rate sheet and the interest rate of each loan offered by the broker to the borrower. HUD Policy Statement I, at 10081.[3]"

205.    Plaintiff is informed and believes and upon such information and belief

alleges that evidence will likely support that the YSP HOMECOMINGS LLC/NETWORK

offered to pay a broker (i.e. TRIMERICA) was primarily a function of how the loan terms

compare to the price the loan would bring when it was sold by HOMECOMINGS

LLC/NETWORK in the secondary mortgage market. In setting the YSP that HOMECOMINGS

---

[2]  Howell E. Jackson and Laurie Burlingame, *Kickbacks or Compensation: The Case of Yield Spread Premiums,* 12 Stan J.L. Bus & Fin. 289 (2007).

[3]  *In re Glover*, 283 F.3d 953, 957-58 (8th Cir. 2002) (footnote omitted).

-46-

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

LLC/NETWORK would pay a broker for particular loan products, HOMECOMINGS
LLC/NETWORK did not consider the specific services that a loan broker may have provided to
the borrower in the particular transaction. Rather, it based the YSP payment to the loan broker on
the difference between the interest rate in the Refinance Loan and the price the loan would bring
on the secondary market. Plaintiff alleges that this YSP was indirectly paid by Plaintiff and
therefore should have been properly disclosed as required by RESPA.

206.    TRIMERICA as the broker failed to ensure that Plaintiff received adequate
disclosure of the YSP fee. When the HUD-1 eventually issued, TRIMERICA failed to instruct
the issuer to correctly reflect the YSP as one made POC and instead left the payment entry
incorrect and ambiguous providing Plaintiff no reasonable chance to discover the fee.

207.    Defendant HOMECOMINGS LLC or alternatively HOMECOMINGS
NETWORK failed to exercise their independent duty as the lender to accurately disclose the
YSP in the HUD-1. When the HUD-1 eventually issued, HOMECOMINGS LLC or alternatively
HOMECOMINGS NETWORK failed to instruct the issuer to correctly reflect the YSP as one
made POC and instead left the payment entry incorrect and  ambiguous providing Plaintiff no
reasonable chance to discover the fee. Moreover Defendant HOMECOMINGS LLC or
alternatively HOMECOMINGS NETWORK, in a document entitled "Addendum To Closing
Instructions" (a true copy of which is attached as EXHIBIT I and incorporated herein) instructed
the settlement agent ("Escrow") to provide a signed certified copy of the "Estimated HUD-1" as
a condition to be satisfied before the loan could fund. Plaintiff is informed and believes and upon
that basis alleges that the document titled "Buyers/Borrowers Closing Statement—Estimated" (a
true copy of which is attached as EXHIBIT J and incorporated herein), served in the place of the

more particular HUD-1 (while lacking the HUD-1 sections and headings which categorize and lend more particularity to costs).

208.    The same failure to disclose the YSP as a POC is contained within EXHIBIT H where it is instead incorrectly entered and ambiguous to the Plaintiff and without any guiding notation (even if such notation was to be ultimately ignored as it was within the actual HUD-1) regarding the presence (and by inference the absence) of any POC notation.  Because the review of the "Estimated" disclosure was a condition prior to the loan's funding there was adequate time and opportunity before the loan closed for a correction by the defendant's to be made in order to assist the Plaintiff in discovering costs; an opportunity that the defendants shunned.

209.    Plaintiff had no actual or constructive knowledge of the violations of RESPA by reason of the lack of any timely early disclosure or final disclosure, and by the inclusion of incorrect or ambiguous language contained in any disclosure. Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support these shortcomings were affirmatively made in order to conceal the YSP and the part it played in enriching the defendants or that in the alternative, the shortcomings were so recklessly disregarded as to infer intent and that Plaintiff relied on an absence of this misconduct which prevented Plaintiff from timely filing a claim if such a claim were otherwise barred by any statute of limitations and therefore an equitable tolling of time allowing Plaintiff to bring a valid claim is proper and may also be proper for purposes of recoupment when a foreclosure is threatened.

210.    The YSP fees paid to TRIMERICA by HOMECOMINGS LLC/NETWORK were improperly disclosed, unnecessary, excessive, illegitimate, and served only to incent and reward Plaintiff's undisclosed placement into a predatory loan and therefore constitute an illegal

kickback under RESPA's Section 8. Moreover Plaintiff is informed and believes and upon that bases alleges that evidence will support that HOMECOMINGS LLC/NETWORK paid the YSP to TRIMERICA as only a "marketing" cost. The loan and settlement costs charged directly to Plaintiff for service (or lack thereof) Plaintiff received are excessive in light of the incorrect and ambiguous disclosure of the illegal kickback TRIMERICA received and its failure to provide services justifying the YSP.

211.   Violation of RESPA Section 8 imposes joint and several liability. §2607 (d) (2).

212.   TRIMERICA and HOMECOMINGS LLC/NETWORK were either actually aware or constructively on notice that Plaintiff either spoke or may have spoken English as a second language and provided no disclosures discussed within this cause of action in Spanish.

213.   TRIMERICA was closely connected and acted as an agent for HOMECOMINGS NETWORK and / or HOMECOMINGS LLC who in addition to the independent duty alleged herein have an imputed duty as is alleged above and incorporated herein.

214.   HOMECOMINGS LLC/NETWORK had actual knowledge of the RESPA violations alleged herein.

215.   Furthermore HOMECOMINGS LLC/NETWORK is required by RESPA to retain a copy of the completed HUD-1 for a period of five-years unless the loan is sold and the lender ceases to service the loan. When a lender disposes of its interest in the loan within the five-year retention period for the HUD-1 it must forward the document to the new owner or servicer who then must retain the document for the remainder of the five-year period. Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support that HOMECOMINGS LLC/NETWORK provided a copy of the HUD-1 to DEUTSCHE BANK and / or GMAC Mortgage Corporation thereby giving DEUTSCHE BANK actual or constructive

knowledge of the incorrect, misleading, and erroneous entry regarding the YSP kickback paid to TRIMERICA for arranging the predatory Refinance Loan.

216.    DEUTSCHE BANK is also properly held liable by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to assert a Holder In Due Course status as alleged above and incorporated herein.

217.    Plaintiff alleges that because the amount paid by Plaintiff to TRIMERICA for costs of the loan were adequate if not excessive for services actually performed that any rebate fee was inherently excessive and recoverable under RESPA at treble value. §2607 (d) (2). Additionally Plaintiff alleges that the rebate amounts paid to TRIMERICA by HOMECOMINGS LLC/NETWORK were in fact indirectly paid by Plaintiff.  Rebates fees totaled $6,228.75 yielding a claim of $18,686.25 at treble the unreasonable fees.

218.    RESPA also provides for recovery of Plaintiff's costs  attorney fees when a kickback such as an unjustified YSP is paid as alleged herein. §2607 (d) (5).

219.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### SIXTH CAUSE OF ACTION: VIOLATION OF CFLL
#### (Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)

220.    Plaintiff realleges and incorporates by reference each and every allegation as set forth above, as if fully set forth within this cause of action.

221.    California Section § 22100, et seq. of the California Financial Code and Title 10 of the California Code of Regulations, commencing with Section 1404 (10 C.C.R. §1404, et seq.) are the relevant statutes governing the California Financed Lender law ("CFLL")    .

222.    Plaintiff 's Refinance Loan was "brokered" by TRIMERICA purportedly under the regulation of the California Finance Lender Law ("CFLL") and to a "finance lender" (HOMECOMINGS LLC/NETWORK) and therefore subject to regulation under the CFLL. This

allegation is supported by three disclosures provided to Plaintiff at time of Refinance Loan document signing: the first document is labeled "Borrowers Initial Disclosure Statement" (EXHIBIT G); the second attachment is labeled "Borrowers Disclosure Statement" (EXHIBIT A); and the third document, although titled the same as EXHIBIT A, is actually a separate disclosure with different content—the document title reads "Borrowers Initial Disclosure Statement" (as does EXHIBIT A) and a true and correct copy of this separate and distinct document is attached as EXHIBIT K which is independently incorporated herein. EXHIBIT G and EXHIBIT K purport within the document headings to comply with "Division 9, Chapter 2, Article 3, Section 22338 (e) of the [Cal. Fin. Code]". EXHIBIT A purports within the document heading to comply with "Division 9, Chapter 2, Article 3, Section 22338 (a) (b) of the [Cal. Fin. Code]". All three referenced Exhibits fail to state any effort to comply with Division 9, Chapter 2, Article 3, Section 22337 (a) of the [Cal. Fin. Code] (i.e. disclosure of loan terms and license information delivered or caused to be delivered by the finance lender) which if purported as such would fail nevertheless.

223. Brokers licensed under the CFLL may only broker loans to lenders that hold a California Finance Lenders license. Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that defendant HOMECOMINGS NETWORK, the entity in whose name the Refinance Loan documents were issued by TRIMERICA to Plaintiff, did not hold a valid California Finance Lender license. Therefore TRIMERICA and HOMECOMINGS NETWORK violated the CFLL.

224. Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that defendant HOMECOMINGS LLC was licensed as a California Finance Lender at the time of Refinance Loan issuance.

225. In some circumstances a CFLL lender may obtain for a borrower a loan that is

from a parent company or affiliate. This provision is set forth in Cal. Fin. Code § 22154 (a) and (b).

226.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that at the time of Refinance Loan issuance that the defendant HOMECOMINGS NETWORK  (a company that defendant has since maintained was not actually in existence at the time of Refinance Loan issuance) was not was not a parent company to HOMECOMINGS LLC. Even if HOMECOMINGS NETWORK was a viable company at the time of loan issuance it is Plaintiff's position that the CFLL does not reach widely enough to allow a loan to be arranged by a CFLL broker through a CFLL lender, and then in turn be brokered by the CFLL lender to an affiliate who is not a supervised financial institution.  Moreover, even when an affiliate or parent company is allowed under the CFLL, the transaction is violative unless;

> "…the products and services are not offered and sold in a manner that restricts the ability of the borrower or customer to individually select or reject a product or service that is offered."

Because Plaintiff did not have the opportunity to select or reject any product but instead was provided a solitary and limited view of only the predatory loan selected by TRIMERICA. Therefore any brokering of the Refinance Loan by HOMECOMINGS NETWORK to its potentially claimed parent or affiliate (i.e. HOMECOMINGS NETWORK) violates the CFLL.

227.    The relevant statutes governing the CFLL  are Section § 22100, et seq. of the California Financial Code and Title 10 of the California Code of Regulations, commencing with Section 1404 (10 C.C.R. §1404, et seq.).

Cal. Fin. Code § 2238 (e) states that each <u>licensed broker</u> shall:

> "**<u>Deliver to the potential borrower</u>** or borrowers, at the time the licensee first requires or accepts any signed instrument or the payment of any fee, a statement showing **in clear and distinct terms the name, address, and license number of the broker and finance lender.**"

-52-
COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

(Emphasis added.)

Cal. Fin. Code § 2237 (f) states that each <u>licensed finance lender</u> shall:

> "**Deliver or cause to be delivered** to the potential borrower, or any one thereof, at the time the licensee first requires or accepts any signed instrument or the payment of any fee, **a statement showing in clear and distinct terms the name, address, and license number of the finance lender and the broker**, if any."
> (Emphasis added.)

228.   EXHIBIT G, if somehow meant to satisfy the requirements of § 2238 (e) and § 2237 (f), fails to comply with the law in several ways;

    a.   Plaintiff received this disclosure on the date the mobile notary came with the entire loan document package prepared for Plaintiff and spouse to sign. It is highly unlikely that the Refinance Loan documents with all of their terms finally negotiated and ready for signature could have been issued without broker (TRIMERICA) having accepted at least one signed document well before the date of the delivery to Plaintiff by the mobile notary. Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that the broker (TRIMERICA) accepted a signed instrument from Plaintiff well before October 20, 2005 (the latest date alleged where Plaintiff signed the Refinance Loan documents), or that in the alternative that broker must have bypassed Plaintiff's signature requirements by an unauthorized placement of a signature similar to Plaintiff's on one or more pre-final settlement documents needed to trigger the issuance of the final documents. Defendant's providing the required CFLL "initial" disclosure to Plaintiff for the first time on the date of final settlement runs counter to the purpose of the

CFLL, and if provided well beyond the signature-trigger, as alleged herein, is
fatally defective;

b.   The initial disclosure omits the correct name of any potential licensed finance
lender who is a party to the transaction. The finance lender is listed as
"HOMECOMINGS FINANCIAL" without the addition of any LLC or
NETWORK description as an appendage and the address disclosed as
belonging to "HOMECOMINGS FINANCIAL" is 4350 Von Karman Ave,
Suite 100, Newport Beach, Ca  92660.

Plaintiff, trying today to determine what company was meant to be
disclosed at loan issuance is as unable today as Plaintiff was at the time of
loan issuance to get a certain answer of the entity that potentially funded
Plaintiff's loan. In trying to unravel the confusion post-loan issuance Plaintiff
now turns to California's "Multiple Department License Lookup" website at
http://search.dre.ca.gov/integrationaspcode/IntLookup.aspx and enters the
entity disclosed ("Homecomings Financial"). No search return yields such a
name listed even in a DBA capacity (See "California Real Estate & Financial
Service s License Status Lookup, a true copy of which is attached as
EXHIBIT L and incorporated herein). There are however returns two listings
returned reflecting the Von Karman address (at page 1, entry #4 and at page 2,
entry #2); with both licenses including an "LLC" designation, forcing Plaintiff
to conclude that the defective initial disclosure, interpreted in today's light and
in the most liberal favor of the defendants, could have only been meant to
disclose HOMECOMINGS LLC as a properly licensed lender to issue a loan

under the regulation of the CFLL. However; this liberal and late interpretation

is further complicated when the actual Refinance Loan documents (as alleged

previously in this Complaint) were issued under the name HOMECOMINGS

NETWORK who within the loan documents it allegedly issued adopts the

address of the HOMECOMINGS LLC entity (at 4350 Von Karman, Newport

Beach).  In EXHIBIT L  on page 1 at entry #1  "Homecomings Financial

Network, Inc. is listed in with an address of "[8400 Normandale Lake BL STE

600] Minneapolis, MN [55437]" and without a license for a CFLL regulated

loan at the time of Refinance Loan issuance. There is no HOMECOMINGS

NETWORK license attributed with the Von Karman address;

c.  The initial disclosure fails to disclose the license number of the potential

lender: The confusion caused by the deceptive failure to accurately name the

potential lender is deepened by the omission of the lender's license number.

Instead of using plain English with an already disadvantaged reader of the

language the initial disclosure displays what if interpreted today in the light

most favorable to defendants is a "file" number meant to be realized as a

"license" number. This interpretation is liberally allowed after the fact; it

could not have been easily deduced at the time of issuance of the disclosure as

the two words have no common English language association or heritage.

Moreover the numerical format used to display the "file" number is not

synchronized with the display format utilized by the California Department of

Corporations ("DOC"). In EXHIBIT G, the "file" number for

HOMECOMING FINANCIAL is broken with a space between the first three

digits and the last four digits. Assuming Plaintiff was able to overcome the

first hurdle and interpret the "file" number to actually mean "license" number

(a linguistic feat even if English were to be Plaintiff's first language) and then

endeavored to search for the entity holding this "file" number on the DOC

website (http://www.corp.ca.gov/FSD/licensees/default.asp) any search

entered as disclosed (a number with the space present) would yield no results.

A "license" number, to be found, must contain an unbroken string of

sequential digits.

Assuming Plaintiff had surmounted the challenge of equating a file

number to a license number and had further determined that the space must be

ignored in order to find an entity with the disclosed license number, Plaintiff's

hypothetical journey would have fared no less Quixotic; the file/license

number disclosed (6037515) belongs to an entity known as "PRIMERICA

FINANCIAL SERVICES HOME MORTGAGES"  (See "CORP :: Financial

Services Division Licensee Address Listing" a true copy of which is attached

as EXHIBIT M and incorporated herein).

229.    Plaintiff could not possibly properly comprehend which institution was actually

meant to be disclosed as the potential CFLL  because the initial disclosure was (a) not timely

issued and when finally issued (b) discloses an entity as a potential CFLL lender that does not

exist ("Homecomings Financial") and then (c) portrays an address registered to

HOMECOMINGS LLC even while (d) the loan documents were actually issued by a

Minneapolis, Minnesota registered company (HOMECOMINGS NETWORK) who in turn (e)

adopts the LLC address of Newport Beach, California and then (f) further discloses its plain

English "license" number as something called a "file" number which then contains (g) a space breaking the sequential string needed to attribute the license number properly which, if interpreted in the light most favorable to defendants, (h) belongs to a company that was never a part of the Refinance Loan transaction. Therefore defendants violated the CFLL's initial disclosure requirement.

230. Defendants repeat most of their earlier failures to disclose and manage to add a layer of smoke on already thick cloud by providing to Plaintiff EXHIBIT K at the time of Refinance Loan document signing with the mobile notary. This version of the "initial disclosure" is almost identical to EXHIBITG; however, in addition to repeating most of the "file and error" mistakes alleged above, the disclosure makes the truth even more difficult to discern. In this disclosure the entity is named as "HOMECOMINGS FINANCIAL )". [ The singular ")" is as stated in the document]. Under certain circumstances the addition of the character ")" to a non-existent entity may be labeled a harmless typographical error (e.g. had the other initial disclosure been accurate) but given the wholesale failure of accuracy as here, deserves stricter scrutiny. Additionally this disclosure contains no "license" or "file" number for the potential CFLL lender whatsoever.

231. Cal. Fin. Code § 2237 (b) states that each <u>licensed finance lender</u> shall :

> "**Obtain from the borrower a signed statement as to whether any person has performed any act as a broker in connection with the making of the loan.** If the statement discloses that a broker or other person has participated, then the finance lender shall obtain a full statement of all sums paid or payable to the broker or other person. The finance lender shall keep these statements for a period of three years from and after the date the loan has been paid in full, or has matured according to its terms, or has been charged off."
> (Emphasis added.)

232. The statement required by Cal. Fin. Code § 2237 (b) is at the bottom of EXHIBIT K; therefore HOMECOMINGS LLC/NETWORK had actual notice of all the inaccurate disclosures contained within the document and the violations of the CFLL.

233. EXHIBIT K fails to satisfy or cure any violation of the CFLL. TRIMERICA and

HOMECOMINGS LLC/NETWORK , each violated the requirements of § 2238 (e) and § 2237 (f) of the CFLL.

234.   Cal. Fin. Code § 2237 (a) states that each <u>licensed finance lender</u> shall :

"**Deliver or cause to be delivered to the borrowe**r, or any one thereof, at the time the loan is made, a statement showing in clear and distinct terms the name, address, and license number of the finance lender and the broker, if any. **The statement shall show the date, amount, and maturity of the loan contract, how and when repayable, the nature of the security for the loan, if any, and the agreed rate of charge or the annual percentage rate pursuant to Regulation Z** promulgated by the Board of Governors of the Federal Reserve System (12 C.F.R. 226)." (Emphasis added.)

235.   EXHIBIT A, if somehow meant to satisfy the requirements of § 2237 (a) fails to comply with the law in several ways;

a.   The disclosure does nothing to remedy the failure of the initial disclosure(s) provided by broker with regard to the complete inadequacy of clear and distinct terms the name and license number of the finance lender already alleged within this cause of action and contains the same or similar errors;

b.   The disclosure completely fails to provide any clear and distinct terms the date, amount, and maturity of the loan contract, how and when repayable, the nature of the security of the loan, if any,  and the agreed rate of charge or the annual percentage rate pursuant to Regulation Z.

236.   Therefore the disclosure failed to satisfy the requirements of § 2237 (a) and HOMECOMINGS LLC/NETWORK by this failure to disclose violated the CFLL.

237.   Cal. Fin. Code § 2238 (a) states that each <u>licensed broker </u>shall :

"Deliver to the borrower, or any one thereof, at the time the final negotiation or arrangement is made, a statement showing in clear and distinct terms the name, address, and license number of the broker and the finance lender. The statement shall show the date, amount, and terms of

the agreement with the broker, **and all amounts paid or to be paid to the broker and to any person other than the finance lender**."
(Emphasis added.)

238.   EXHIBIT A, if somehow meant to also satisfy the requirements of § 2238 (a) as it purports, fails to comply with the law in several ways;

    a.   The disclosure does nothing to remedy the failure of the initial disclosure(s) provided by broker with regard to the complete inadequacy of clear and distinct terms the name and license number of the finance lender already alleged within this cause of action and contains the same or similar errors;

    b.   The disclosure fails to state costs paid to others [e.g. it lists "Appraisal" as a cost—a cost that is indeed required on a 2238 (a) disclosure—but fails to include the cost which must be necessarily be known to both broker and finance lender as the cost is shown in EXHIBIT H on line #859].

239.   Therefore the disclosure failed to satisfy the requirements of § 2238 (a) and TRIMERICA by this failure to disclose violated the CFLL.

240.   Cal. Fin. Code § 2238 (b) states that each <u>licensed broker</u> shall :

"**Deliver to the finance lender making the loan a copy of the statement** referred to and described in subdivision (a)."
(Emphasis added.)

241.    Cal. Fin. Code § 2238 (c) states that each <u>licensed broker</u> shall:

"**Deliver to the person making any payment to the broker** to be retained by the broker, a plain and complete receipt for each payment made, at the time it is made, showing the total amount received, and identifying the brokerage agreement and the loan contract upon which the payment is applied. **If the payment is made by a person other than the finance lender, a copy of the receipt shall be delivered to the finance lender.**"
(Emphasis added.)

242.   EXHIBITA states that Plaintiff will pay to broker $6,228.75 (as a person making

payment to the broker other than the finance lender), therefore Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that that defendant TRIMERICA delivered a copy of EXHIBIT A to defendant HOMECOMINGS LLC/NETWORK .

243.    Borrower is informed and believes and upon such bases alleges that evidence will likely support that because HOMECOMINGS LLC/NETWORK, in addition to its own failure to disclose properly under the CFLL, had adequate notice of the broker's failure to disclose properly by virtue of the broker's provision of the inadequate disclosure to HOMECOMINGS LLC/NETWORK under Cal. Fin. Code §§ 2238 (b), (c) and therefore had adequate notice of the various violations of Cal. Fin. Code § 2238 (a) and yet took no action to cure the broker's disclosure violation(s) and thereby sanctioned the misconduct.

244.    Cal. Fin. Code Section  § 22302 states;

> "(a) Section 1670.5 of the Civil Code applies to the
> provisions of a loan contract that is subject to this division.
> (b) A loan found to be unconscionable pursuant to Section 1670.5
> of the Civil Code shall be deemed to be in violation of this division
> and subject to the remedies specified in this division."

The Civil Code Section cited above (§ 1670.5) states;

> "(a) If the court as a matter of law finds the contract or
> any clause of the contract to have been unconscionable at the time it
> was made the court may refuse to enforce the contract, or it may
> enforce the remainder of the contract without the unconscionable
> clause, or it may so limit the application of any unconscionable
> clause as to avoid any unconscionable result.
>      (b) When it is claimed or appears to the court that the contract
>  or any clause thereof may be unconscionable the parties shall be
> afforded a reasonable opportunity to present evidence as to its
> commercial setting, purpose, and effect to aid the court in making
> the determination."

226. To find unconscionability there must be a determination of both "procedural" and "substantive" unconscionability. Plaintiff alleges that Refinance Loan is unconscionable under both prongs.

227. Procedural unconscionability in Plaintiff's Refinance Loan is supported by the following;

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

a) TRIMERICA solicited Plaintiff by telephone over a period of several Months for the purpose of inducing Plaintiff into the Refinance Loan;

b) TRIMERICA represented the loan Plaintiff obtained as the best possible given Plaintiff's particular credit score and income;

c) TRIMERICA represented that the Refinance Loan would meet Plaintiff's pre-condition of lower payment and fixed rate while never intending, nor disclosing that the loan arranged was neither.

d) All conversations relating to the Refinance Loan were conducted in Spanish.

e) All the loan documents were delivered in English; with actual or constructive knowledge that a language Plaintiff has a very limited ability to read and comprehend when reading;

f) The loan documents did not contain the terms that TRIMERICA had represented and Plaintiff's limited English and education prevented Plaintiff the opportunity to understand the actual content.

g) TRIMERICA failed to make any effort or arrangement to explain loan documents to Plaintiff and instead sent a "mobile notary" who stated she could not explain any of the documents;

h) Plaintiff called Defendant TRIMERICA the day after signing and stated he wished to cancel the loan;

i) Defendant TRIMERICA, through its agent, and an employee purporting to be a supervisor, told Plaintiff that it was "too late to cancel—you already signed everything;"

j) Plaintiff signed the loan documents in Cloverdale, California, and is informed and believes that these documents could not have been delivered any earlier than the following day to TRIMERICA's Southern California address—meaning it actually wasn't too late to stop the loan from funding;

k) Defendant TRIMERICA did not advise Plaintiff to seek the counsel of an attorney

after becoming aware of Plaintiff's discomfort with loan documents that were signed even while they were signed without explanation;

l) Plaintiff had no chance to review the loan documents or any advance explanation prior to the appearance of the mobile notary;

m) Plaintiff's loan, which had no right of rescission, and therefore no reason to delay in closing, is now known to have in fact not closed for several days after signing (a fact purposefully withheld from Plaintiff). Plaintiff therefore alleges that a cancellation of the loan was possible and that Defendant TRIMERICA purposefully misrepresented Plaintiff's potential remedies and/or rights.

n) Because the loan did not close as TRIMERICA meant Plaintiff to understand by stating it was too late, Plaintiff alleges the Refinance Loan closing was purposefully delayed to lend an air of authenticity designed to earn or support TRIMERICA's loan fees and that this delay violated Cal. Fin. Code § 22317.5

o) TRIMERICA purposefully took advantage of Plaintiff's relative lack of knowledge and sophistication in its arranging the Refinance Loan.

245.   Substantive unconscionability is supported by the following factors:

p) Excessive Fees: Loan an extraordinarily high rebate from Lender to TRIMERICA that Plaintiff was not made aware was being paid and was obtained by TRIMERICA as a rebate for what Plaintiff is informed and believes, and on that basis alleges, was made as a payment to steer Plaintiff into a more onerous loan than Plaintiff qualified. TRIMERICA was paid 3.0 Percentage Points ($8,715.00) in addition to Broker Point charge of 1.75 Percentage Points ($5,083.75), and Broker add-on fees of $1,145.00, for a total compensation to Broker of $14,943.75 on the loan amount of $290,500. This equates to an overall compensation to Broker of approximately 5.144 Percentage Points;

q)  The Loan was issued with a near-high APR: A high-APR loan is defined as a loan whose APR is at least three percentage points higher than the interest rate on U.S. Treasury securities of the same maturity, at the time the loan was made. Plaintiff's loan was made in October 2005, with a stated APR of 7.193% and a term of thirty-years. The rate for a thirty-year U.S. Treasury security in October 2005 requires an adjustment to calculate, and Plaintiff is informed and believes, and on that basis alleges, that the calculation necessary yields a percentage of 2.873%, or very near to the 3 percentage point threshold which when combined with the fees charged for the Refinance Loan is unreasonable;

r)  Plaintiff's loan was made at an adjustable rate with introductory period of three years or less;

p)  The loan carried a substantial prepayment penalty;

q)  The loan prepayment penalty extended beyond the introductory rate period;

r) The loan had a teaser rate couched in favorable and deceiving terms –stating that the payment "may change" when it actually must and did change;

s) The loan negatively amortized without adequate disclosure.

246.    The California Legislature directed that the CFLL law be interpreted liberally to protect borrowers. If a lender violates any other statutory provision of Cal. Fin. Code §§22000, 22780, the contract of loan is void and no person may collect or receive any principal, charges, or recompense in connection with the transaction (see Cal. Fin. Code §22750) unless the lender shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error despite the maintenance of procedures reasonably adapted to avoid the error and notices the borrower of the error and makes whatever adjustments in the account that are

necessary to correct the error within 60 days of discovering the error for computational error [Cal. Fin. Code §22751(b)] and 30 days for other unintentional error [Cal. Fin. Code §22752(b)]. Because Plaintiff did not receive any notice of any CFLL required disclosure errors, and because the CFLL disclosure errors are so pervasive, Plaintiff alleges that HOMECOMINGS LLC/NETWORK is unable to meet this burden of proof and therefore the contract of loan is void.

247.    Plaintiff had no actual or constructive knowledge of the violations of CFLL by reason of the lack of any timely or accurate initial early disclosure and by the provision of an incomplete and inaccurate final statement which failed to correct the shortcomings of the initial disclosure(s) or provide the terms of the loan as required by statute, nor a reasonable opportunity to discover. The failure to include loan terms denied Plaintiff the only chance Plaintiff otherwise had to review the Refinance Loan in certain terms and a clear manner before making a final commitment. The failure also denied the only opportunity Plaintiff may have had to discover that the loan was not what had been promised by TRIMERICA; one with a fixed rate and stable payment(s). Even if the disclosure and statement been provided accurately as required by statute, both TRIMERICA and HOMECOMINGS LLC/NETWORK, were actually aware or constructively on notice that Plaintiff spoke or may have spoken English as a second language and made no effort to provide the disclosure and statement in Spanish. This failure further prevented Plaintiff from obtaining information and denied Plaintiff a reasonable opportunity to understand the nature and content of the documents.

248.    Defendant DEUTSCHE BANK is liable to Plaintiff for violation of the CFLL by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to assert a Holder In Due Course status as alleged above and incorporated herein.

249.    Plaintiff is alleges that defendants failure to comply with the CFFL was affirmatively made in order to conceal the true terms of the Refinance Loan and the part it played in enriching the defendants or in the alternative that defendants so recklessly disregarded the requirements of the CFLL as to infer intent and, Plaintiff relied on an absence of misconduct or disregard which in turn prevented Plaintiff from timely filing a claim if such a claim were otherwise barred by any statute of limitations. Therefore an equitable tolling of time allowing Plaintiff to bring a valid claim is proper.

250.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**SEVENTH CAUSE OF ACTION: VIOLATION OF ECOA**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC and DEUTSCHE BANK.)**

251.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

252.    The Equal Credit Opportunity Act ("ECOA")  is set forth in 15 USC §§1691-1691f and may be implemented as provided by Regulation B, 12 CFR pt 202.

253.    HOMECOMINGS LLC/NETWORK as the lender to Plaintiff acted as an entity involved in residential real estate transactions and is therefore subject to ECOA as a regular extender of credit ("commercial lender"). 15 U.S.C. 1691a (e).

254.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that HOMECOMINGS LLC/NETWORK discriminated against Plaintiff on basis of  Plaintiff's ethnicity. The terms and conditions of the loan are believed to be less favorable than those offered to similarly situated borrowers of different race or origin, and thereby violated the Equal Credit Opportunity Act (ECOA—15 U.S.C. §§ 1691–1691f): HOMECOMINGS LLC/NETWORK also required instruments to be signed by spouse while knowing it shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of  marital status 15 U.S.C. Sec . 1691(a) (1) and by requiring the

signature of an applicant's spouse unnecessary credit instruments violated the act. 12 C.F.R. § 202.7(d) (4) ("Regulation B").

255.    ECOA provides "it shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction (1) on the basis of race, color, national origin, [or] sex." 15 U.S.C. § 1691(a). The regulations define "discriminate against an applicant" to mean to treat an applicant less favorably than other applicants. 12 C.F.R. § 202(n).

256.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support  HOMECOMINGS LLC/NETWORK participated in the decision to extend credit to Plaintiff and that HOMECOMINGS LLC/NETWORK is a creditor as set forth in the ECOA because it set the terms of the credit that was extended, and designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein.

257.    Commission-driven, discretionary pricing systems–such as those in the real estate mortgage industry that are structurally similar to the system Plaintiff believes were utilized by HOMECOMINGS LLC/NETWORK have been found to produce significant discriminatory effects. Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated throughout the financing industry for several years, particularly since 1994, as a result of numerous high profile actions by the United States Department of Justice and federal regulatory agencies[4].

--------

[4] *United States v. Hispanicpipe State Bank, Civ. Act. No. 93-5115* (D. S.D. filed November 16, 1993) (charging American Indians higher interest rates)
*United States v. First National Bank of Vicksburg, No. 5:94 CV* 6(B)(N) (S.D. Miss. filed Jan. 21, 1994) (charging African- Americans higher interest rates)
*United States v. Huntington Mortgage Co., No. 1; 95 CV 2211* (N.D. Ohio filed October 18, 1995) (charging African-Americans higher fees)
*United States v. Security State Bank of Pecos, No. SA 95 CA* 0996 (W.D. Tex. filed October 15, 1995) (charging minority borrowers higher interest rates)

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

Many of these actions concern the effects of rebate pricing or "Yield Spread Premiums" (YSP) previously alleged within this Complaint as the manifestation of discriminatory pricing.

258.    In 2002 a new home buying report, *All Other Things Being Equal,*" based on results found by HUD in the cities of Los Angeles and Chicago uncovered the following:

a)  Hispanic homebuyers face a statistically significant risk of receiving less favorable treatment than comparable whites when they ask mortgage-lending institutions about financing options.

b)  Hispanics were denied basic information about loan amount and house price, told about fewer products, and received less follow-up compared to Anglo homebuyers.

c)  Hispanics were quoted lower loan amounts or house prices, told about fewer products, and offered less coaching than comparable Anglo homebuyers.

259.    HOMECOMINGS LLC/NETWORK as a sophisticated commercial lender knew or should have known about the discriminatory potential of the then current lending practice and knew or should have known or should have known that its credit pricing system causes minority borrowers to pay more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.

260.    Because Plaintiff's ethnicity was declared within the URLA (EXHIBIT C)

---

*United States v. First National Bank of Gordon, No. CIV-96-*5035 (W.D.S.D. filed April 15, 1996)  (charging American Indians higher interest rates)
*United States v. Fleet Mortgage Corp.*, No. 96-2279 (E.D.N.Y. filed May 7, 1996) (charging African-Americans and minority borrowers higher interest rates)
*United States v. Long Beach Mortgage Co.*, No. CV-96-6159 (C.D. Cal. filed Sept. 5, 1996)  (charging African-Americans, Latinos, women and persons over age 55 higher interest rates)

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

and because HOMECOMINGS LLC/NETWORK reviewed this document, HOMECOMINGS

LLC/NETWORK was aware of Plaintiff's ethnicity and the potential for abuse or discriminatory

advantage even if such discriminatory advantage or abuse was jointly or separately enabled by an

agent (TRIMERICA) in the solicitation and selling of HOMECOMINGS LLC/NETWORK

loans. Given the totality of circumstance HOMECOMINGS LLC/NETWORK was on notice to

exercise a prudent review of the factors and terms within the Refinance Loan to determine if this

particular extension of credit was less favorable than other extensions of credit to similarly

situated borrowers who had no minority ethnicity entered on their URLA.

261.    Even if HOMECOMINGS LLC/NETWORK lacked discriminatory intent,

Plaintiff need not establish a discriminatory intent under ECOA as articulated

In *Miller, v. American Express Company* (9th Cir. 1982) 688 F.2d 1235 where the court said:

> "In Anderson, we held that there was credit "discrimination" within the meaning
> of the ECOA when a regulation promulgated under the ECOA was violated. No
> showing of any specific intent to discriminate was required. 666 F.2d at 1277. As
> another court has noted, not requiring proof of discriminatory intent is especially
> appropriate in analysis of ECOA violations because "discrimination in credit
> transactions is more likely to be of the unintentional, rather than the intentional,
> variety." Cherry v. Amoco Oil Co., 490 F.Supp. 1026, 1030 (N.D. Ga. 1980).

> "In determining the existence of discrimination ... courts or agencies are free to
> look at the effects of a creditor's practices as well as the creditor's motives or
> conduct in individual transactions."

262.    Plaintiff alleges that HOMECOMINGS LLC/NETWORK motives were for profit

and without prudent regard or consideration to the sophistication or knowledge of the Plaintiff

and purposefully capitalized on Plaintiff's lack of familiarity with the English written language

in order to encourage Plaintiff to become obligated to the predatory Refinance Loan and that

HOMECOMINGS LLC/NETWORK conduct regarding the documentation and practices

employed in issuing the Refinance Loan falls short when considering the adequate notice it

received of its selling agent's (TRIMERICA) failure to disclose HOMECOMINGS

LLC/NETWORK own failing to take any steps to either remedy such failure or to abide its own

duty to adequately disclose.

263.    TRIMERICA as agent and HOMECOMINGS LLC/NETWORK as lender further

violated ECOA by obligating spouse of Plaintiff to sign a debt obligation beyond what was

required to make the property being offered as security available to satisfy the debt in the event

of default.

264.    At the time of Refinance Loan signing (and for a period of time thereafter)

Plaintiff believed (as did spouse) that the Refinance Loan was to be an obligation of both

Plaintiff and spouse jointly. TRIMERICA did not communicate that Plaintiff would serve as the

sole obligor, used the income of spouse (or some close approximation) on the loan application,

failed to adequately explain any documents before, during, or after document signing, failed to

provide any documentation in Spanish and, the documents  TRIMERICA and HOMECOMINGS

LLC/NETWORK caused to be signed as a condition of securing the Refinance Loan did little if

anything at all to deter a conclusion that the loan was to be issued as a joint obligation even if

they had been properly explained to Plaintiff.

265.    Spouse of Borrower was not told by the mobile notary there was an expectation

that she sign the Note (EXHIBIT B) and it was therefore not presented to her for signature.

However, spouse was presented the following "Rider" documents with an expectation of

signature: "Adjustable Rate Rider" (a true copy of which is attached as EXHIBIT N and

incorporated herein)；a "Prepayment Rider" (a true copy of which is attached as EXHIBIT O

and incorporated herein)；and a "1-4 Family Rider" (a true copy of which is attached as

EXHIBIT P and incorporated herein).  The documents presented to spouse, prepared and

expected for her signature, were ostensibly titled addenda to the "Security Instrument" (i.e. Deed of Trust), and all Rider signature lines prepared for Plaintiff's spouse were labeled with the title "Borrower."  (Note: EXHIBITS "N", "O", and "P" while having a space designated for signature of spouse do not contain any signatures. The reason for this is Plaintiff was supplied at time of document signing a "pre-copied document package." However, Plaintiff is informed and believes and upon such bases alleges that evidence will likely support the executed copies contain spouse's signature.)

266.    Plaintiff signed a "Prepayment Addendum to Note" (a true copy of which is attached as EXHIBIT Q and incorporated herein) without the presentation or expectation of signature of spouse and while this addendum was to the "Note" only it contained essentially the same terms that Plaintiff and spouse were caused to sign as a Rider to the Deed of Trust.

267.    ECOA prohibits a commercial creditor from requiring the signature of an "additional party" (e.g. the applicant's spouse or a person other than a joint applicant) on the credit instrument if the applicant meets a creditor's standards of creditworthiness. 12 CFR §202.7(d)(1). Nor can the creditor require an additional party to secure more interest than necessary in the event of a default. 12 CFR § 202.7(d) (4).

268.    In a letter dated January 13, 2004 from the FDIC for purposes of  "issuing guidance to assist financial institutions in complying with the complex marital status and spousal signature provisions of Regulation B"  [FIL-6-2004],  "securing more interest" under paragraph 202.7 (d) (4) is further explained  as follows;

> "If an applicant requests secured credit, a creditor may under § 202.7(d)(4) require the signature of the applicant's spouse on any instrument necessary, or reasonably believed by the creditor to be necessary,[12] under applicable state law, to make the property being offered as security available to satisfy the debt in the event of default (e.g., an instrument creating a valid lien).[13]"

The footnote references quoted above contain the following:

> "[12]Regulation B requires reasonable belief to be supported by a thorough review of pertinent statutory law and decisional law or an opinion of the state attorney general. Official Staff Interpretations at Paragraph 202.7(d) (4), Comment 2.
>
> [13]Regarding integrated notes and security agreements, see Official Staff Interpretations at Paragraph 202.7(d) (4), Comment 3."

And the staff interpretation referenced in footnote 13 above reads:

> "3. Integrated instruments. When a creditor uses an integrated instrument that combines the note and the security agreement, the spouse cannot be required to sign the integrated instrument if the signature is only needed to grant a security interest. But the spouse could be asked to sign an integrated instrument that makes clear--for example, by a legend placed next to the spouse's signature--that the spouse's signature is only to grant a security interest and that signing the instrument does not impose personal liability."

269.   Because a "Prepayment Penalty" is suffered only in the absence of a default or perhaps alternatively through a premature payoff through foreclosure, and because Plaintiff is not aware of any pertinent statutory law and decisional law or an opinion of the California State Attorney General which would permit HOMECOMINGS LLC/NETWORK to conclude that the Prepayment Rider signed by spouse was necessary to make the property being offered as security available to satisfy the debt in the event of default, at least one document signed by spouse reaches too far in violation of ECOA. Plaintiff alleges the other "Rider" documents signed by spouse previously referenced in this cause of action reach similarly too far and although titled as Riders to the "Security Instrument" served only to create a debt obligation without any appurtenant rights for spouse or lessening of the obligation imposed upon Plaintiff, and that these Rider documents were not necessary to make the Property available in the event of default.

270.   Plaintiff also asserts that the Rider documents signed by spouse cannot be

construed as "integrated" or that if held as integrated are also violative of ECOA as none of the signature lines created for spouse contain a legend stating the limited purpose for signature.

271.    Plaintiff is informed and believes and upon such information and belief alleges that HOMECOMINGS LLC/NETWORK violations of the ECOA were affirmatively made in to racially discriminate against Plaintiff and obligate Plaintiff to the predatory Refinance Loan and that HOMECOMINGS LLC/NETWORK's requiring spouse of Plaintiff to execute documents providing more security than needed to make the Property available in the event of default was engineered purposefully and maliciously or at the very least with reckless disregard of the law. Plaintiff relied on TRIMERICA and HOMECOMINGS LLC/NETWORK and trusted them to avoid this type of harmful misconduct and overreaching.

272.    Plaintiff was not provided an adequate explanation of the documents signed by both Plaintiff and spouse, all of which were written in English despite Plaintiff's known Hispanic ethnicity and despite the fact that the loan's negotiation was conducted entirely in Spanish. Because of defendant's misconduct, overreaching, and deception and, because of Plaintiff's lack of a reasonable opportunity to discover this behavior, Plaintiff's filing this claim at an earlier date has been wrongfully hindered and an equitable tolling of time is proper to allow Plaintiff to assert this claim as though timely even if it were otherwise barred by any statute of limitation and may also be proper for purposes of recoupment when a foreclosure is threatened.

273.    TRIMERICA is liable for its arrangement for the provision of the Refinance Loan documents and its failure to adequately explain or disclose.

274.    DEUTSCHE BANK is liable to Plaintiff by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to assert a Holder In Due Course status as alleged above and incorporated herein.

275.     HOMECOMINGS LLC/NETWORK violated the ECOA maliciously and with intent as demonstrated by the facts within this cause of action or in the alternative in reckless disregard of the law.

276.     When the ECOA is violated by a commercial lender with either malicious intent or reckless disregard of the law, Plaintiff may recover punitive damages and costs. Such damages and costs may be awarded without the proving of any actual damages.

277.     WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**EIGHTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200 et seq. & 17500 et seq.**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

278.     Plaintiff realleges each and every allegation as set forth and previously alleged within Preliminary Allegations, Predatory Loan, Agency Relationship, Closely Connected Parties, and No Holder in Due Course (paragraphs 7 through 104 inclusive) and within Violation of RESPA (paragraphs 173 through 217 inclusive) and hereby incorporates all of these allegations herein by this reference.

279.     Beginning at an exact date unknown to Plaintiff but at least on or before September 01, 2005 (the date admitted as the existence of an agreement with Plaintiff in EXHIBIT A) TRIMERICA purposefully committed untrue and misleading advertising as defined by Business and Professions Code 17500, by engaging in telephone solicitation(s) professing to supply the best loan while instead intending to steer unwary and unsophisticated public members, including Plaintiff, into onerous or predatory loan contracts.

280.     Plaintiff is informed and believes and upon that bases alleges that evidence will likely support that TRIMERICA induced Plaintiff intending to earn an illegal kickback for the loan it intended to arrange and ultimately arranged on Plaintiff's behalf.

281.     Because TRIMERICA violated Business and Professions Code 17500 and any

violation of this code is unlawful,  the violation is also a per se violation of Business and Professions Code 17200's unlawful prong.

282.    Therefore  Plaintiff alleges the additional violation by TRIMERICA of Business and Professions Code 17200.

283.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff by virtue of its close connection of its TRIMERICA as alleged above and incorporated herein.

284.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff for inducing TRIMERICA to place Plaintiff in a loan with more onerous terms than Plaintiff qualified for at the time of the Refinance Loan by paying TRIMERICA a kickback (YSP) that was unreasonable for the services broker provided and with the knowledge that Plaintiff was paying a separate and substantial cost for the Refinance Loan. HOMECOMINGS LLC/NETWORK further induced TRIMERICA by increasing the YSP payment for TRIMERICA's success in selling the loan at the most onerous terms.  HOMECOMINGS LLC/NETWORK circulated "rate sheets" that advertised or promised the kickback fees in furtherance of its inducing Plaintiff's placement into a loan with more onerous terms than those for which the Plaintiff qualified.

285.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff by virtue of its agency relationship with TRIMERICA  and ratification of TRIMERICA's misconduct and by virtue of its knowledge that it failed to correct or provide adequate disclosures regarding the loan.

286.    DEUTSCHE BANK is liable to Plaintiff by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and because of its inability to assert a Holder In Due Course status as alleged above and incorporated herein.

287.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**NINTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200 et seq.**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

288.    Plaintiff realleges each and every allegation as set forth and previously alleged within Preliminary Allegations, Predatory Loan, Agency Relationship, Closely Connected Parties, and No Holder in Due Course (paragraphs 7 through 104 inclusive) and  within Violation

of RESPA (paragraphs 173 through 217 inclusive) and hereby incorporates all of these allegations herein by this reference.

289.    Because TRIMERICA and HOMECOMINGS LLC/NETWORK violated RESPA and any violation of RESPA is unlawful, such violations are actionable under 17200's unlawful prong.

290.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff by virtue of its close connection to TRIMERICA and DEUTSCHE BANK.

291.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff for inducing TRIMERICA to place Plaintiff in a loan with more onerous terms than Plaintiff qualified for at the time of the Refinance Loan by paying TRIMERICA a kickback (YSP) that was unreasonable for the services broker provided and with the knowledge that Plaintiff was paying a separate and substantial cost for the Refinance Loan. HOMECOMINGS LLC/NETWORK further induced TRIMERICA by increasing the YSP payment for TRIMERICA's success in selling the loan at the most onerous terms. HOMECOMINGS LLC/NETWORK circulated "rate sheets" that advertised or promised the kickback fees in furtherance of its inducing Plaintiff's placement into a loan with more onerous terms than those for which the Plaintiff qualified.

292.    HOMECOMINGS LLC/NETWORK is liable to Plaintiff by its agency relationship with TRIMERICA and by its ratification of TRIMERICA's misconduct and liable for its own failing to correct or provide adequate disclosures regarding the loan.

293.    DEUTSCHE BANK is liable to Plaintiff by virtue of its close connection to TRIMERICA and HOMECOMINGS LLC/NETWORK and because of its inability to assert a Holder In Due Course status as alleged above and incorporated herein.

294.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**TENTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200 et seq.**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

295.    Plaintiff realleges each and every allegation as set forth and previously alleged

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

within Preliminary Allegations, Predatory Loan, Agency Relationship, Closely Connected

Parties, and No Holder in Due Course (paragraphs 7 through 104 inclusive) and  within Violation

of CFLL (paragraphs 222 through  248 inclusive) and hereby incorporates all of these allegations

herein by this reference.

296.     Because TRIMERICA and HOMECOMINGS LLC/NETWORK violated the

 CFLL and any violation of the CFLL is unlawful, such violations are actionable under 17200's

unlawful prong.

297.     HOMECOMINGS LLC/NETWORK is liable to Plaintiff for inducing

TRIMERICA to place Plaintiff in a loan with more onerous terms than Plaintiff qualified for at

the time of the Refinance Loan by paying TRIMERICA a kickback (YSP) that was unreasonable

for the services broker provided and with the knowledge that Plaintiff was paying a separate and

substantial cost for the Refinance Loan. HOMECOMINGS LLC/NETWORK further induced

TRIMERICA by increasing the YSP payment for TRIMERICA's success in selling the loan at

the most onerous terms.  HOMECOMINGS LLC/NETWORK circulated "rate sheets" that

advertised or promised the kickback fees in furtherance of its inducing Plaintiff's placement into

a loan with more onerous terms than those for which the Plaintiff qualified.

298.     HOMECOMINGS LLC/NETWORK is liable to Plaintiff by its agency

relationship with TRIMERICA  and by its ratification of TRIMERICA's misconduct and liable

for its own failing to correct or provide adequate disclosures regarding the loan.

299.     DEUTSCHE BANK is liable to Plaintiff by virtue of its close connection

to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to assert a Holder

In Due Course status as alleged above and incorporated herein.

300.     WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**ELEVENTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200**
**et seq.**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

301.     Plaintiff realleges each and every allegation as set forth and previously alleged

within Preliminary Allegations, Predatory Loan, Agency Relationship, Closely Connected

Parties, and No Holder in Due Course (paragraphs 7 through 104 inclusive) and  within Violation

of  ECOA (paragraphs 252 through  275 inclusive) and hereby incorporates all of these

allegations herein by this reference.

302.   Because TRIMERICA and HOMECOMINGS LLC/NETWORK violated the

 ECOA and any violation of the ECOA is unlawful, such violations are actionable under 17200's

unlawful prong.

303.   HOMECOMINGS LLC/NETWORK is liable to Plaintiff for inducing

TRIMERICA to place Plaintiff in a loan with more onerous terms than Plaintiff qualified for at

the time of the Refinance Loan by paying TRIMERICA a kickback (YSP) that was unreasonable

for the services broker provided and with the knowledge that Plaintiff was paying a separate and

substantial cost for the Refinance Loan. HOMECOMINGS LLC/NETWORK further induced

TRIMERICA by increasing the YSP payment for TRIMERICA's success in selling the loan at

the most onerous terms.  HOMECOMINGS LLC/NETWORK circulated "rate sheets" that

advertised or promised the kickback fees in furtherance of its inducing Plaintiff's placement into

a loan with more onerous terms than those for which the Plaintiff qualified.

304.   TRIMERICA is liable to Plaintiff for acting as the agent for HOMECOMINGS

LLC/NETWORK.

305.   HOMECOMINGS LLC/NETWORK is liable to Plaintiff by its agency

relationship with TRIMERICA  and by its ratification of TRIMERICA's misconduct and liable

for its own failing to correct or provide adequate disclosures regarding the loan.

306.   DEUTSCHE BANK is liable to Plaintiff by virtue of its close connection

to TRIMERICA and HOMECOMINGS LLC/NETWORK and by its inability to assert a Holder

In Due Course status as alleged above and incorporated herein.

307.   WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**IX.**

**PRELIMINARY ALLEGATIONS RE: IMPROPER FORECLOSURE**

308.    To institute and complete a non-judicial foreclosure in California, statutory law must be strictly followed.

309.    A Notice of Default ("NOD") has been issued and recorded against the Plaintiff's property used as the security for the predatory Refinance Loan (a true copy of which is attached as EXHIBIT R and incorporated herein). Such notice is required to be issued and recorded when a non-judicial foreclosure is contemplated.

310.    The NOD was issued by defendant CAL-WESTERN RECONVEYANCE CORPORATON ("CAL-WESTERN") as trustee.

311.    CAL-WESTERN authority to act as trustee is ostensibly acquired by a Substitution of Trustee ("SUB-TRUSTEE"—a true copy of which is attached as EXHIBIT S and incorporated herein) executed between CAL-WESTERN and defendant MORTGAGE ELECTRONIC REGISTRATION, INC. ("MERS"). On page #1 of SUB-TRUSTEE at ¶3, CAL-WESTERN states that MERS is the "original" beneficiary as nominee for HOMECOMINGS NETWORK under the Deed Of Trust ("DOT") a true copy of which is attached as EXHIBIT T and incorporated herein.

312.    MERS is not the original beneficiary under the DOT. On page #1 at ¶ (C) of the DOT the original beneficiary is the "Lender." The Lender is then defined (within this same paragraph) as "HOMECOMINGS FINANCIAL NETWORK, INC."

313.    Plaintiff  is informed and believes and upon such bases alleges that evidence will likely support that MERS often relies on the questionable practice of asserting it is an original beneficiary because it is named within the DOT as a "nominee" with powers enabling MERS to institute foreclosure proceedings. MERS refers to this language as a "MOM" clause. However, there is no such MOM language (MERS as nominee) in Plaintiff's DOT.

314.    Because MERS is not a party to the DOT in any capacity, CAL-WESTERN's "original beneficiary" claim set forth within the SUB-TRUSTEE is false.

315.    On page #1 of SUB-TRUSTEE at ¶5 CAL-WESTERN also states that MERS in addition to being the original beneficiary under the DOT, is the "present" beneficiary under the DOT (as the undersigned on page #2). Plaintiff alleges that MERS holds no such true capacity.

316.    Much of the difficulty MERS faces in making an assertion as the true present beneficiary is caused by the operation of the securitized secondary loan marketplace. Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that Refinance Loan issued to Plaintiff has been placed into a secondary market as a Mortgage Backed Security ("MBS") by being sold into a Mortgage Backed Security Trust ("MBS Trust") and that DEUTSCHE BANK is the "Indenture Trustee" for the MBS Trust into which Plaintiff's Refinance Loan was either sold or attempted to be sold. Evidence supporting this allegation is contained within defendant AURORA's Response to Plaintiff's Qualified Written Request (EXHIBIT F) on page #2 at ¶ 3wherein where AURORA states that "Deutsche Bank Trust Company Americas, In Trust For, Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4" is the current owner of the debt and therefore this particular MBS Trust is the entity described as the owner of Plaintiff's debt. ("The Trust" or "MBS Trust" shall henceforth specifically mean the entity described as the owner of Plaintiff's debt for the Refinance Loan.)

317.    When an MBS trust is established with the intent to sell securities, various filings must be made with the Securities and Exchange Commission ("SEC"), a federal agency which regulates the sale and trade of securities and similar investments.

318.    Because these filings are voluminous Plaintiff has attached only certain filing excerpts within EXHIBIT E ("SEC Excerpts"), supporting Plaintiff's claims.

319.    In EXHIBIT E (SEC Excerpts), on page #2-#3, at ¶ 6, loans that were selected for MBS Trust purchase by the "Depositor" (Residential Accredit Loans, Inc., an affiliate of Residential Funding Corporation [who, at the time of MBS Trust formation was the corporate parent of HOMECOMINGS NETWORK—see page 2, at ¶ 7of  EXHIBIT E]) were purchased from (among other sources) the Depositor's affiliates (i.e. HOMECOMINGS NETWORK and GMAC Mortgage Corporation).

320.    Mortgage loans are typically sold, transferred, conveyed, and assigned into the MBS trust by a deal "cut-off" date. Rating agencies determine subordination levels at deal cut-off. Typically, the MBS issuer assembles a pool of loans and passes the information of these loans to rating agencies. Rating agencies then work independently to examine how much subordination is needed for the tranches to reach certain ratings, such as AAA, AA, A, BBB etc. This forms the perspective debt structure. In most cases, this debt structure is the final deal structure accepted by the issuer and provided to the investors.

321.     The cut-off date for the MBS Trust  is stated as November 1, 2005 (EXHIBIT E, page #1 at ¶ 1)  and the assets for the "Mortgage Pool" are described by both number of loans (2,306) and aggregate principal value ($796,979,968)  "as of the cut-off date" (EXHIBIT E, page #2 at ¶ 8).  While the Mortgage Pool is described as approximate numbers, the specificity is such as to likely include Plaintiff's Refinance Loan as calculated within these totals, and a MBS TRUST asset already purchased.

322.    Paragraph 9 on page #3 of  EXHIBIT E requires that the Depositor or Designated Seller represent that it had good title to any mortgage loan prior to the cut-off date.

323.    Therefore Plaintiff is informed and believes and upon such bases alleges that for Plaintiff's debt to be owed to the MBS Trust (as asserted by defendant AURORA) Plaintiff's Refinance Loan must have been sold into the MBS Trust on or before the cut-off date of November 1, 2005.

324.    Additionally, in the second full paragraph of EXHIBIT D, HOMECOMINGS NETWORK admits that both the Refinance Loan and its servicing rights have already been sold.

325.    Because HOMECOMINGS NETWORK (i) admits prior to the cut-off date that it has sold Plaintiff's loan and (ii) it is a reasonable assumption by Plaintiff that based on the entity admitted by AURORA to currently own the debt that (iii) the Refinance Loan must have been sold prior to the cut-off date in order for (iv) representations required within the SEC filings to be fulfilled that on or before November 1, 2005, Plaintiff's Refinance Loan was sold into the MBS Trust (or to the "Depositor"), and that the MBS Trust represented its ownership of the Refinance Loan to rating agencies so that they might make an evaluation to attract investors based on the associated rating(s) risk.

326.    When a loan contract (the Note) is sold, assigned, or conveyed, it is presumed, unless there is an agreement to the contrary, that the underlying security (DOT) is sold along with the Note. (The Deed follows the Note.)

327.    The opposite is not presumed: when a DOT is sold, assigned, or conveyed, and there is no agreement regarding the Note, the transfer results in no right to foreclose or enforce the Note as may be otherwise provided within the Deed.

328.    If the Note and Deed have been separated, there is also no ability to enforce the Note as may otherwise be allowed in the Deed (e.g. any agreement to allow a non-judicial foreclosure under a Power of Sale in the DOT).

329.    HOMECOMINGS NETWORK purports to have assigned the Plaintiff's Deed of Trust (the security instrument for the Refinance Loan) to defendant MERS as reflected in its "Assignment of Deed of Trust" a true copy of which is attached as EXHIBIT U and incorporated herein, and as executed on November 3, 2005, by the assignor, a "Michael Lind" who states he is the Assistant Secretary of Homecomings Financial Network, Inc..

330.    The November 3, 2005 date is beyond the representation that the loan had already been sold made by HOMECOMINGS NETWORK in October when Plaintiff signed the Refinance Loan documents. It is also beyond the November 1, 2005 cut-off date for the MBS Trust into which the loan was presumably sold. Moreover it was made at a date which has been maintained by defendant HOMECOMINGS LLC (the asserted successor of HOMECOMINGS NETWORK) as one beyond the corporate existence of HOMECOMINGS NETWORK.

331.    Because HOMECOMINGS NETWORK made this assignment on November 3, 2009, Plaintiff is informed and believes that evidence will likely support that (i) the assignment is ineffective because either (a) HOMECOMINGS NETWORK did not have a corporate existence at the time of assignment, or (b) had no remaining interest in the DOT by virtue of its earlier sale of the Note, or in the alternative (ii) the assignment is effective but because of the earlier sale of the Note this assignment was intended or resulted in the separation of the Note from the DOT.

332.    At or about the time an MBS trust issues securities to an investor, the Depositor typically transfers, conveys, and assigns to the MBS trust all of its right, title, and interest in the underlying loan to the Indenture Trustee. In turn, the MBS trust will transfer, convey, and assign some or all of an underlying loan to one or more additional MBS trusts. Such an assignment

includes the transfer to the MBS trust of all principal and interest due by a borrower with respect to the loan. The MBS trust will then execute and deliver the MBS to investors.

333.     Paragraph 10 on page 4 of EXHIBIT E shows that on November 29, 2005 the Depositor "caused" the issuance of the MBS.

334.     MERS caused the Assignment of Deed of Trust (EXHIBIT U) to be recorded on February, 01, 2006. A date well beyond the issuance of the MBS (November 29, 2005 ) which Plaintiff is informed and believes and upon such bases alleges evidence will likely support Plaintiff's Refinance Loan (and any obligation for repayment) was sold to investors.

335.     The time of this issuance (per paragraph 11 on page 4 of EXHIBIT E), requires a concurrent assignment of the loans in exchange for the securities to be issued, and if the loan was not already electronically registered with defendant MERS, it was registered on this date. Furthermore, when registered with MERS as required by this clause no more than an administrative interest in the loan is granted to MERS.

336.     Prior to this assignment (at the time of issuance) RFC represents that it holds "good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest…" (EXHIBIT E on page 4 at ¶ 12). Plaintiff is therefore subject to an additional claim by The Trust that it holds the loan without the security interest MERS must necessarily hold in order to declare to CAL-WESTERN that it is either the "original or present beneficiary" of the obligation that RFC claims to have held prior to the purported assignment to the MBS Trust. Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that MERS (also a participant of The Trust) is unlikely in light of RFC's declaration of "good title" to believe it held any security interest in Plaintiff's Property and that CAL-WESTERN in declaring that it has reviewed documents affording MERS any claim of beneficial interest affording payment of the obligation was aware of this infirmity.

337.     A recent court ruling by the Supreme Court of Kansas [*Landmark National Bank*

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

1   *v. Kesler* (2009 Kan.) LEXIS 834] does much to survey a multitude of previous proceedings

2   involving MERS and its purported interest.  A true copy of this case as sourced from

3   http://www.kscourts.org/Cases-and-Opinions/opinions/supct/2009/20090828/98489.htm  is

4   attached as EXHIBIT V and incorporated herein.

5      338. Notable excerpts within the case include that even as a "nominee"  (a status which

6   Plaintiff alleges MERS fails to obtain by any claim such language was included in Plaintiff's

7   Deed of Trust) MERS has "few or no legally enforceable rights" (EXHIBIT V on page 8 at ¶ 10

8   through page 10 at ¶ 1) is merely a "…straw man…" (EXHIBIT V on page 9 at ¶ 7.) and admits

9   that it "merely tracks loans… and  that "MERS does not receive compensation from consumers."

10  (EXHIBIT V on page 11 at ¶ 6).

11     339. *Landmark National Bank* (Id.) also canvasses rulings on the impact of separating

12  a Deed of Trust from a Promissory Note in the context of foreclosure (as Plaintiff alleges has

13  occurred in this Complaint) and states in one quote that, "The practical effect of splitting the

14  deed of trust from the promissory note is to make it impossible for the holder of the note to

15  foreclose, unless the holder of the deed of trust is the agent of the holder of the note. " (EXHIBIT

16  V on page 10 at ¶ 3.) In Plaintiff's case either the note was separated from the deed when

17  HOMECOMINGS NETWORK assigned its interest to MERS beyond the date it admitted it had

18  sold the Refinance Loan (presumably to the MBS Trust) thus separating the note from the deed

19  (or in the alternative no effective assignment occurred leaving MERS without even any tenuous

20  interest) yet MERS asserts its authority as either the "nominee of the original lender" or as the

21  holder of an "original or present" beneficiary interest to payment of the obligation. MERS does

22  not assert nor demonstrate it is the agent of the purported "holder of the note" (DEUTSCHE

23  BANK) to foreclose unless it is an agent for the holder of the note.

24     340. Because MERS has no actual present beneficiary interest in the DOT, CAL-

25  WESTERN's assertion that it was duly appointed within the SUB-TRUSTEE fails.

26     341. Plaintiff is informed and believes and upon such information and belief alleges

27  that evidence will likely support that CAL-WESTERN had actual or constructive knowledge of

28  MERS inability to duly appoint CAL-WESTERN as a substitute trustee and that therefore any

action undertaken by CAL-WESTERN in this role was without any qualified privilege and actionable.

342.    Despite the knowledge Plaintiff alleges, CAL-WESTERN issued and recorded against Plaintiff's Property an NOD (EXHIBIT R) executed on March 4, 2009 and recorded on March 5, 2009 wherein on page  #2 at ¶ 9, CAL-WESTERN states that the present beneficiary (already stated as MERS) has deposited with CAL-WESTERN "Deed of Trust and all documents evidencing obligations secured thereby."

343.    Plaintiff's DOT does not contain any MOM language or any other  obligations in favor of MERS; therefore CAL-WESTERN is unable to conclude that MERS may duly appoint it under the auspice of an original beneficiary.

344.    HOMECOMINGS NETWORK assignment of the DOT was made well after the sale of Plaintiff's loan into an MBS and as such made it impossible for MERS to enforce the Note by proceeding with any foreclosure sale.

345.    MERS even if permitted to enact a foreclosure sale, was intended to and can only hold, an artificial beneficial interest in the DOT and would not be entitled to the sale proceeds.

346.    Plaintiff did not grant to MERS a power of sale in the DOT.

347.    Plaintiff has alleged sufficient facts demonstrating that MERS had actual or constructive knowledge of its inability to claim the necessary interest required to appoint a substitute trustee and instruct the trustee to undertake efforts to initiate a foreclosure.

348.    Because Plaintiff is informed and believes that evidence will likely support that CAL-WESTERN (i) is a sophisticated entity with actual or constructive knowledge of the MBS and the limitations imposed on MERS assertions afforded thereby and (ii) had actual or constructive knowledge of the infirmities MERS suffered when making any claim as any original

or present beneficiary (iii) that CAL-WESTERN can only have purposefully acted in a manner that was not authorized or privileged and that (iv) such acts caused the Plaintiff harm.

## X.

## CALIFORNIA COMMERCIAL CODE IN A NON-JUDICIAL FORECLOSURE

349.   California has a statutory scheme to effect a non-judicial foreclosure that has been described in some situations to be "comprehensive."  Plaintiff believes that this description is may be proper when analyzing the procedural aspects of a non-judicial foreclosure but that the description does not otherwise deny equal dignity for other California law when there is no conflict. California Commercial Code § 3301 et seq. governs the enforcement of instruments (i.e. Note) and is therefore applicable.

350.   Comm. Code  § 3301 describes who is entitled to enforce an instrument:

> ""Person entitled to enforce" an instrument means (a) the holder of the instrument, (b) a nonholder in possession of the instrument who has the rights of a holder, or (c) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3309 or subdivision (d) of Section 3418.  A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument."

351.   Plaintiff is informed and believes and upon such information alleges that evidence will likely support that MERS (the entity appointing CAL-WESTERN as the SUB-TRUSTEE based on its status as the original or present beneficiary of the obligation in order to undertake a foreclosure to the Note, i.e. "instrument")  (i) is not the holder of the instrument; (ii) is not a non-holder in possession of the instrument and who has (iii) the rights of a holder; (iv) is not entitled to enforce under 3309 (3418 is not applicable to this action).

352.   Evidence already supporting Plaintiff's allegation regarding MERS inability to

enforce the Note as required by the Comm. Code  is demonstrated by (i) AURORA's  admission that DEUTSCHE BANK as trustee is the current owner of the debt. If the Note were to have been taken out of the trust prior to enforcement, AURORA would likely not have not so named the purported owner of the debt and furthermore AURORA admits on page 8 at ¶ 7, of EXHIBIT F , AURORA states that it is "the holder and/or custodian of the Note." (ii) therefore MERS cannot be a non-holder in possession and (iii) because no Nominee was created by contract (MOM language in the DOT) (iv) will not have any rights under 3309 as this primarily concerns lost instruments and because MERS never had possession of the Note it could not have lost that which it never held.

353.    Because MERS had no rights to enforce the instrument any action undertaken by MERS to undertake enforcement is improper.

## TWELFTH CAUSE OF ACTION: VIOLATION OF CAL. CIV. CODE 2924 et seq.
### (Against MERS, AURORA, CAL-WESTERN, and DUETSCHE BANK.)

354.    Plaintiff realleges and incorporates by reference each and every allegation as set forth above in paragraphs 308 through 353 inclusive, as if fully set forth within this cause of action.

355.    A non-judicial foreclosure sale under the power-of-sale in a deed of trust or mortgage must be conducted in strict compliance with its provisions and applicable statutory law. A trustee's powers and rights are limited to those set forth in the deed of trust and laws applicable thereto. *Coppola v. Superior Court (*1989) 211 Cal.App.3d  848,  868.

356.    A trustee's sale based on deficient notice of default is invalid. *Anderson v. Heart Federal Sav. & Loan Assn*. (1989) 208 Cal.App.3d  202,  211.

357.    California Civ. Code 2924 et seq. is the statute that governs the procedure for

undertaking a non-judicial foreclosure sale.

358.    Civ. Code § 2924(a) states "[Where] … a power of sale is conferred upon the

mortgagee, trustee, or any other person, to be exercised after a breach of the obligation for which

that mortgage or transfer is a security…" requiring first that there (i) be a power of sale conferred

within the DOT (Plaintiff does not contest that such a power was indeed conferred); (ii) that

there be a breach (Plaintiff does not contest, without either admitting or denying any reason

thereof, that payments upon the obligation were not made); (iii) that the mortgage containing the

Power of Sale (DOT) must be a security for the obligation (the Note). Because MERS has no

beneficial interest in the obligation (the Note) any DOT which MERS claims to hold as such

security fails and thereby precludes MERS from instituting any sale or foreclosure proceeding

under  Civ. Code § 2924.

359.    Civ. Code § 2924 (a) requires that the "power [of sale] shall not be exercised….

 until all of the following apply:"  to include the plain language of Civ. Code § 2924(a)(1)(C),

which empowers the beneficiary and only the beneficiary to elect to sell or cause the property to

be sold. This is in stark contrast to other subsections of § 2924 which permit the ministerial

aspects of the statute to be carried out by the trustee or various authorized agents. Section

2924(a)(1)(C) states that the Notice of Default "shall" include:

> "A statement setting forth the nature of each breach actually
> **known to the beneficiary and of his or her election to sell
> or cause to be sold the property** to satisfy that obligation
> and any other obligation secured by the deed of trust or
> mortgage that is in default."

(Emphasis added.)

360.    The wording of the Code is mandatory. In order to undertake  a Trustee's Sale in

accordance with § 2924, MERS must demonstrate it held the Note (in order "to satisfy the obligation" it purports to a DOT) on March 4, 2009, the time of the election to sell, which occurs upon issuance of the Notice of Default.

361.    Civ. Code § 2924(a)(1) is more broad, empowering parties other than the beneficiary to participate in the filing of a NOD as a preliminary step prior to a non-judicial foreclosure. The code states that prior to any sale that the "…trustee, mortgagee, or beneficiary, or any of their authorized agents shall first file… a notice of default.…"

362.    CAL-WESTERN filed an NOD under the auspice of "duly appointed trustee" as designated by SUB-TRUSTEE (EXHIBIT S). This appointment of trustee was made by MERS as either the original or present beneficiary (of the obligation; i.e. Note). Because MERS is not a beneficiary MERS could not appoint CAL-WESTERN as trustee and therefore even the broader language of § 2924 fails to permit the filing and issuance of the NOD by CAL-WESTERN.

363.    Even if somehow permitted to file the NOD, defendant CAL-WESTERN (and the actual beneficiary of the Note) fail to comply with 2924(a)(1)(C) by setting forth within the NOD "A statement setting forth the nature of each breach actually known to the beneficiary…" On page #1 of the NOD (EXHIBIT R) the notice opens with the language "If your property is in foreclosure because you are behind on payments…."  This statement, regardless of any knowledge held by Plaintiff, is uncertain and fails to make any assertion of the actual beneficiary's knowledge of a breach as required by law. The notice continues beyond its uncertain opening to explain that Plaintiff may have a legal right to make any amounts for "past due payments plus permitted expenses and costs."  A full sentence following this explanation tells Plaintiff that no sale date may be set until after three-months have passed from the issuance of the NOD—there is no mention within this sentence of due payments or costs. The following

sentence opens, "This amount is $4,895.80 as of March 04, 2009, and will increase until your account becomes current." Because there is a sentence interjected between the uncertain "if" question leveled in the NOD's opening there is no way for Plaintiff to logically connect the amount to a breach actually known by a beneficiary and required by law to be set forth as such. CAL-WESTERN, potentially aware of the language deficiency setting forth the known breach sufficiently on page one, includes a page two attached to the NOD. On page #2 at ¶8 the NOD states that the "…obligations for which such Deed of Trust is a security has occurred in that payment has not been made of: __" CAL-WESTERN by its attempt to add clarifying language and then leaving the amount blank has made any known breach that must be stated as such by law by the beneficiary completely uncertain, vague, ambiguous, and therefore fails to comply with the requirements of § 2924. Moreover the language with the "blank" on the second page restates that the "obligations for which such Deed of Trust is a security" which has been previously addressed in that MERS holds no right to payment on the Note.

364.    Because the law abhors a forfeiture in order to effect an involuntary sale beyond the eyes of the court, what otherwise might be called innocent or typographical errors such as the uncertain setting forth of the breach known to the beneficiary fail. There is no allowance for deviation from the requirements of § 2924. It is no different in the well developed body of California law regulating unlawful detainer actions where technical errors similar to the above result in a failure to state a cause of action and are grounds for dismissal.

365.    CAL-WESTERN is liable to Plaintiff for its violation of  § 2924 by its actual or constructive knowledge that defendant MERS is not a true beneficiary of any obligation secured by the DOT, that it was not a duly appointed trustee by any present or original owner of the

obligation secured by the DOT,  and by its failure to set forth any breach known by the beneficiary.

366.    MERS is liable to Plaintiff for its knowingly causing violations of § 2924 to occur by falsely and without justification appointing CAL-WESTERN as a substitute trustee and by its inability and failure to state any known breach under the DOT for which obligations were owed to MERS.

367.    AURORA, as the servicer for the debt, is liable to Plaintiff,  by what Plaintiff is informed and believes and upon such bases evidence will likely support its knowingly causing violations of § 2924 and for its "quarterbacking" of the enforcement measures (NOD filing and issuance) to either collect the debt or institute a forced sale, and the selection of the parties involved (MERS) and its knowledge of the necessary infirmities MERS must suffer when asserting any independent claim or power associated with the issuance of an NOD.

368.    Moreover Plaintiff made AURORA aware prior to the issuing and filing of a "Notice of  Trustee's Sale"  a true copy of which is attached as EXHIBIT W and incorporated herein, of the potential for the lack of viability for any MERS beneficiary claim and AURORA despite this knowledge  either allowed or instructed such notice to be issued and filed. The filing and issuing of a Notice of Trustee's Sale is also governed under §2924.

369.    Plaintiff is informed and believes and upon such bases alleges that evidence  will likely support that AURORA is owned by Lehman Brothers who in turn is a major investor in Great Hill Partners, the company that owns Promiss Solutions which in turn owns the company CAL-WESTERN. Therefore, as within much of this Complaint, the parties are closely connected.

370.    DEUTSCHE BANK is liable to Plaintiff for its knowingly causing violations of §

2924 to occur when passively standing idle even while believing itself to be the true beneficiary

of the obligation (on behalf of MBS investors) secured by the DOT and by its intending to

benefit by the foreclosure sale of Plaintiff's Property despite its knowledge of the actual or likely

§2924 violations.

371.   Additionally Plaintiff alleges that each named defendant owes to Plaintiff the duty

of reasonably prudent commercial conduct and of good faith and fair dealing and that each

named defendant failed in conduct to exercise a reasonable level of skill, knowledge, and care

and that proof of this failure is supported by the issuing and filing of a Notice of Sale despite the

inevitable, likely, and known §2924 violations as alleged herein.

372.   Because Plaintiff has been exposed to an improper foreclosure as set forth under

the requirements of  § 2924, and because fees have been attributed as owed by Plaintiff for all

separate efforts separately attributed to the improper filing and issuance of the NOD, Plaintiff

has suffered harm.

373.   WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**THIRTEENTH CAUSE OF ACTION:VIOLATION OF CAL. CIV. CODE § 2923.5**
**(Against MERS, AURORA, CAL-WESTERN, and DUETSCHE BANK.)**

374.   Plaintiff realleges and incorporates by reference each and every allegation as set

forth above in paragraphs 308 through 372 inclusive, as if fully set forth within this cause of

action.

375.   A non-judicial foreclosure sale under the power-of-sale in a deed of trust or

mortgage must be conducted in strict compliance with its provisions and applicable statutory

law. A trustee's powers and rights are limited to those set forth in the deed of trust and laws

applicable thereto. *Coppola v. Superior Court (Id.).*

376.   Cal. Civ. Code § 2923.5 is a part of the provisions governing a non-judicial

foreclosure sale.

377.     The California Legislature enacted 2923.5 (b) primarily to implement an extra-effort that must be followed before foreclosing on owner-occupied residences securing loans made between January 1, 2003, and December 31, 2007; criteria that applies exactly to Plaintiff's Property and Refinance Loan.

378.     §2923.5 (b), as enacted, requires that for any non-judicial foreclosure sale of real property, that any mortgagee, beneficiary or its authorized agent must demonstrate by declaration that it has made due diligence efforts to contact the borrower. §2923.5 also requires upon contact with the borrower that there be an offer of opportunity to discuss and explore alternatives to foreclosure and that there be a 30 day grace period after such discussion before the filing of any NOD.

379.     § 2923.5 (b) requires a declaration of due diligence contact efforts to be included within the NOD prior to any filing. The language requiring the declaration is not permissive, stating that such notice **"shall include a declaration."**

380.     in the last paragraph on page two of the he NOD filed and issued by CAL-WESTERN (EXHIBIT R) it states that the "mortgagee, beneficiary, or authorized agent for the mortgagee or beneficiary…declares that… [it] has either contacted the borrower or tried with due diligence to contact the borrower as required by California Civil Code 2923.5"

381.     The declaration is signed under the heading "CAL-WESTERN RECONVEYANCE CORPORATION" by a "Shannon K Mattola /BP."

382.     Because CAL-WESTERN can only be acting at best as a substituted trustee and is necessarily without any personal knowledge of any efforts to comply with § 2923.5, the declaration fails to comply with the law.

383.     Moreover, MERS, having no obligation for, nor receiving any payment from

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

Plaintiff, nor ever making any independent effort to contact Plaintiff, cannot appoint or delegate CAL-WESTERN to make this declaration on its behalf.  MERS, as argued above and incorporated herein, has and had no authority as either the original or present beneficiary to appoint CAL-WESTERN as the substitute trustee—the role CAL-WESTERN necessarily attempts to assume in order to have the ability to issue and file the NOD.

384.   Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that AURORA holds the responsibility for making the 2923.5 declaration, and can only be said to have indirectly appointed CAL-WESTERN, if such appointment were to be somehow valid.

385.   Even if the party signing the declaration were to offer some proof of color of authority the declaration is overly broad. It completely fails to state what party made or failed to make what contact with Plaintiff, providing no opportunity for Plaintiff to assess the accuracy of the declaration or for the People of California to determine that the legislature's wish to afford extra-protection prior to a foreclosure sale has been met. It is simply a blanket assertion that attempts to say more by saying less.

386.   Because the 2923.5 declaration is (i) overly broad and (ii) attested to by a party who had no personal knowledge about any attempts or efforts to contact the Plaintiff, or any connection (iii) to a party who held such knowledge, and (iv) because the declarant's appointment as substitute trustee was made by a party who based this appointment on its incorrect assertion as the original or present beneficiary to obligations secured by Plaintiff's DOT; the declaration fails and the NOD must fail with it.

387.   CAL-WESTERN is liable to Plaintiff for its violation of § 2923.5 by its actual or

constructive knowledge that defendant MERS is not a true beneficiary of any obligation secured by the DOT and therefore CAL-WESTERN was not a duly appointed trustee by any present or original owner of the obligation secured by the DOT. That it had no authority to make a 2923.5 declaration on behalf of MERS; that it had nor any personal knowledge of the attempts to contact Plaintiff or an agency relationship with a party responsible for attempting to contact Plaintiff prior to issuing and filing an NOD;  that it could not make a 2923.5 declaration on its own;  and by its failure to include a more specific declaration made by a proper party.

388.    MERS is liable to Plaintiff for its knowingly causing violations of § 2923.5 to occur by falsely and without justification appointing CAL-WESTERN as a substitute trustee and by its inability and failure to state any attempts made to contact Plaintiff as required within the 2923.5 declaration .

389.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that AURORA, as servicer, caused MERS to appoint CAL-WESTERN and that AURORA (knowing that a 2923.5 declaration flaw must result) took no steps to prevent the declaration error and thereby conspired or tacitly supported the failure to comply with the law.

390.    AURORA, as the servicer for the debt, is liable to Plaintiff,  by what Plaintiff is informed and believes and upon such bases evidence will likely support its knowingly causing violations of § 2923.5 and for its "quarterbacking" of the enforcement measures (NOD filing and issuance) to either collect the debt or institute a forced sale, and the selection of the parties involved (MERS) and its knowledge of the necessary infirmities MERS must suffer when asserting any independent claim or power associated with the issuance of an NOD, and by its failure to correct the error and tacit support.

391.    Plaintiff is informed and believes and upon such bases alleges that evidence

will likely support that AURORA is owned by Lehman Brothers who in turn is a major investor in Great Hill Partners, the company that owns Promiss Solutions which in turn owns the company CAL-WESTERN. Therefore (as is the case within much of this Complaint) the parties (AURORA & CAL-WESTERN) are likely to be closely connected.

392.    DEUTSCHE BANK is liable to Plaintiff for its knowingly causing violations of § 2923.5 to occur when passively standing idle even while believing itself to be the true beneficiary of the obligation (on behalf of MBS investors) secured by the DOT and by its intending to benefit by any foreclosure sale of Plaintiff's Property despite its knowledge of the actual or likely 2923.5 violations.

393.    Plaintiff asserts there is no Office of Thrift Supervision ("OTS") field  preemption claim available for AURORA to escape the requirements of California law. AURORA simply "stands in the shoes" of the Master Servicer for the MBS trust as a subservicer (see EXHIBIT E, page 2 at ¶ 4). Plaintiff is informed and believes that evidence will likely support that at the time of loan issuance the original servicer (or subservicer) of the loan was under no regulation of the OTS. To allow any preemption shield to AURORA would sanction a form of bootstrapping that is contrary to the intent of a uniform scheme where such a scheme is not intended or contemplated at the onset. Additionally, 12 C.F.R. § 560.2 specifically exempts from any claim of exemption both state contract and real property law(s) to the extent those state laws only incidentally affect the operation of entities under OTS regulation. Because a foreclosure sale is based on contract (power of sale in the DOT) and concerns real property, and the requirements of § 2923.5  are only incidental to the primary function the debt servicer holds (collecting monthly payment) even if AURORA were able to "bootstrap" an OTS preemption claim, the claim must fail.

394.    Additionally Plaintiff alleges that each named defendant owes to Plaintiff the duty of reasonably prudent commercial conduct and of good faith and fair dealing and that each named defendant failed in conduct to exercise a reasonable level of skill, knowledge, and care and that proof of this failure is supported by the issuing and filing of a Notice of Sale despite the inevitable, likely, and known §2923.5 violations as alleged herein.

395.    Because Plaintiff has been exposed to an improper foreclosure as set forth under the requirements of  § 2923.5, and because fees have been attributed as owed by Plaintiff for all separate efforts separately attributed to the improper filing and issuance of the NOD, Plaintiff has suffered harm.

396.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### FOURTEENTH CAUSE OF ACTION: SLANDER OF TITLE
### (Against MERS, AURORA, CAL-WESTERN, and DUETSCHE BANK.)

397.    Plaintiff realleges and incorporates by reference each and every allegation as set forth above in paragraphs 304 through 349 inclusive and 351 through 368 inclusive, as if fully set forth within this cause of action.

398.    On or about June 6, 2009, Plaintiff was owner in fee of the subject property.

399.    On or about June 6, 2009, CAL-WESTERN willfully, maliciously, and without any qualified privilege or justification issued and published a false statement disparaging Plaintiff's right to title of Plaintiff's Property by issuing and filing an improper Notice of Sale.

400.    On or about March 5, 2009, Plaintiff was owner in fee of the subject property

401.    On or about March 5, 2009 CAL-WESTERN willfully, maliciously, and without any qualified privilege or justification issued and published a false statement disparaging Plaintiff's right to title of Plaintiff's Property by issuing and filing an improper NOD.

402.     It was foreseeable that the filing of Notices would impair the salability of Plaintiff's Property as such Notices necessarily must and there need be no identified purchaser present for a slander of title to result.

403.    The Notices were filed with a reckless disregard for their ability to comply with Cal. Civ. Code §§ 2923.5 and 2924.

404.    The Notices failed to adequately describe any breach of any obligation Plaintiff may have owed and cast further cloud on title by asserting a beneficial interest that does not exist; factors that would naturally complicate and impair salability.

405.    Costs have been calculated as owed by Plaintiff  attributed directly or indirectly to the filing of the improper Notices.

406.    Plaintiff incurs costs in proceeding with this suit to clear title.

407.    Defendants MERS, AURORA, and DEUTSCHE BANK are directly or secondarily liable for CAL-WESTERN'S conduct in the filing of the NOD and the Notice of Sale ("Notices") and owed Plaintiff a duty of care which they failed to abide, as alleged above and already incorporated herein.

408.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**FIFTEENTH CAUSE OF ACTION: PROFESSIONAL NEGLIGENCE**
**(Against MERS, AURORA, CAL-WESTERN, and DUETSCHE BANK.)**

409.    Plaintiff hereby incorporates by this reference all of the allegations set forth in paragraphs 304 through 349 inclusive and 351 through 368 inclusive, and paragraphs 393 through 403 inclusive, as though fully set forth at length herein.

410.    Plaintiff is a member of the class that the California Legislature intended to entitle with the strict statutory requirements of Cal. Civ. Code §§ 2923.5 and 2924 before any forced non-judicial sale may be undertaken.

411.    Because Plaintiff is a member of this class, and as such is owed a duty of care, a duty of reasonably prudent commercial conduct, and of good faith and fair dealing whenever an action is undertaken under the provisions of these statutes.

412.    Because the defendants violated Cal. Civ. Code §§ 2923.5 and 2924 as alleged. above and incorporated herein the duties owed to Plaintiff were breached.

413.    Because the violations of Cal. Civ. Code §§ 2923.5 and 2924  involved the

an attempt to seize Plaintiff's property by foreclosure, an extraordinary form of relief ultimately resulting in the forfeiture of property by Plaintiff if consummated, and because the taking of a property is not within the normal scope of extending credit or the servicing of a loan, Plaintiff maintains that defendants owe Plaintiff an independent and similar duty of reasonably prudent commercial conduct.

414.    Because the defendants violated Cal. Civ. Code §§ 2923.5 and 2924 as alleged above and incorporated herein the duties owed to Plaintiff were breached.

415.    The filing and issuing of an NOD and a Notice of Sale of harmed the Plaintiff, placed a slander on Plaintiff's title and exposed Plaintiff to an improper foreclosure and costs of this action.

416.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

## PLAINTIFF'S PRAYER FOR RELIEF

### FOR EVERY CAUSE OF ACTION

1.  All damages, costs, and fees that may be awarded as a recoupment or a set-off for any debt or cost that may be proven as owed by Plaintiff to any defendant.

2.  For such other further relief as the court may deem proper and just.

### ON THE FIRST CAUSE OF ACTION

1.  For general damages according to proof;

2.  For special damages according to proof;

3.  If the loan is ordered rescinded, for any restitution owed to any assignee of the loan to be paid by the person with whom the loan was originally contracted.

### SECOND, THIRD, AND FOURTH CAUSE OF ACTION

1.  Cancelation of the loan agreement, as void ab initio, or in the alternative, rescission of the loan agreement;

2.  For general damages according to proof;

-99-
COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

3.  For special damages according to proof;

4.  For punitive damages in an amount sufficient to punish and to make an example of Defendants, and to deter others from engaging in similar conduct;

5.  Reasonable attorney's fees, expenses and costs;

6.  Pre and post-judgment interest.

FIFTH CAUSE OF ACTION

1.  For treble damages of payment associated with Refinance Loan to total $18,686.25;

2.  For any award of damages as permitted by statute;

3.  For reasonable attorney's fees, expenses, and costs as permitted by statute.

SIXTH CAUSE OF ACTION

1.  Cancelation of the loan agreement as void ab initio or in the alternative, either an order declaring the loan voidable or an order which only obligates Plaintiff to the loan contract to the extent necessary to avoid any unconscionable result.

SEVENTH CAUSE OF ACTION

1.  For actual damages according to proof;

2.  For punitive damages in an amount sufficient to punish and to make an example of Defendants, and to deter others from engaging in similar conduct;

3.  For reasonable attorney's fees, expenses, and costs as permitted by statute.

ON THE EIGTH, NINTH, TENTH, AND ELEVENTH CAUSES OF ACTION

1.  For all consideration unlawfully obtained as according to proof;

2.  For reasonable attorney fees pursuant to CCP 1021.5 and as according to proof;

3.  For costs of suit incurred herein.

TWELFTH CAUSE OF ACTION

1.  For an order by the court declaring any foreclosure sale undertaken on the Notice of Default and Notice of Sale be unlawful and invalid;

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

2. For an order by the court rescinding the Notice of Default and Notice of Sale;

3. For reasonable attorney fees as permitted under California Civil Code §1717, according to proof;

4. For costs of suit incurred herein.

THIRTEENTH CAUSE OF ACTION

1. For an order by the court declaring any foreclosure sale undertaken on the Notice of Default and Notice of Sale be unlawful and invalid;

2. For an order by the court rescinding the Notice of Default and Notice of Sale;

3. For reasonable attorney fees as permitted under California Civil Code §1717, according to proof;

4. For costs of suit incurred herein.

5. subject property;

FOURTEENTH CAUSE OF ACTION

1. For general damages according to proof;

2. For special damages according to proof;

3. For punitive damages in an amount sufficient to punish and to make an example of Defendants, and to deter others from engaging in similar conduct;

4. For such sanctions as may be awarded under CCP 128.5;

5. For reasonable attorney fees pursuant to CCP 1021.5 and as according to proof;

6. For an order by the court rescinding the Notice of Default and the Notice of Sale;

7. For reasonable attorney fees as permitted according to proof;

8. For costs of suit incurred herein.

FIFTEENTH CAUSE OF ACTION

1. For general damages according to proof;

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

2. For special damages according to proof;

3. For punitive and exemplary damages according to proof;

4. For reasonable attorney fees as permitted according to proof;

5. For costs of suit incurred herein.

Dated: October 2, 2009                                Respectfully Submitted,

By: /s/ Allan J. Cory
Allan J. Cory, Attorney for Plaintiff,
Jose Vera

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

**CERTIFICATE OF SERVICE:**

I hereby certify that on **October 2, 2009**, a true and correct copy of **FIRST AMENDED COMPLAINT,** was electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to all ECF registrants in this case.

By: */s/ Allan J. Cory*
Allan J. Cory

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE