1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Allan J. Cory SBN: 224289
Email: cory@sonic.net
LAW OFFICE OF ALLAN J. CORY
740 4th Street,
Santa Rosa, CA 95404
Office: 707-527-8810
Fax:    707-569-1547
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOSE VERA<br><br>          Plaintiff,<br><br>          vs.<br><br>AURORA LOAN SERVICES LLC;<br>CAL-WESTERN RECONVEYANCE<br>CORPORATION;<br>DEUTSCHE BANK TRUST COMPANY<br>AMERICAS, IN TRUST FOR, RESIDENTIAL<br>ACCREDIT LOANS, INC. MORTGAGE<br>ASSET-BACKED PASS-THROUGH<br>CERTIFICATES, SERIES 2005-QO4;<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC.;<br>HOMECOMINGS FINANCIAL, LLC;<br>HOMECOMINGS FINANCIAL NETWORK,<br>INC., a business organization, form unknown;<br>TRIMERICA MORTGAGE CORPORATION,<br>a business organization, form unknown. | ) Case No: CV 09-03626-CW<br>)<br>) Hon. Claudia Wilken<br>) Courtroom: A – 15th Floor<br>)<br>)<br>) **SECOND AMENDED COMPLAINT FOR**<br>)    1.  **VIOLATION OF RESPA;**<br>)    2.  **VIOLATION OF CAL. FIN.**<br>)        **CODE§22100 et seq.;**<br>)    3.  **BREACH OF FIDUCIARY DUTY;**<br>)    4.  **FRAUD**<br>)    5.  **CONCEALMENT;**<br>)    6.  **VIOLATION OF CAL. BUS. &**<br>)        **PROF. CODE 17200 et seq.;**<br>)    7.  **VIOLATION OF CAL. BUS. &**<br>)        **PROF. CODE 17200 et seq. ;**<br>)    8.  **WRONGFUL FORECLOSUE**<br>)<br>)<br>) Complaint Filed: July 1, 2009<br>) Removed: August 7, 2009<br>) Trial Date: None<br>) |

## I.

## JURISDICTION

1.   This Complaint was originally filed in the Superior Court of California and then

subsequently removed to this Court with the stated basis for removal being that Plaintiff had made a claim arising under the Truth in Lending Act (15 U.S.C. § §1601-1667(f).  Although the basis for removal was improperly stated (Plaintiff's original Complaint contained no allegation or inference of a violation of the Truth in Lending Act) jurisdiction is still proper because the Complaint prior to removal, (and as amended), contains claims arising under the Real Estate Settlement and Procedures Act (12 U.S.C. §§ 2601, et seq.).

2.   Because both the original Complaint and this Second Amended Complaint raise claims that depend on the resolution of substantial federal questions, original jurisdiction is conferred to this Court pursuant to 28 U.S.C. §1331.  Removal is proper pursuant to 28 U.S. C. § 1441 (a).

3.   Supplemental jurisdiction exists for all remaining claims pursuant to 28 U.S.C. § 1367.

## II.

## <u>VENUE</u>

4.   Plaintiff originally filed a civil action with the Superior Court of California for the County of Sonoma. Sonoma County is within the Northern District of California and therefore venue is proper upon removal to this Court pursuant to 28 U.S.C. § 1441 (a).

## III.

## <u>INTRODUCTION</u>

5.   This is an action concerning two distinct but necessarily related matters: The first portion of this Complaint challenges the very nature of a mortgage loan Plaintiff was induced to purchase without having the opportunity to understand its predatory nature, its true cost, or its onerous terms.

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

6.  The second part of the Complaint challenges the attempt to foreclose on the very property Plaintiff was seduced into providing as security for the predatory loan: This portion of the Complaint exposes a fatal lack of adherence to procedure and details a purposeful attempt to circumvent the safeguards which ensure that any forfeiture not be sanctioned lightly or sanctioned at all without absolute and strict compliance to well established California law.

## IV.

## PRELIMINARY ALLEGATIONS

7.  Jose Vera ("Plaintiff") is now, and at all times relevant to this Complaint, the owner of the real property that is the subject of this Complaint, commonly known as 142 Elm Street, Cloverdale, California in the County of Sonoma ("Property").  The Sonoma County assessor's parcel number for Property is 001-085-010.

8.  Plaintiff owns Property that is the subject of this Complaint as a Joint Tenant with Maria Vera ("spouse").

9.  Plaintiff and  spouse are both Hispanic and original citizens of  Guadalajara, Mexico. English is a second language to both Plaintiff and his spouse.

10.  While Plaintiff and his spouse are hardworking and gainfully employed, they both lack any higher-level education: Plaintiff stayed in school in his native Mexico only through the fourth-grade; Plaintiff's spouse finished the sixth-grade. Approximately 13 years ago Plaintiff attempted to better his English comprehension by enrolling in a course in English at a local junior college. Plaintiff's spouse underwent sufficient training in her native Mexico to obtain what is comparable to a Beauty School certificate. Despite these later-in-life education effort(s) both Plaintiff and spouse are severely limited in their ability to read and comprehend the written English language. They are somewhat stronger in their understanding of spoken English.

11.  Both Plaintiff and spouse have become naturalized citizens of the United States.

12.  Through hard work and determination Plaintiff and spouse were able to purchase property in the new country they now call home.

13.  Plaintiff obtained a refinance loan ("Refinance Loan") for Property which recorded as secured by a new Deed of Trust on October 25, 2005.

14.  Defendant Homecomings Financial Network, Inc. was the actual lender for Plaintiff's Refinance Loan. Plaintiff is informed and believes and upon such bases alleges that Homecomings LLC is a successor in interest to defendant Homecomings Financial Network, Inc. Therefore, when no differentiation between the entities is necessary, both entities shall hereinafter be referred to collectively as "Homecomings."

15.  Plaintiff did not undertake any of the initial affirmative steps to seek the Refinance Loan but was instead contacted by telephone and solicited ("cold-called") several months prior to engaging in the process of refinance by an individual who identified himself as Steve Preciado ("Preciado") who represented himself to Plaintiff as a loan broker working under the supervision of defendant Trimerica Mortgage Corporation ("Trimerica"). The majority of Preciado's solicitation calls to Plaintiff occurred on or before September 1, 2005, a date where it is known by Trimerica's own admission that an agreement between Plaintiff and Trimerica was made. See "Borrower's Disclosure Statement" a true copy of which is attached and incorporated herein as EXHIBIT A, wherein it states that "Date of Agreement" is 09/01/2005.

16.  Preciado told Plaintiff that as a "broker" Preciado could obtain for Plaintiff the "best possible loan."

17.  Plaintiff resisted Preciado's initial advance(s) but Preciado followed-up with multiple phone calls over the span of several months and in each conversation Preciado would assure both

Plaintiff and Plaintiff's spouse that he was still striving to get them that "best possible loan."

18.  Preciado continually preached to Plaintiff and spouse the benefits of refinancing.

19.  Preciado made Plaintiff and spouse feel as though failing to refinance was a huge mistake, especially given Preciado's ability to secure the "best possible loan."

20.  Preciado had successfully invited himself into Plaintiff's life prior to the do-not-call act of 2006 and continued to call Plaintiff without any encouragement.

21.  Preciado spoke to Plaintiff and to Plaintiff's spouse at all times only in Spanish.

22.  Plaintiff and Spouse eventually informed Preciado that the only type of loan they might consider as beneficial would be a fixed-rate loan for a term of 30-years that was lower than the rate of interest on their current loan.

23.  Preciado answered that this condition wouldn't present a problem; the interest rate would be lowered and a fixed-rate payment of under $1000.00 could be achieved.  Preciado offered to send "papers" to begin the process.

24.  Plaintiff and spouse, relying on Preciado's  specific agreement and representation and Preciado's consistent promises that the Refinance Loan would be the very best possible, assented and allowed Preciado to take the application for the loan.

25.  Plaintiff and spouse trusted Preciado's stated position as a broker and relied on Preciado's represented superior position (a broker) to be utilized for their benefit.

26.  Plaintiff was promised peace of mind and future security by the benefit Preciado offered: the Refinance Loan was to be less costly on a monthly basis than any other available loan, at a lower fixed rate interest than their current loan, and with a fixed payment of less than $1000. Plaintiff never requested and Preciado never mentioned of possibility of arranging a loan with negative amortization, and fluctuating payments.

27.  Preciado, aware of Plaintiff's comfort with only the Spanish language and likely aware of Plaintiff's inability to comprehend the confusing amount of loan documents in any language, made no effort to provide a less challenging burden by providing any documentation to Plaintiff in Spanish.

28.  Preciado caused the loan documents for the Refinance Loan to be delivered to Plaintiff and spouse by use of a mobile notary; a notary that Plaintiff or spouse did not participate in selecting or hiring for this task, and with whom they had no familiarity.

29.  The mobile notary ("Angels on the Run")  came to Plaintiff's home with the multiple documents necessary to obtain Preciado's promised Refinance Loan on a date between October 15th 2005 and October 20th, 2005 in the evening. (Plaintiff pleads a range of dates for the singular appearance of the mobile notary because while uncertain of the exact date, Plaintiff is informed and believes that evidence will likely support that the date of signing occurred within this date range.)

30.  Preciado through an earlier phone conversation with Plaintiff, instructed Plaintiff to sign the documents delivered by the mobile notary upon receipt and assured Plaintiff that the documents reflected the verbal representations Preciado had made regarding the loan's fixed rate and lower payments. Preciado underscored the importance and urgency of signing the documents when delivered in order to obtain the best loan possible.

31.  Preciado made no arrangement to be available during the actual signing and did not provide Plaintiff any contact information for reaching him after normal business hours in case the mobile notary arrived in the evening.

32.  Preciado was notably absent in the most important part of the loan application process—the actual signing of the loan obligation and disclosure documents. Plaintiff was left

alone and without any assistance by the broker who had enlisted himself as Plaintiff's confidant.

33.  Plaintiff and spouse, overwhelmed with Refinance Loan documents written only in English and beyond their comprehension, turned to the mobile notary as the party most naturally in position to provide guidance about the nature and content of the documents.

34.  When asked for document explanation assistance the mobile notary responded that she could not provide this kind of guidance and that any such questions had to be directed to the broker arranging the loan. She stated that she could only point out which documents needed to be signed and that she was not able to help Plaintiff or spouse understand what any document contained or concerned.

35.  Plaintiff and spouse, although now feeling abandoned and without guidance, relied on Preciado's earlier reassuring statements and promises and signed all the documents where the mobile notary indicated their signatures were required.

36.  The next morning Plaintiff and spouse awoke uneasy, feeling that at a critical part of a confusing the process they had been left to fend completely on their own. Other than promising a certain lower payment amount and a lower fixed-interest rate Preciado had never discussed the Refinance Loan with Plaintiff in more than a generalized and promising manner, always assuring Plaintiff that Preciado had arranged the best possible loan. The absence of Preciado to correlate his promising statements with the actual loan documents when it was most needed made Plaintiff and spouse distrustful. His lack of presence at the finish line raised a warning in their minds. With fear beginning to grip them and no place to turn for an explanation Plaintiff and spouse perceived the surest course to certain safety was to completely cancel the transaction and the loan.

37.  On the morning following Plaintiff's signing of the loan documents, during business

hours, Plaintiff placed a call to the Southern California office of Preciado. An aide or co-worker of Preciado received the call and responded that Mr. Preciado was not available to speak with Plaintiff because he was too busy. Preciado, who had once been so eager to speak with Plaintiff about this "best possible loan" could not take Plaintiff's call at this critical juncture and no a promise of a return call was communicated on his behalf. This lack of attention reinforced the growing apprehension and fear shared by Plaintiff and spouse. A short while later on the same day Plaintiff anxiously called Preciado again; this time Preciado answered. Plaintiff stated he wished to cancel "the papers" because he did not understand them and was now worried they concealed something less than the best possible loan. Preciado responded curtly that it was "too late" because Plaintiff and spouse had already signed the papers. When Plaintiff began to explain his concern that the documents were never correlated properly to demonstrate they contained all of Preciado's earlier promises, Preciado repeated again that it was too late for Plaintiff to do anything and terminated the conversation without further explanation.

38. Preciado's behavior caused Plaintiff and spouse to experience elevated anxiety. Preciado had made no effort to allay any of their fears and sounded like he wished only to be free of them. They felt a collective pit deepen in their stomach and suspected the earlier smiling voice of Preciado, this stranger who before had always spoke so easily and encouragingly in the trusted tones of their native language, had duped them and taken advantage of their lack of acumen.

39. Plaintiff's spouse determined to make an effort to verify or disaffirm their newfound fear and made a strong effort to decipher the signed loan documents and while not certain of the effect, noted language within the "Adjustable Rate Note" (a true copy of which is attached as EXHIBIT B and incorporated herein) stating the initial payment amount of $985.24 "may change" [EXHIBIT B, pg. #1 at ¶ 3 (B)] and also that the interest rate of 1.375% "may change"

[EXHIBIT B, pg. #2 at ¶ 2 (C)]. Plaintiff's spouse, unable to further interpret the loan documents to determine what condition actually created the opportunity for the "may change" language to become effective, and believing she was also a party to the Refinance Loan (this belief turned out to be false), called Trimerica again on the afternoon of the day immediately following Plaintiff's signing of the loan document, this time to speak with a supervisor of Preciado.

40.  Plaintiff's spouse was connected to an individual claiming a supervisor capacity to whom she  explained the reason(s) for the newly developed feelings of distrust and the concern she and Plaintiff had about the potential meaning of loan terms that were never explained and she did not understand. She said she wished to cancel the loan unless she had certain assurance that these ambiguous terms allowing a possible change in payment in rate did not apply in this loan. The individual identified as supervisor asked her to wait on hold while the matter was looked into. After an unknown amount of time leaving spouse on hold the supervisor returned to the phone and stated, "It's too late—all the documents have been signed." Supervisor then terminated the call without any further advice or potential recourse.

41.  In reality the Refinance Loan did not close and record for at least another four-days (on October 25, 2005). Plaintiff was not made aware of the delay (or its potential) and relied on the representations by Preciado and Preciado's supervisor. These representations were made to necessarily mean the loan had already closed or would close on the day following the signing of the loan documents and therefore no interruption of the closing process was available to Plaintiff. Trimerica and Preciado were financially motivated to declare the timeline as "too late"

42.  Preciado's subterfuge was substantially assisted by the fact that the actual lender (Homecomings Financial Network, Inc.) and Trimerica each failed in their duty to provide early disclosures regarding the loan.

43.  Plaintiff received his disclosures regarding the loan at the same time he was instructed to sign all the various loan documents.

44.  RESPA (12 U.S.C. § 2604(c); 24 C.F.R. § 3500) requires that the lender and mortgage broker provide to the borrower a Good Faith Estimate ("GFE") with the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement.''  This disclosure must contain a dollar amount or a good faith range of costs based on experience for the items that will ultimately be entered in section "L" of the settlement statement ("HUD-1"). Section L of the HUD-1 contains line entries broken into categories that are labeled and numbered 700 through 1400.

45.  The GFE must disclose estimated direct and indirect fees no later than 3 days after loan application. 24 CFR 3500.7(a) and (b).

46.  In Borrowers Disclosure Statement (EXHIBIT A) Trimerica admits the " Date of Agreement" as 09/01/2005, therefore the GFE must have issued on or before 09/04/2005 to comply with RESPA.

47.  Plaintiff received no timely GFE from Trimerica.

48.  If the mortgage broker fails to provide the GFE it is the lender's separate and independent responsibility to ensure that the GFE is timely provided. The requirement that Plaintiff receive a timely GFE and that all fees be disclosed is intended to insure that consumers are shown the full amount of compensation to brokers and others early in the transaction.

49.  Plaintiff received no timely GFE from Homecomings.

50.  Additional early disclosure(s) are required when a loan is brokered under regulation of the California Finance Lender Law as is alleged and discussed later within this Complaint.

The party responsible for supplying CFLL disclosures varies but Plaintiff alleges that none of the various disclosures were timely provided and that when they were provided failed to conform with statutory requirements.

51.  Homecomings demonstrates a modicum of concern about which disclosures Plaintiff received as is demonstrated in their "Closing Instructions" (a true copy of which is attached as EXHIBIT I and incorporated herein) wherein , for example, Homecomings requires Plaintiff to sign a copy of  the "Fair lending Notice" as a condition to funding the loan. In the Addendum (page two), Homecomings requires Plaintiff to sign copy of the "Estimated HUD-1" as an additional funding condition. Homecomings notably does not request or require signed copies of the CFLL disclosures or of the GFE in its Closing Instructions.

52.  Moreover, because Homecomings required Plaintiff's signed copy of the Estimated Hud-1, Homecomings had actual knowledge of the errors contained therein.

53.  Plaintiff is informed and believes and upon that basis alleges that the document titled "Buyers/Borrowers Closing Statement—Estimated" (a true copy of which is attached as EXHIBIT J and incorporated herein) served in the place of the more particular HUD-1. This document, unlike an actual HUD-1, does not segregate costs into separate categories (e.g. closing costs) making it difficult for a borrower to discern costs associated with the loan.

54.  Had an actual "Estimated HUD-1" been provided to Plaintiff (a condition Homecomings required prior to funding the loan in the Closing Instructions) the "Marketing Fee" Homecomings paid to incent Trimerica to solicit Plaintiff's Refinance Loan would have been listed under the heading "Items Payable in Connection With Loan" with a required annotation of POC or YSP next to the amount paid.

55.  Plaintiff  received the Estimated Closing Statement at the same time he was required

to sign all of the loan documents. The Marketing Fee Homecomings paid to Trimerica is listed under "New Loan Charges" without any POC or YSP annotation (unlike the "Appraisal Fee" entry which follows closely below in the same document).

56.   Because Homecomings  review of the "Estimated Hud-1" disclosure was a condition prior to the Refinance Loan funding there was adequate time and opportunity before the loan closed for a correction to be caused by Homecomings in order to assist the Plaintiff in discovering the incentive paid by Homecomings to solicit Plaintiff's loan; an opportunity Homecomings shunned.

57.  Plaintiff would never have accepted the terms of the loan had Preciado represented the actual terms of the Refinance Loan; provided  truthful explanation or assistance regarding the loan terms at the critical moment of document signing; provided advance copies of all documents to be signed for review and provided these documents in Spanish, the language in which the loan was negotiated; assured Plaintiff falsely that the loan documents contained terms verbally agreed and insisting in advance that the documents must be signed when delivered in order to obtain the loan; or understood the excessive costs for obtaining the loan generated by Homecomings already paying Trimerica $8,715.00 on a loan amount of $290, 500.00 (3% of the loan amount) in addition to the charges levied by Trimerica.

58.  Preciado was substantially assisted in failing to disclose the terms and nature of the Refinance Loan by Homecomings failure to issue early disclosures and to correct errors and omissions in the disclosures Plaintiff received. Had either Trimerica and/or Homecomings provided accurate and timely early disclosures regarding the true terms of the loan and the true nature of their relationship, Plaintiff may have been provided his lawful opportunity to learn the true character of the Refinance Loan .

# VII.

## CLOSELY CONNECTED PARTIES

59.  Plaintiff is informed and believes and upon such information and belief alleges at all times relevant to this complaint that both Homecomings Financial Network, Inc. was either a direct or indirect subsidiary of ResCap, who in turn was either a direct or indirect subsidiary of General Motors Corporation "GM".

60.  Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support Homecomings sold Plaintiff's loan and servicing prior to the loan closing ("forward sale"). Plaintiff makes this allegation in part based on Homecomings own admission contained in a document Plaintiff received at the time of signing the loan documents. A true copy of this untitled document is attached and incorporated herein as EXHIBIT D. The purpose of this document seems to be twofold; (i) to notify Plaintiff the Refinance Loan had been sold along with its servicing rights and, (ii) to provide Plaintiff temporary payment coupons. In the second paragraph Homecomings admits that Plaintiff's  "…loan has been sold…."  This statement is made in no uncertain terms: However, the document does not state to whom the loan has been sold.  Plaintiff is informed and believes and upon such basis alleges there is likelihood that evidence will support the loan had been sold either directly or indirectly into a securitized trust. The document also states that the loan's servicing has been sold. The entity identified as purchasing the servicing is "GMAC Mortgage Corporation." Plaintiff is informed and believes and upon such information and belief alleges GMAC Mortgage Corporation was a wholly owned subsidiary of ResCap, a division of General Motors Corporation ("GM") at the time of Refinance Loan issuance.

61.  Attached as EXHIBIT E  and incorporated herein are true copies of various

SEC filing excerpts ("SEC Excerpts") for the Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("The Trust"), which Plaintiff is informed and believes and upon such bases alleges, evidence will likely support is the securitized trust into which Plaintiff's loan was sold.

62.  Paragraph #1 of EXHIBIT E ("The Trust Structure Paragraph") establishes Residential Accredit Loans, Inc. Loans, Inc. ("RALI") as The Trust depositor and affiliate of Residential Funding Corporation ("RFC") and "The Trust Structure Paragraph" lists RFC as the "Master Servicer" for The Trust and RALI as an affiliate of RFC.  Plaintiff is informed and believes and upon such information and belief alleges that RFC was a wholly owned subsidiary of ResCap, a division of GM at the time of Plaintiff's Refinance Loan issuance .

63.  Paragraph #2 of EXHIBIT E establishes that the Master Servicer has complete authority on its own or through others to service and administer loans within The Trust.

64.  Paragraph #3 of  EXHIBIT E allows the Master Servicer to enter or honor subservicing agreements (assumedly these agreements entitle Master Servicer to some form of compensation) and, if a nonsubservicing agreement is utilized, to otherwise be compensated.

65.  Paragraph #4 of  EXHIBIT E establishes that despite any agreement with any other servicer, the Master Servicer (RFC) remains liable to the Trustee.

66.  Paragraph #5 of  EXHIBIT E establishes that defendant Mortgage Electronic Registration Systems, Inc ("MERS") is a party to the structure of The Trust.

67.  The Trust Structure Paragraph of  EXHIBIT E establishes that defendant Deutsche Bank Trust Company Americas, In Trust For, Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("Deutsche Bank") is the Trustee for The Trust.

68.  Defendant Aurora Loan Services LLC ("Aurora") provided a response to Plaintiff's Qualified Written Request (a true copy of which is incorporated herein and attached as EXHIBIT F) wherein Aurora admits that the current owner of the debt for Refinance Loan is defendant Deutsche Bank. (EXHIBIT F at page 2). Plaintiff is informed and believes and upon such bases alleges, that Aurora is a subservicer or has some form of agreement with the Master Servicer.

69.  Paragraph #13 of EXHIBIT E establishes that Deutsche Bank provides investment and banking advice to ResCap and that Deutsche Bank may be a lender utilizing ResCap or its affiliates' credit facilities.

70.  Paragraph #14 of EXHIBIT E establishes that Deutsche Bank anticipated the possibility of owning certificates issued by the securitized Trust into which Plaintiff's Refinance Loan was likely sold.

71.  Based upon the facts and allegations and or information and belief contained within paragraphs 60 through 72 inclusive of this Complaint, Plaintiff alleges that the parties involved in the arranging, selling, servicing of the Refinance Loan either shared or share a common unity by; (A) an affiliation with ResCap and GM or, (B) an agency, partnership, joint-venture, common financial interest, or similar arrangement with ResCap and GM and, (C) a contemplated and agreed design to work in a unified purpose and manner designed to profit from the sale of securities which included  Plaintiff's Refinance Loan .

72.  Because all the parties to the loan were so closely connected any claim Plaintiff may bring against Homecomings is also properly imputed to Deutsche Bank.

## VIII.

### NO HOLDER IN DUE COURSE

73.  When there is fraud inducing an obligor to sign a negotiable instrument (i.e. Note)

California Commercial Code §3305 (a) (1) (C) limits the rights of a party to enforce the obligation to pay on the instrument ("Note") if the obligor has neither the knowledge nor reasonable opportunity to learn of the instrument's character or essential terms.

74.  The test for whether this section of the code applies is the excusable ignorance of the contents of the writing signed. Factors to be considered include the <u>obligor's education and the ability to read English</u>. Also relevant is the reasonable reliance on representations made prior to signing, the presence or absence of any third person who might read or explain the document to the signer, and the necessity of acting without delay.

75.  Preciado instructed Plaintiff to sign the Refinance Loan documents when delivered (including the Note) and that their immediate signing was necessary to obtain the loan containing the falsely promised negotiated terms, thus Preciado created the necessity to act without delay. Plaintiff had pre-conditioned that a fixed rate loan with low and constant payment must be terms of loan acceptance and Preciado misrepresented the contents of the Note (no disclosure that it was an adjustable rate loan with negative amortization and higher payments) while also making no arrangement to have anybody available to explain the documents at the time of signing. Plaintiff's spouse, as the only present third party other than the mobile notary, was no better equipped to adequately interpret the documents than Plaintiff—both lacked any higher level education and were unable to read and comprehend more than the most basic of words written in English.

76.  Therefore Plaintiff's excusable ignorance of the Note's true content at the time of signing was reasonable and any claims against the original lender (Homecomings) are properly imputed without any Holder In Due Course immunity against Deutsche Bank as the purported current owner of the debt.

**FIRST CAUSE OF ACTION: VIOLATION OF RESPA**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

77.  Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

78.  RESPA is the Real Estate Settlement Practices Act under 12 U.S.C. § 2601, et seq. as implemented by Regulation X, 24 C.F.R. § 3500 et seq. ("Reg. X").

79.  Homecomings paid Trimerica Homecomings paid Trimerica $8,715 as a Yield Spread Premium ("YSP") in connection with the Refinance Loan.

80.  RESPA regulations apply to any "federally related mortgage loan" secured by a residential property of one to four units on less than 25 acres and is either: 1) made by a federally insured lender; 2) made by any lender that is regulated in any manner by any agency of the federal government; 3) made by the Secretary of Treasury or assisted in any way by any agency of the federal government ; 4) Eligible for purchase by Fannie Mae, Ginnie Mae or Freddie Mac; or 5) made by any creditor as defined in section 103 (f) of the Consumer Protection Act who makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

81.  Plaintiff alleges the security for the Refinance Loan is a qualifying property and that the lender at the time of loan issuance met one or more of the criteria making the transaction subject to RESPA regulation.

82.  RESPA prohibits any person from giving and any person from accepting any fee, kickback, or other thing of value pursuant to any agreement or understanding that business shall be referred to any person and prohibits the payment or acceptance of fees for services that are not performed or unearned. 12 USC 2607 (a) and (b).

83.  HUD provides illustrative factors to be considered when weighing the propriety of the payment or acceptance of any YSP payment; these factors include (among others):

c) "Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

…

i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

…

n) Participating in the loan closing"

84.  Trimerica failed to educate Plaintiff, to truthfully describe the loan product, to offer alternative loan products, or to explain how closing costs and monthly payments may vary. Trimerica failed to provide adequate or early disclosures and did not participate in Plaintiff's signing of the Refinance Loan documents; a key part of the loan closing.

85.  Plaintiff  is informed and believes and upon such information and belief alleges that evidence will likely support that the YSP amount paid by Homecomings to Trimerica was based on the payment the Homecomings would receive when it was sold Plaintiff's Refinance Loan to the secondary mortgage market and that Homecomings in its establishing the YSP payment did not consider the specific services Trimerica may have provided to the borrower in the transaction. This allegation is further supported by Homecomings own characterization of the YSP fee. In Homecomings "Funding Control Sheet" (a true copy of which is attached as EXHIBIT N and incorporated herein) Homecomings admits that the $8,715 paid Trimerica was merely a "Marketing Fee" (see EXHIBIT N, directly below line 802 and entry at "Total Points Split").

86.  Plaintiff had no knowledge regarding Homecomings characterization of the YSP fee as a "Marketing Fee" at the time of the Refinance Loan negotiation and issuance and in fact did not receive a copy of the Funding Control Sheet until approximately May of 2009.

87.  Plaintiff had no actual or constructive knowledge of the violations of RESPA by

reason of the lack of any timely or accurate early disclosure(s); by Trimerica's absence at the time of Plaintiff's signing the Refinance Loan documents; and by the ambiguous language regarding the YSP contained in both the Estimated HUD-1 and the final HUD-1( a document that issued only after the loan closed) . A true copy of Plaintiff's final HUD-1 is attached as EXHIBIT H and incorporated herein. RESPA requires that any YSP be annotated with a "POC" (paid outside close) or "YSP" on the HUD-1. A POC annotation was included for Plaintiff's cost of appraisal but conveniently omitted on the YSP payment (see EXHIBIT H, page 2, line 859 & 865).

88.  Plaintiff is informed and believes and upon such information and belief alleges that evidence will likely support these shortcomings were affirmatively employed in order to conceal the YSP and the part it played in enriching the defendants, or that in the alternative, the shortcomings were so recklessly disregarded as to infer intent and that Plaintiff reasonably relied on an absence of such misconduct .

89.  Violation of RESPA Section 8 imposes joint and several liability.

90.  Trimerica, pursuant to an agreement or understanding that business incident to or as part of a real estate settlement service involving federally related mortgage loans would be referred to Homecomings, is liable to Plaintiff for violation of 12 U.S.C. § 2607(1) and 24 C.F.R.§ 3500.14(b).

91.  Homecomings and Trimerica in giving or accepting a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c), are liable to Plaintiff.

92.  Defendant Deutsche Bank is liable for violation of RESPA by virtue of its close

connection to Homecomings and by its inability to assert a Holder In Due Course status.

93.  Homecomings and Trimerica in failing to provide accurate and timely disclosures regarding the YSP, and Homecomings failure to disclose its characterization that the YSP was merely a "Marketing Fee" further deprived Plaintiff the information necessary for Plaintiff to understand or reasonable opportunity to learn of the alleged RESPA violation(s).

94.  RESPA, pursuant to 12 U.S.C. § 2607(d), entitles Plaintiff to recover an amount equal to three times the amount of any and all charges for "settlement services."

95.  RESPA also provides for recovery of Plaintiff's costs  attorney fees when a kickback such as an unjustified YSP is paid as alleged herein. §2607 (d) (5).

96.  WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### SECOND CAUSE OF ACTION: VIOLATION OF CFLL
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

97.  Plaintiff realleges and incorporates by reference each and every allegation as set forth above, as if fully set forth within this cause of action.

98.  In California loans secured by real property may be brokered under several regulations including those of the Department of Real Estate ("DRE") or the Department of Corporations ("DOC"). Some brokerages hold multiple licenses and run a "split-shop" with the ability to broker loans under several regulations.

99.  Trimerica, at the time of plaintiff's loan issuance, was authorized by both the DRE and the DOC to broker loans (See "State of California Department of Real Estate" a true copy of which is attached as EXHIBIT O and incorporated herein; and see "Multiple Department License Lookup" a true copy of which is attached as EXHIBIT L and incorporated herein.)

100.    A sales agent working under the supervision of a DOC broker does not need a

separate license to solicit loans.  A sales agent in order to lawfully broker a DRE loan under a broker's supervision must be separately licensed by the DRE.

101.    At the time the Refinance Loan documents were delivered for Plaintiff's signature Trimerica disclosed to Plaintiff that the Refinance Loan was brokered under the regulation of the DOC and governed by the California Finance Lender Law ("CFLL"). This admission is further supported by the apparent lack of any past or current DRE licensing of Preciado who acted as Trimerica's sales agent. (See: "DRE Public License Search Results" a true copy of which is attached as EXHIBIT P, and incorporated herein.)

102.    At all times relevant to this Complaint Homecomings was a DOC licensed California Finance Lender.

103.    California Section § 22100, et seq. of the California Financial Code and Code of Regulations (10 C.C.R. §1404, et seq.) are the relevant statutes governing CFLL.

104.    These statutes and regulations establish mandatory disclosure requirements for both the broker and lender when arranging a loan.

105.    Homecomings, as lender,  failed to deliver or cause to be delivered the statement required by Cal. Fin. Code § 22337 (a). This statement must be delivered at the time the loan is made (a date which Plaintiff contends was the time of document signing and in no case is later than the date of the Refinance Loan funding) and must contain in clear and distinct terms the name, address, and license number of the broker and lender. The statement must also show the date, amount, and maturity of the loan contract, how and when the loan is repayable, the nature of the security of the loan, and the agreed rate of charge or annual percentage rate in a manner similar to federal requirements under the Truth In Lending Act (TILA) as implemented by Regulation Z (12 C.F.R. 226). Homecomings failure to provide this statement violated Cal. Fin.

Code § 22337 (a).

106.    Cal. Fin. Code § 22338 (a) requires the broker to provide at the time of final [loan] negotiation or arrangement a statement showing in clear and distinct terms the name, address, and license number of the broker and the finance lender. The statement shall show the date, amount, and terms of the agreement with the broker, and all amounts paid or to be paid to the broker and to any person other than the finance lender.

107.    Plaintiff is informed and believes and upon such bases alleges that the final negotiation or arrangement of Plaintiff's Refinance Loan occurred on or prior to October 3rd, 2005. This allegation is supported by Homecomings own admission in its Funding Control Sheet wherein the "loan lock" (the date in which the arranged and negotiated loan must fund) is scheduled to expire on November 3, 2005 (See EXHIBIT N at line 10, far right column). A loan lock typically exists for a 30 to 60 day period prior to expiration and Plaintiff is informed and believes and upon such bases alleges that evidence will likely support was the approximate time period for plaintiff's Refinance Loan lock. Plaintiff  did not receive the 22338 (a) statement prior to the date of the mobile notary visitation; a date well beyond October 3rd date for the loan to be negotiated based on the presumed latest date enabling the loan lock to be made.

108.    When Trimerica belatedly provided Plaintiff a statement purporting to comply with requirements of  Cal. Fin. Code § 22338 (a) the statement failed to otherwise meet the statute's requirement(s).

109.    Trimerica's 22338 (a) statement admits an agreement date of 09/01/2005 (yet  another indication of Trimerica's receipt of signed document(s) well in advance of the disclosure)  but the amount and terms of this agreement are left completely blank. (See EXHIBIT A, referred to hereinafter as the "22338 (a) statement.")

110.    The 22338 (a) statement reflects the amount paid to the broker "From Borrower loan funds" as $6, 228.75. However, the HUD-1 reflects actual amounts paid to the broker as $5778.7— a discrepancy of $500. (See "EXHIBIT H, page 2, at 857 and 865).

111.    The 22338 (a) statement "Amounts paid to be paid to others not including the finance lender" includes $150.00 for a "signing fee" but omits the $400 appraisal fee paid by Plaintiff prior to closing as reflected on line #859 of the HUD-1.

112.    Because Trimerica's 22338 (a) statement fails to recite the amount and terms of the agreement with Trimerica, to accurately list all amounts paid to the broker and, to accurately list all amounts paid to any person other than the finance lender, Trimerica violated Cal. Fin. Code § 22338 (a).

113.    Cal. Fin. Code § 22338 (b) requires the broker to deliver the 22338 (a) statement to the finance lender, making Homecomings necessarily aware or alternatively obligated to be aware of Trimerica's date of agreement with Plaintiff, its failure to timely deliver the 22338 (a) statement, and of all the inaccuracies and omissions contained therein. Homecomings, despite this knowledge or obligation, took no action to correct or inform Plaintiff of the violations.

114.    Cal. Fin. Code § 22338 (e) requires that at the time the broker accepts any fee or signed instrument that it deliver to the "potential"  borrower a statement showing in clear and distinct terms the name, address, and license number of the broker and finance lender.

115.    When Trimerica belatedly provided Plaintiff a statement purporting to comply with requirements of  Cal. Fin. Code § 22338 (e) the statement failed to otherwise meet the statute's requirement(s). A true copy of this statement entitled "Borrower's Initial Disclosure Statement" is attached as EXHIBIT G and incorporated herein referred to hereinafter as the

"22338 (e) statement." This statement further supports the brokering of the loan under the CFLL by reciting that the Department of Corporations is the regulating agency (and not the Department of Real Estate).

116.    Trimerica's 22338 (e) statement fails to clearly or distinctly identify the license number for either the broker (Trimerica) or the finance lender(Homecomings). There is a "file number 603 7515 for Homecomings, which if generously interpreted to mean "license," is not in associated with Homecomings but is instead issued to "Primerica Financial Services Home Mortgages"  (See "CORP :: Financial Services Division Licensee Address Listing" a true copy of which is attached as EXHIBIT M  and incorporated herein).   Therefore Trimerica violated Cal. Fin. Code § 22338 (e).

117.    Trimerica issued an additional  22338 (e) statement also entitled "Borrower's Initial Disclosure Statement" (a true copy of which is attached as EXHIBIT K and incorporated herein) completely omitting any license number for Homecomings.

118.    This redundant 22338 (e) statement may be an attempt to comport  with the requirements of Cal. Fin. Code §22337 (b) wherein it is required that a finance lender (Homecomings) obtain a statement from the borrower regarding any person who has acted as a broker to the loan.

119.    Moreover, because the 22338 (e) statement(s) are redundantly titled, Plaintiff was unable to determine that the documents contained different information and was thereby denied any reasonable opportunity to determine the varying content; additionally they do not vary greatly from the 22338(a) statement which creates a net camouflage effect —seemingly the statement(s) were merely multiple copies contained within the large stack of documents that Plaintiff was instructed to sign without explanation in order to obtain the Refinance Loan .

120.     Cal. Fin. Code § 22337 (f) requires that each licensed finance lender shall deliver or cause to be delivered the 22338 (e) statement. Homecomings had an independent duty to deliver the statement and therefore violated Cal. Fin. Code § 22338 (e).

121.     Homecomings had actual knowledge the Refinance Loan was brokered under the regulation of the CFLL. In Homecomings "Closing Instructions" (EXHIBIT I) Homecomings requires that a copy of Plaintiff's "Fair Lending Notice" be delivered before funding the Refinance Loan. A true copy of Plaintiff's "The Housing Financial Discrimination act of 1977 Fair Lending Notice" is attached as EXHIBIT Q and incorporated herein. This notice instructs Plaintiff to contact the DOC. If the Refinance Loan had been brokered under the regulation of the DRE the appropriate entry on this document would have instructed Plaintiff to contact the DRE.

122.     Damages for violating the mandatory provisions of the CFLL depend on the willfulness or negligence of the actor and the maintenance of procedures for the detection of bona fide errors.

123.     Plaintiff alleges that Trimerica willfully violated the CFLL. This allegation is supported by Trimerica's knowledge of the date of agreement and parallel and similar failure to provide the GFE required under RESPA. These omissions when considered together show a reckless disregard to properly disclose terms of the loan. In the alternative Plaintiff alleges that no reasonable procedures to detect bona fide errors could have been maintained by Trimerica when the overall alleged violations of the CFLL committed by Trimerica are considered in totality there are simply too many errors and omissions for such procedures to have been in place.

124.     Plaintiff alleges that Homecomings willfully failed to provide the 22337 (a)

statement disclosing the terms of the loan.  This allegation is further supported by Homecomings parallel and similar failure to provide the GFE required under RESPA. These omissions when considered together show a reckless disregard to properly disclose terms of the loan. In the alternative Plaintiff alleges that no reasonable procedures to detect bona fide errors could have been maintained by Homecomings when the overall alleged violations of the CFLL committed by Homecomings are considered in totality there are simply too many errors and omissions for such procedures to have been in place.

125.    Because CFLL § 22302 incorporates the provisions of Cal. Civ.  Code § 1670.5 a court may find a contract to be unconscionable as a matter of law and either refuse to enforce the contract or strike out those provisions that are unconscionable.

126.    To find unconscionability there must be a determination of both "procedural" and "substantive" unconscionability. The overall determination of unconscionability allows a sliding scale approach where facts supporting one prong may weigh heavily enough to reduce facts necessary to support the other prong. Plaintiff alleges that Refinance Loan is unconscionable under both prongs, or in the alternative that the loan was so procedurally unconscionable that the substantive unconscionability need be only minimal.

127.    Procedural unconscionability concerns the manner in which the contract was negotiated and the elements of oppression and surprise. Plaintiff's Refinance Loan procedural unconscionability is supported a multitude of facts;

    a)  Preciado solicited Plaintiff by telephone over a period of several months for the purpose of inducing Plaintiff into the Refinance Loan;

    b)  Preciado falsely represented the Refinance Loan as the best possible;

c) Preciado falsely told Plaintiff that the Refinance Loan met Plaintiff's pre-condition of a lower payment and a fixed rate;

d) All conversations relating to the negotiation and obtaining of the Refinance Loan were conducted in Spanish while all the loan documents were delivered in English;

e) The loan documents did not contain the terms that Preciado represented and Plaintiff's limited English and education prevented Plaintiff the opportunity to understand the actual content;

f) Preciado failed to make any effort or arrangement to explain the loan documents to Plaintiff and instead sent a "mobile notary" who stated she could not explain any of the documents;

g) Preciado assured Plaintiff that if Plaintiff wanted the loan that Preciado falsely led Plaintiff to believe he would obtain (fixed-rate with lower payments) then Plaintiff must sign the loan documents delivered by the mobile notary;

h) Plaintiff called Preciado and a Trimerica supervisor the day after signing and stating he wished to cancel the loan and was told that it was "too late, the documents were signed" even though the loan did not close for several days later;

i) Preciado and a Trimerica supervisor did not advise Plaintiff to seek the counsel of an attorney after becoming aware Plaintiff wished to cancel the loan;

j) Plaintiff had no chance to review the loan documents or any advance explanation prior to the appearance of the mobile notary;

128.    Substantive unconscionability concerns the actual terms of the loan. Substantive unconscionability in Plaintiff's loan is supported by the following factors:

a) The Loan was issued with a near-high APR: A high-APR loan is defined as a loan whose APR is at least three percentage points higher than the interest rate on U.S. Treasury securities of the same maturity, at the time the loan was made. Plaintiff's loan was made in October 2005, with a stated APR of 7.193% and a term of thirty-years. The rate for a thirty-year U.S. Treasury security in October 2005 requires an adjustment  to calculate, and Plaintiff is informed and believes, and on that basis alleges, that the calculation necessary yields a percentage of 2.873%, or very near to the 3 percentage point threshold which when combined with the fees charged for the Refinance Loan is unreasonable;

b) Plaintiff's loan was made at an adjustable rate with introductory period of three years or less;

c)  The loan carried a substantial prepayment penalty;

d) The loan prepayment penalty extended beyond the introductory rate period;

e) The loan had a teaser rate couched in favorable and deceiving terms –and stated only that the interest rate and  payment amount "may change" when instead the interest rate and payment amount were known to necessarily change and did change;

f) The loan negatively amortized without adequate disclosure.

129.    Plaintiff was denied any meaningful opportunity to discover that the loan was both procedurally and substantively unconscionable and therefore the loan may be modified if determined as such by a court.

130.    Plaintiff was denied by both Homecomings and Trimerica any meaningful

opportunity to discover the omissions and errors contained within the untimely and inaccurate CFLL statements and was not provided any subsequent statements correcting those errors which further contributed to Plaintiff's inability to discover these errors and the original lack of timely delivery.

131.    Defendant Deutsche Bank is liable for violation of the CFLL by virtue of its close connection to Homecomings and by its inability to assert a Holder In Due Course status.

132.    WHEREFORE Plaintiff prays for the relief set forth hereinafter

**THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

133.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

134.    Preciado and Trimerica held themselves out to Plaintiff as a mortgage loan broker and Plaintiff is informed and believes and upon such bases alleges that there is a likelihood evidence will support that at the time of the Refinance Loan solicitation, arrangement of the loan, and at loan issuance, Trimerica was licensed to conduct business within the State of California as both a broker for loans regulated by the California Department of Real Estate, and as a broker for loans regulated by the California Department of Corporations.

135.    A mortgage loan broker owes the borrower fiduciary duties of highest good faith and fullest disclosure of all material facts concerning the transaction that might affect the borrower's decision. A sales agent under the control and supervision of a broker owes this same duty to the borrower.

136.    Preciado breached his duty to Plaintiff by:

a.   Failing to offer Plaintiff a choice of loans;

b. Failing to discuss rates with Plaintiff and instead "locking the loan" at a rate unilaterally selected by the loan broker without any mutual discussion;

c. Recommending and arranging loan that was less advantageous than other loans for which Plaintiff qualified;

d. Subordinating Plaintiff's interests to their own by recommending a loan that primarily benefitted Trimerica and Homecomings rather than Plaintiff;

e. Failing to explain the essential terms of the loan to Plaintiff;

f. Failing to disclose that the loan they arranged was not a fixed-rate loan, as Plaintiff had conditioned a necessary term, but instead a variable rate loan;

g. Falsely representing without Plaintiff's consent, Plaintiff's income and expenses on the loan application;

h. Failing to provide early disclosures about the Refinance Loan;

i. Failing to disclose that the loan's cited 1.375% interest rate was not the actual interest rate; the actual rate was much higher.  Thus, Plaintiff's payment did not cover all of the interest.  The additional, unpaid, interest was added to the principal, creating a negative amortization;

j. Failing to disclose that the loan's cited 1.375% interest rate was only a "teaser" and that Plaintiff's payments would increase dramatically after the teaser period ended;

k. Failing to advise that the language within the note stating the initial payment amount and interest rate "may change" would instead certainly change;

l. Failing to inform Plaintiff that he could not predictably afford the loan payments that would be required after the teaser period ended;

m. Failing to inform Plaintiff that he would be sole obligor of the debt;

n. Failing to disclose that when the principal balance of the loan exceeded 115% of the loan amount, the loan would automatically "reset" to a fully-amortized

loan requiring payments of over $2323.77 per month, more than double the amount represented to Plaintiff as the amount he would have to pay;

o.  Failing to disclose that the loan included a prepayment penalty and that the amount of that penalty was so exorbitant that it made it economically impracticable for Plaintiff to refinance the Property out of the loan;

p.  Failing to timely disclose the existence, type, and amount of points and other brokerage fees paid to Trimerica;

q.  Failing to disclose that the points and other brokerage fees paid to Trimerica were unreasonably high and not reasonably related to the services rendered or the facilities provided, and therefore violated RESPA;

r.  Failing to attend the final settlement as Plaintiff's agent or representative when the settlement agent selected by broker and not by Plaintiff was geographically distant from Plaintiff (Southern California) thereby denying Plaintiff the opportunity to receive a final settlement statement before the loan closed;

s.  Failing to arrange an accommodation signing with an office of the settlement agent located more geographically near to Plaintiff thus depriving Plaintiff of the opportunity to receive and review a final settlement statement at or before the time of settlement;

t.  Failing to inform Plaintiff of the right to review the final settlement statement the day before settlement or to arrange the opportunity for this review.

u.  Failing to advise Plaintiff to seek legal advice when Plaintiff wished to cancel the loan;

v.   Failing to advise Plaintiff of the possibility of issuing instructions to escrow not to close the Refinance Loan while time remained to do so by instead falsely stating to Plaintiff that it was too late to cancel any commitment;

137.   Preciado's breach of duty, occurred within the scope of his employment by Trimerica and is thus properly imputed to Trimerica.

138.   As a direct result of Trimerica's breach of duty Plaintiff has been exposed to increased loan fees and now faces the potential forfeiture of the Property in a foreclosure sale.

139.   At the time of the loan transaction, Plaintiff lacked knowledge or experience with loan practices, procedures, and terms beyond that of a typical homeowner and was further burdened by his inability to comprehend the written English language.

140.   Plaintiff reasonably relied upon Trimerica as a licensed loan broker to to apprise him of all of the essential terms, conditions, advantages, and disadvantages of the Refinance Loan and Trimerica was aware or should have been aware of Plaintiff's reasonable reliance on Trimerica to comport itself in a manner that fulfilled all of its fiduciary duties to Plaintiff.

141.   Homecomings financially incented Trimerica to solicit Plaintiff's loan with payment of a "Marketing Fee" in an amount exceeding Plaintiff's already high-cost for the loan.

142.   Homecomings had actual knowledge that the Marketing Fees paid to Trimerica to encourage solicitation of Plaintiff's loan were of no benefit to Plaintiff (e.g. no credit was given to Plaintiff to offset the costs of the loan—a typical use of these funds in similar transactions) and that the Marketing Fees did not fairly compensate Trimerica for services performed.

143.   Homecomings had actual knowledge that the Marketing Fees were not timely disclosed by Trimerica.

144.    Homecomings failure to provide early disclosures denied Plaintiff any opportunity to learn of the Marketing Fee paid by Homecomings and the nature of the arranged Trimerica and Homecomings "pay for loan solicitation" relationship.

145.    Homecomings had actual  knowledge of the errors and failure to timely deliver the statement(s) required under the CFLL which triggered an independent duty for Homecomings to provide and correct these disclosures which Homecomings did not abide.

146.    Homecomings had actual knowledge that Plaintiff did not receive a GFE disclosure as required under RESPA which triggered an independent duty for Homecomings to provide this early disclosure, which it failed to abide.

147.    Homecomings had constructive knowledge of Plaintiff's potential vulnerability in that the loan terms may have been negotiated in Spanish by virtue of its receipt of the Uniform Residential Loan Application (a true copy of which is attached as EXHIBIT C and incorporated herein) wherein it is stated that Plaintiff is of Hispanic origin, and also by virtue of the Trimerica agent surname (Preciado); a reasonable indicator for the potential of the Spanish language to be used in negotiating the loan while the loan documents were issued in English.

148.    Homecomings had actual knowledge of the geographic distance between Trimerica and Plaintiff and the use of a mobile notary to deliver the loan documents, thereby creating the likelihood for the Trimerica agent to be absent from Plaintiff's document signing.

149.    Because Homecomings failed to take any reasonable and affirmative steps to limit the potential for Trimerica's misconduct and because Homecomings failed to provide its own early and accurate disclosures or to correct or cause to be corrected known disclosure mistakes, and because Homecomings had actual or constructive knowledge of Plaintiff's vulnerability, Homecomings knowingly provided substantial assistance to Preciado's misconduct.

150.    Deutsche Bank is liable by virtue of its close connection to Homecomings and by its inability to assert any of Holder In Due Course status.

151.    Trimerica's and Homecomings' conduct, as alleged herein, or the ratification and failure to correct such acts and omissions, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

152.    Plaintiff had no reasonable opportunity to learn of the this breach of duty, and in fact was likely to have been purposefully preyed upon solely because of Plaintiff's relative lack of education and unfamiliarity with the English language.

153.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**FOURTH CAUSE OF ACTION: FRAUD**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

154.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in this Complaint as though fully set forth herein.

155.    Preciado intentionally misrepresented the material terms and conditions of the Refinance Loan.

156.    Preciado made these affirmative false representations in the course of several telephone calls occurring on various dates  occurring at least between September 1, 2005 and the date of the Refinance Loan closing.

157.    Preciado's affirmative false representations and failure to correct Plaintiff's reasonable assumptions included but were not limited to:

        a.   Making false statements that the loan was the most advantageous loan for which Plaintiff qualified.

        b.   Asserting that the loan was fixed-rate product and making this assertion while knowing this was a condition upon which Plaintiff relied.

        c.   Falsely stating that 1.375% was the actual interest rate.

d.   Assuring Plaintiff that each payment covered all interest and principal.

e.   Assuring Plaintiff that the loan had no negative amortization feature.

f.   Telling Plaintiff it was too late to cancel the transaction when in fact the Refinance Loan did not close for several days after this false statement.

g.   Providing Plaintiff inaccurate disclosures.

158.   Preciado's fraudulent acts, occurred within the scope of his employment by Trimerica and is thus properly imputed to Trimerica.

159.   Plaintiff, lacking any real formal education and unable to competently read the English language, and with little knowledge or experience with loan practices, procedures, and terms beyond that of a typical homeowner, reasonably relied upon Preciado's representations

160.   Preciado knew that these representations were false or made these representations recklessly and without regard for their truth.

161.   Plaintiff would not have entered into the Refinance Loan agreement had he known its essential terms and the truth about the falsely represented facts

162.   Preciado intended that Plaintiff to rely on the representations and was aware that Plaintiff would not have entered into the Refinance Loan agreement had Plaintiff known the true essential terms of the loan and that Preciado's representations were false.

163.   Plaintiff reasonably relied upon Trimerica as a licensed loan broker to to apprise him of all of the essential terms, conditions, advantages, and disadvantages of the Refinance Loan and Trimerica was aware or should have been aware of Plaintiff's reasonable reliance on Trimerica to comport itself in a manner that fulfilled all of its fiduciary duties to Plaintiff.

164.   Plaintiff was harmed and his reliance upon Preciado's false representations was a

substantial factor in causing this harm. As a direct result of Trimerica's false representations Plaintiff has been exposed to increased loan fees and now faces the potential forfeiture of the Property in a foreclosure sale.

165.    Homecomings financially incented Trimerica to solicit Plaintiff's loan with payment of a "Marketing Fee" in an amount exceeding Plaintiff's already high-cost for the loan.

166.    Homecomings had actual knowledge that the Marketing Fees paid to Trimerica to encourage solicitation of Plaintiff's loan were of no benefit to Plaintiff (e.g. no credit was given to Plaintiff to offset the costs of the loan—a typical use of these funds in similar transactions) and that the Marketing Fees did not fairly compensate Trimerica for services performed.

167.    Homecomings had actual knowledge that the Marketing Fees were not timely disclosed by Trimerica.

168.    Homecomings failure to provide early disclosures denied Plaintiff any opportunity to learn of the Marketing Fee paid by Homecomings and the nature of the arranged Trimerica and Homecomings "pay for loan solicitation" relationship.

169.    Homecomings had actual knowledge of the errors and failure to timely deliver the statement(s) required under the CFLL which triggered an independent duty for Homecomings to provide and correct these disclosures which Homecomings did not abide.

170.    Homecomings had actual knowledge that Plaintiff did not receive a GFE disclosure as required under RESPA which triggered an independent duty for Homecomings to provide this early disclosure, which it failed to abide.

171.    Homecomings had constructive knowledge of Plaintiff's potential vulnerability in that the loan terms may have been negotiated in Spanish by virtue of its receipt of the Uniform Residential Loan Application (EXHIBIT C) wherein it is stated that Plaintiff is of Hispanic

origin, and by virtue of the Trimerica agent surname (Preciado); a reasonable indicator for the potential of the Spanish language to be used in negotiating the loan while the loan documents were issued in English.

172.    Homecomings had actual knowledge of the geographic distance between Trimerica and Plaintiff and the use of a mobile notary to deliver the loan documents, thereby creating the likelihood for the Trimerica agent to be absent from Plaintiff's document signing.

173.    Because Homecomings failed to take any reasonable and affirmative steps to limit the potential for Trimerica's misconduct and because Homecomings failed to provide its own early and accurate disclosures or to correct or cause to be corrected known disclosure mistakes, and because Homecomings had actual or constructive knowledge of Plaintiff's vulnerability, Homecomings knowingly provided substantial assistance to Preciado's misconduct.

174.    Deutsche Bank is liable by virtue of its close connection to Homecomings and by its inability to assert any of Holder In Due Course status.

175.    Trimerica's conduct, as alleged herein, and Homecomings failure to correct such acts, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

176.    Because Plaintiff had no reasonable opportunity to learn of these fraudulent acts, and in fact was likely to have been purposefully preyed upon solely because of Plaintiff's relative lack of education and unfamiliarity with the English language.

177.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**FIFTH CAUSE OF ACTION: CONCEALMENT**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, HOMECOMINGS FINANCIAL NETWORK, INC., and DEUTSCHE BANK.)**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation

contained in this Complaint as though fully set forth herein.

179.   Preciado as a loan broker ostensibly representing  Plaintiff, owed to Plaintiff a fiduciary duty of the highest good faith and was charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect Plaintiff's decision to obtain the Refinance Loan.

180.   Preciado failed to completely disclose to Plaintiff that:

    a.   The loan recommended was not the best loan for which Plaintiff qualified.

    b.   The loan was not a fixed-rate loan, as Plaintiff had conditioned, but a variable rate loan.

    c.   1.375% interest rate was not the actual interest rate, and only a "teaser."

    d.   Plaintiff could not afford or would have voluntarily elected to obligate payments at the amounts expected after the teaser period ended.

    e.   Plaintiff's payments would not cover all of the interest.

    f.   Paying only the stated amounts would cause negative amortization.

    g.   Plaintiff's debt-to-income ratio was insufficient to justify the loan amount.

    h.   The loan would automatically "reset" when the principal balance of the loan exceeded 115% of the loan amount, requiring Plaintiff to pay more than double the amount Plaintiff had been mislead to expect.

    i.   The loan included a prepayment with a penalty so exorbitant that it made it economically impracticable for Plaintiff to refinance the Property.

    j.   That Plaintiff's income to qualify for the loan was combined with Plaintiff's spouse on the loan application yet Plaintiff was the sole obligor of the debt.

    k.   The existence, type, and amount of points and other brokerage fees paid to Trimerica, and that such fees were unreasonable and without justification.

181.   Preciado's acts of concealment, occurred within the scope of his employment By Trimerica and is thus properly imputed to Trimerica.

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

182.    Plaintiff, lacking any real formal education and unable to competently read the English language, and with little knowledge or experience with loan practices, procedures, and terms beyond that of a typical homeowner, reasonably relied upon Preciado's representations and was not made reasonably aware of any acts of concealment.

183.    Plaintiff would not have entered into the Refinance Loan agreement had he known its essential terms and the truth about the concealed facts.

184.    Preciado intended that Plaintiff to rely on the representations made and was aware that Plaintiff would not have entered into the Refinance Loan agreement had Plaintiff known the true essential terms of the loan and that Preciado's concealed essential facts.

185.    Plaintiff reasonably relied upon Trimerica as a licensed loan broker to to apprise him of all of the essential terms, conditions, advantages, and disadvantages of the Refinance Loan and Trimerica was aware or should have been aware of Plaintiff's reasonable reliance on Trimerica.

186.    Plaintiff was harmed by Preciado's acts of concealment and those acts were a substantial factor in causing this harm. As a direct result of Trimerica's false representations Plaintiff has been exposed to increased loan fees and now faces the potential forfeiture of the Property in a foreclosure sale.

187.    Homecomings financially incented Trimerica to solicit Plaintiff's loan with payment of a "Marketing Fee" in an amount exceeding Plaintiff's already high-cost for the loan.

188.    Homecomings had actual knowledge that the Marketing Fees paid to Trimerica to encourage solicitation of Plaintiff's loan were of no benefit to Plaintiff (e.g. no credit was given to Plaintiff to offset the costs of the loan—a typical use of these funds in similar transactions) and that the Marketing Fees did not fairly compensate Trimerica for services performed.

189.    Homecomings had actual knowledge that the Marketing Fees were not timely disclosed by Trimerica.

190.    Homecomings failure to provide early disclosures denied Plaintiff any opportunity to learn of the Marketing Fee paid by Homecomings and the nature of the arranged Trimerica and Homecomings "pay for loan solicitation" relationship.

191.    Homecomings had actual  knowledge of the errors and failure to timely deliver the statement(s) required under the CFLL which triggered an independent duty for Homecomings to provide and correct these disclosures which Homecomings did not abide.

192.    Homecomings had actual knowledge that Plaintiff did not receive a GFE disclosure as required under RESPA which triggered an independent duty for Homecomings to provide this early disclosure, which it failed to abide.

193.    Homecomings had constructive knowledge of Plaintiff's potential vulnerability in that the loan terms may have been negotiated in Spanish by virtue of its receipt of the Uniform Residential Loan Application (EXHIBIT C) wherein it is stated that Plaintiff is of Hispanic origin, and by virtue of the Trimerica agent surname (Preciado), a reasonable indicator for the potential of the Spanish language to be used in negotiating the loan while the loan documents were issued in English.

194.    Homecomings had actual knowledge of the geographic distance between Trimerica and Plaintiff and the use of a mobile notary to deliver the loan documents, thereby creating the likelihood for the Trimerica agent to be absent from Plaintiff's document signing.

195.    Because Homecomings failed to take any reasonable and affirmative steps to limit the potential for Trimerica's misconduct and because Homecomings failed to provide its own early and accurate disclosures or to correct or cause to be corrected known disclosure mistakes,

and because Homecomings had actual or constructive knowledge of Plaintiff's vulnerability, Homecomings knowingly provided substantial assistance to Preciado's misconduct.

196.     Deutsche Bank is liable by virtue of its close connection to Homecomings and by its inability to assert any of Holder In Due Course status.

197.     Trimerica's conduct, as alleged herein, and Homecomings failure to correct such acts, was despicable, malicious, oppressive, and fraudulent, justifying an award of punitive damages.

198.     Because Plaintiff had no reasonable opportunity to learn of these acts of concealment, and in fact was likely to have been purposefully preyed upon solely because of Plaintiff's relative lack of education and unfamiliarity with the English language.

199.     WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**SIXTH  CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

200.     Plaintiff realleges each and every allegation as set forth and previously alleged in paragraphs 7 through 76 inclusive and  as set forth in Violation of RESPA (paragraphs 78 through  95 inclusive) and hereby incorporates all of these allegations herein by this reference.

201.     Because Trimerica and Homecomings violated RESPA and any violation of RESPA is unlawful; such violations are actionable under the unlawful prong of Cal. Bus. & Prof.17200 et seq..

202.     Deutsche Bank is liable by virtue of its close connection to Homecomings and by its inability to assert any of Holder In Due Course status.

203.     WHEREFORE Plaintiff prays for the relief set forth hereinafter.

**SEVENTH CAUSE OF ACTION: VIOLATION OF CAL. BUS. & PROF. CODE 17200**
**(Against TRIMERICA, HOMECOMINGS FINANCIAL LLC, and DEUTSCHE BANK.)**

-41-
COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

204.    Plaintiff realleges each and every allegation as set forth and previously alleged in paragraphs 7 through 76 inclusive and  as set forth in <u>Violation of CFLL</u> (paragraphs 97 through  131 inclusive) and hereby incorporates all of these allegations herein by this reference.

205.    Because Trimerica and Homecomings violated the CFLL and any violation of the CFLL is unlawful; such violations are actionable under the unlawful prong of Cal. Bus. & Prof.17200 et seq..

206.    Deutsche Bank is liable by virtue of its close connection to Homecomings and by its inability to assert any of Holder In Due Course status.

207.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

## SEVENTH CAUSE OF ACTION: WRONGFUL FORECLOSURE
### (Against MERS, AURORA, CAL-WESTERN, and DUETSCHE BANK.)

208.    To institute and complete a non-judicial foreclosure in California, statutory law must be strictly followed and there must be some form of contractually enabling language within the agreement between the parties.

209.    A Notice of Default ("NOD") has been issued and recorded against the Plaintiff's property used as the security for the predatory Refinance Loan. This notice is required to be issued and recorded when a non-judicial foreclosure is contemplated. The NOD was issued and caused to be recorded by defendant Cal-Western  Reconveyance  Corporation  ("Cal-Western") as a substituted trustee. (A true copy of the NOD is attached as EXHIBIT R and incorporated herein.)

210.    The power to initiate a non-judicial foreclosure in California is contractually granted, typically by a power of sale provision included within the Deed of Trust ("DOT"). A true copy of the Plaintiff's relevant DOT is attached as EXHIBIT T and incorporated herein.

Plaintiff granted the non-judicial power of sale to Investors Title Company, as the original

trustee (see EXHIBIT T, page 2 under "Transfer Rights In Property").

211.    Cal-Western's  authority to act as a later appointed trustee is ostensibly acquired

 by the "Substitution of Trustee" document which Cal-Western provided for MERS to execute

prior to Cal-Western's recordation of the NOD.  A true copy of the Substitution of Trustee

("Substitution")   is attached as EXHIBIT S and incorporated herein.

212.    The Substitution inaccurately asserts that MERS is the "original" Beneficiary as

nominee for Homecomings under the DOT .

213.    In the DOT the original beneficiary is the "Lender" who is then further defined as

 "Homecomings Financial Network, Inc." [EXHIBIT T, page 1 at ¶ (C)]

214.    The DOT grants the Lender (Homecomings) the contractual ability to substitute a

successor trustee.  In order to substitute the Lender must execute and acknowledge an instrument

that is recorded in the county where the property is located. The recorded instrument <u>shall name</u>

<u>the original Lender</u> and this "procedure for substitution of trustee shall govern to the exclusion of

all other provisions for substitution." (EXHIBIT, page 12 at ¶ 24).

215.    MERS is not the original Lender. Therefore the Substitution is ineffective and

violates any contractual authority Plaintiff granted to Lender or Trustee within the DOT.

216.    Moreover, in California where the power to sell a property is granted

contractually it is part of the security and vests in the person who by assignment becomes

entitled to payment of the debt (the beneficiary). Cal. Civ. Code § 2932.5

217.    The Substitution also recites states that MERS, as the undersigned,

is the "present" beneficiary under the DOT. While a statement of the present beneficiary is not a

contractual requirement contained within the DOT, it is a statutory necessity under Cal. Civ.

Code §2934a (a) (1) where the execution and acknowledgement by all of the beneficiaries under the deed of trust are needed for an effective substitution of trustee.

218.    Aurora admits that Deutsche Bank is the present owner of the debt (and therefore the purported present beneficiary).

219.    MERS in the Substitution claims to be the present beneficiary, thereby entitled to payment on the debt even while Aurora, as the servicer of the loan, asserts Deutsche bank is the current owner of the debt.  MERS, because is not entitled to payment on the debt is not the present beneficiary. The Substitution therefore fails to meet statutory requirement(s) for an effective execution.

220.    Plaintiff is informed and believes and upon such bases alleges that evidence will likely support that Refinance Loan issued to Plaintiff has been placed into a secondary market as a Mortgage Backed Security ("MBS") by being sold into a Mortgage Backed Security Trust ("MBS Trust") and that Deutsche Bank is the "Indenture Trustee" for the MBS Trust into which Plaintiff's Refinance Loan was either sold or attempted to be sold. Evidence supporting this allegation is contained within defendant Aurora's Response to Plaintiff's Qualified Written Request wherein where Aurora states that "Deutsche Bank Trust Company Americas, In Trust For, Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4" is the current owner of the debt (see EXHIBIT F on page #2 at ¶ 3). Therefore this particular MBS Trust is the entity claiming owner of Plaintiff's debt. ("The Trust" or "MBS Trust" shall henceforth specifically mean the entity described as the purported owner of Plaintiff's debt for the Refinance Loan.)

221.    When an MBS trust is established with the intent to sell securities, various filings must be made with the Securities and Exchange Commission ("SEC"), a federal agency which

regulates the sale and trade of securities and similar investments.

222.   Because these filings are voluminous Plaintiff has attached only certain filing excerpts within EXHIBIT E supporting Plaintiff's claims ("SEC Excerpts").

223.   Loans were selected for purchase into the MBS Trust by the "Depositor" (Residential Accredit Loans, Inc. ("RALI"), an affiliate of Residential Funding Corporation ("RFC"). (See EXHIBIT E, page 2-3, at ¶ 6). These loans were purchased from the Depositor's affiliates (i.e. Homecomings and GMAC Mortgage Corporation) and from other sources.

224.   RFC at the time of the Refinance Loan was a corporate parent of Homecomings Financial Network, Inc (see EXHIBIT E, page 2, at ¶ 7).

225.   Mortgage loans are typically sold, transferred, conveyed, and assigned into the MBS trust by a deal "cut-off" date. Rating agencies determine subordination levels at deal cut-off. Typically, the MBS issuer assembles a pool of loans and passes the information of these loans to rating agencies. Rating agencies then work independently to examine how much subordination is needed for the tranches to reach certain ratings. This then forms the debt structure. In most cases this debt structure is the final deal structure accepted by the issuer and provided to the investors.

226.   The cut-off date for the MBS Trust  is stated as November 1, 2005 (EXHIBIT E, page #1 at ¶ 1)  and the assets for the "Mortgage Pool" are described by both number of loans (2,306) and aggregate principal value ($796,979,968) "as of the cut-off date." (EXHIBIT E, page 2 at ¶ 8).  While the Mortgage Pool is described as approximate numbers, the specificity is such as to likely calculate Plaintiff's Refinance Loan within these totals, and therefore an asset already sold by Homecomings and purchased by the MBS Trust prior to the cut-off date.

227.   The Depositor or Designated Seller had to represent that it had good title to any

mortgage loan prior to the cut-off date (see EXHIBIT E, page 3 at ¶ 9).

228.    Because Homecomings admits prior to the cut-off date that it had sold Plaintiff's loan and because it is a reasonable assumption based on Aurora's admission that Deutsche Bank is the current owner of the debt, and because the Refinance Loan must have been sold prior to the cut-off date in order for the representations required within the SEC filings to be fulfilled, MERS is not the beneficiary under the DOT (the party entitled to payment thereon) and therefore unable to assert any "present beneficiary" status required under California law to effect and record a lawful substitution of trustee.

229.    MERS may insist that that despite the lack of any contractual relationship with Plaintiff , MERS is authorized to act as a successor by virtue of assignment.

230.    Homecomings purports to have assigned the Plaintiff's Deed of Trust (the security instrument for the Refinance Loan) to defendant MERS as reflected in its "Assignment of Deed of Trust" a true copy of which is attached as EXHIBIT U and incorporated herein, executed on November 3, 2005, by the assignor, a "Michael Lind" who states he is the Assistant Secretary of Homecomings Financial Network, Inc..

231.    The November 3, 2005 date is beyond the representation that the loan had already been sold made by Homecomings when Plaintiff signed the Refinance Loan documents. It is also beyond the November 1, 2005 cut-off date for the MBS Trust into which the loan was presumably sold to the MBS Trust or its Depositor.

232.    At or about the time an MBS trust issues securities to an investor, the Depositor typically transfers, conveys, and assigns to the MBS trust all of its right, title, and interest in the underlying loan to the Indenture Trustee. In turn, the MBS trust will transfer, convey, and assign some or all of an underlying loan to one or more additional MBS trusts. Such an assignment

includes the transfer to the MBS trust of all principal and interest due by a borrower with respect

to the loan. The MBS trust will then execute and deliver the MBS certificates to investors.

233.    On November 29, 2005 the Depositor "caused" the issuance of the MBS

certificates (see EXHIBIT E, page 4 at ¶ 10).

234.    The time of certificate issuance required a concurrent assignment of the loans in

exchange for the securities to be issued, and if the loan was not already electronically registered

with defendant MERS, it was registered on this date. Furthermore, when registered with MERS

no more than an administrative interest in the loan was granted to MERS (see EXHIBIT E, page

4 at ¶ 11).

235.    Prior to the concurrent assignment RFC represented to the certificate investors

that it held "good title to, and was the sole owner of, each Mortgage Loan free and clear of any

pledge, lien, encumbrance or security interest…"  (EXHIBIT E on page 4 at ¶ 12).

236.    Plaintiff is therefore subject to additional claims by the certificate holders

as the MBS Trust certificate holders must necessarily rely on Homecomings affiliated company's

representation that all loans within The Trust are without any other security interest.

237.    MERS, a party to the Trust Structure, and therefore likely aware of these

representations made to certificate holders, still persevered to cause the Assignment of Deed of

Trust (EXHIBIT U) to be recorded on February, 01, 2006. A date well beyond the issuance of

the MBS certificates (November 29, 2005).

238.    To better understand the true nature of MERS Plaintiff attaches and incorporates

herein as EXHIBIT V, a recent court ruling by the Supreme Court of Kansas [*Landmark

National Bank v. Kesler* (2009 Kan.) Lexis 834] which considers many cases across the country

involving MERS and does much to explain MERS purported interest.  Notable excerpts within

the case include that even as a "nominee" MERS has "few or no legally enforceable rights" (EXHIBIT V, page 8 at ¶ 10 - 10 ¶ 1) and is merely a "…straw man…" (EXHIBIT V, page 9 at ¶ 7) and furthermore admits that it "merely tracks loans… and  that "MERS does not receive compensation from consumers."  (EXHIBIT V, page 11 at ¶ 6).

239.    MERS has no original contractual relationship with Plaintiff, no credible ability to assert any effective subsequent assignment of  a contractual relationship with Plaintiff, no entitlement to payments derived from any security interest in Plaintiff's Property, and no ability to assert itself as either an original or present beneficiary; therefore MERS is unable to substitute a trustee under either a contract theory or under California law. MERS is liable to Plaintiff for knowingly substituting a trustee without proper authority in order to cause the present foreclosure proceeding on Plaintiff's Property and for the appropriate costs associated with bringing this suit.

240.    Cal-Western supplied the Substitution to MERS as a form and presumably established the basic language contained therein; Cal-Western also caused the Substitution to be recorded. Plaintiff is informed and believes that evidence will likely support Cal-Western had actual knowledge that Plaintiff's Refinance Loan was claimed as an obligation by the MBS Trust and that Cal-Western therefore had the requisite knowledge or suspicion that the recitals within the document were false or potentially false as Plaintiff alleges and yet Cal-Western recorded the document and accepted the substitution recklessly or without regard for the truth. Cal-Western is therefore liable to Plaintiff the appropriate costs associated with bringing this suit.

241.    When mortgage loans are issued it is very common for the original trustee given the power of sale to be the title company which acted in connection with the loan. When a foreclosure is contemplated the original trustee is often substituted out to allow a trustee with

specialized foreclosure experience to become involved. Plaintiff is informed and believes, and upon such bases alleges that evidence will likely support this to be the sequence of events regarding the contemplated foreclosure of Plaintiff's Property.

242.    The party responsible for instituting or causing the sequence of events necessary to undertake the contemplated foreclosure is generally servicer of the loan. Plaintiff's is informed and believes, and upon such bases alleges that evidence will likely that Aurora, as the servicer for the Refinance Loan, is the party that caused the sequence of events initiating the contemplated foreclosure. This allegation is supported by the language within the MBS Trust claiming ownership of Plaintiff's debt, wherein the "Master Servicer" is obligated to foreclose. (EXHIBIT E on page 5 at ¶ 15) and by the Master servicer's ability to enter into "Subservicing Agreements" (EXHIBIT E on page 1 at ¶ 3) where such agreements are likely to delegate the Master Servicer's obligation to foreclose to the subservicer.

243.    Plaintiff is informed and believes, and upon such bases alleges that Aurora has an agreement with the Master Servicer of the MBS Trust and that this agreement delegated the responsibility of initiating the foreclosure proceeding to Aurora. Plaintiff is informed and believes and upon such bases alleges that Aurora had actual knowledge regarding the circumstances in which Homecomings assigned the DOT to MERS and the lack of MERS contractual or statutory ability to execute the Substitution. Aurora, by its knowingly causing MERS to wrongfully substitute the trustee, is liable to Plaintiff for the appropriate costs associated with bringing this suit.

244.    Deutsche bank, as the purported true successor in interest to Plaintiff's Refinance Loan and therefore the underlying security, is liable to Plaintiff for the appropriate costs associated with bringing this suit by contractual agreement as a successor to the Deed of Trust,

by virtue of its close connection to MERS, and by virtue of the MBS Trust relationship with Aurora as a subservicer. Deutsche Bank granted tacit approval for the wrongful acts herein alleged by choosing to idly stand by while MERS and Cal-Western knowingly and wrongly caused the Substitution to be recorded at the behest of Aurora.

245.    Despite knowledge of the infirm Substitution, Cal-Western recorded against Plaintiff's Property an NOD on March 5, 2009.

246.    Under California law a proper NOD must contain the contact information for the current beneficiary of the loan. Cal. Civ. Code § 2924c (b).

247.    California law also requires that an NOD set forth w "A statement setting forth the nature of each breach actually known to the beneficiary…"  Cal. Civ. Code § 2924(a)(1)(C).

248.    In the NOD Cal-Western asserts that MERS is the present beneficiary and that Cal-Western acts as the contact address for MERS.

249.    Cal-Western further states that the present beneficiary (MERS) has deposited with Cal-Western a "Deed of Trust and all documents evidencing obligations secured thereby."  (See EXHIBIT R, page 2 at ¶ 9).

250.    Plaintiff's allegations support that no showing of present beneficiary status could have been deposited with Cal-Western by MERS and therefore Cal-Western, by causing the NOD to be recorded, is liable to Plaintiff for the appropriate costs associated with bringing this suit, or is alternatively liable if MERS deposited documents supporting its beneficiary claim of which Plaintiff is unaware, and these documents falsely support a present beneficiary claim, and therefore Cal-Western acted in a manner that was not commercially prudent or with reckless disregard of the truth.

251. MERS is liable to Plaintiff for the appropriate costs associated with bringing this suit by its causing the NOD to be recorded while having knowledge it was not a present beneficiary and could not be listed as such in the NOD, nor could MERS supply any known information regarding a breach as required by virtue of its inability to act as a beneficiary.

252. Plaintiff is informed and believes, and upon such bases alleges that evidence will likely support a copy of the NOD was supplied to Aurora.

253. Aurora is liable to Plaintiff for the appropriate costs associated with bringing this suit by virtue of its admitted knowledge that Deutsche Bank is the true purported owner of the debt (present beneficiary) and for its failure to act in a commercially prudent manner and its failing to cause the NOD to be rescinded.

254. Deutsche bank, as the purported true successor in interest to Plaintiff's Refinance Loan and therefore the underlying security is liable to Plaintiff for the appropriate costs associated with bringing this suit by contractual agreement as a successor to the Deed of Trust, by virtue of its close connection to MERS, and by virtue of the MBS Trust relationship with Aurora as a subservicer. Deutsche Bank granted tacit approval for the wrongful acts herein alleged by choosing to idly stand by while MERS and Cal-Western knowingly and wrongly caused the NOD to be recorded at the behest of Aurora.

255. Cal-Western subsequently recorded a Notice of Trustee's Sale ("NOS") concerning Plaintiff's Property, a true copy of which is attached as EXHIBIT W and incorporated herein.

256. A proper NOS must provide the name and address of the beneficiary at whose request the sale is to be conducted. Cal. Civ. Code § 2924f.

257. Cal-Western includes no other name and address within the NOS other than its

own.  Therefore either Cal-Western is now asserting it is the beneficiary or the NOS is defective.

258.    Plaintiff is informed and believes, and upon such bases alleges that evidence will likely support a copy of the NOD was supplied to Aurora

259.    Because the NOS is but a subsequent step to the filing of the NOD, the named defendants within this cause of action are further liable to Plaintiff for the recording of the NOS under the same liability bases asserted for the recording and issuance of the NOD.

260.    Plaintiff alleges that all named defendants within this cause of action acted in concert and with common knowledge of the alleged violations in order to further an illicit scheme in violation of the law to undertake a wrongful foreclosure of Plaintiff's property.

261.    WHEREFORE Plaintiff prays for the relief set forth hereinafter.

### PLAINTIFF'S PRAYER FOR RELIEF

FOR EVERY CAUSE OF ACTION

1.  All damages, costs, and fees that may be awarded as a recoupment or as a set-off for any debt or cost that may be proven as owed by Plaintiff to any defendant;

2.  Pre-judgment interest on any damages awarded to Plaintiff;

3.  For such other further relief as the court may deem proper and just.

ON THE FIRST CAUSE OF ACTION

1.  For treble damages of all payment associated with settlement costs and as according to proof;

2.  For any other award of damages as permitted by statute;

3.  For reasonable attorney's fees, expenses, and costs as permitted by statute.

ON THE SECOND CAUSE OF ACTION

1. Cancelation of the loan agreement as void ab initio or in the alternative, either an order declaring the loan voidable or an order which only obligates Plaintiff to the loan contract to the extent necessary to avoid any unconscionable result;

2. For general damages according to proof;

3. For special damages according to proof.

ON THE THIRD CAUSE OF ACTION

1. For general damages according to proof;

2. For special damages according to proof;

3. For punitive damages in an amount sufficient to punish and to make an example of defendants, and to deter others from engaging in similar conduct.

ON THE FOURTH AND FIFTH CAUSE OF ACTION

1. For general damages according to proof;

2. For special damages according to proof;

3. For punitive damages in an amount sufficient to punish and to make an example of defendants, and to deter others from engaging in similar conduct.

ON THE SIXTH CAUSE OF ACTION

1. For all consideration unlawfully obtained as according to proof;

2. For reasonable attorney's fees, expenses, and costs as permitted by RESPA and as according to proof;

3. For reasonable attorney fees pursuant to CCP 1021.5 and as according to proof.

ON THE SEVENTH CAUSE OF ACTION

1. For all consideration unlawfully obtained as according to proof;

2. For reasonable attorney fees pursuant to CCP 1021.5 and as according to proof;

3.  For costs of suit incurred herein.

ON THE EIGHTH CAUSE OF ACTION

1.  For an order by the court declaring any foreclosure sale undertaken with the current Notice of Default and current Notice of Sale be unlawful and invalid;

2.  For an order by the court rescinding the Notice of Default and Notice of Sale;

3.  For reasonable attorney fees as permitted under California Civil Code §1717, according to proof;

4.  For costs of suit incurred herein.

Dated: November 23, 2009                    Respectfully Submitted,


                                            By: */s/ Allan J. Cory*
                                            Allan J. Cory, Attorney for Plaintiff,
                                            Jose Vera

COMPLAINT FOR PREDATORY LOAN AND IMPROPER FORECLOSURE

**CERTIFICATE OF SERVICE:**

I hereby certify that on **November 23, 2009**, a true and correct copy of **SECOND AMENDED COMPLAINT,** was electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to all ECF registrants in this case.

Dated: November 23, 2009                    By: */s/ Allan J. Cory*
                                                  Allan J. Cory

EXHIBIT TABLE OF CONTENTS

Borrowers Disclosure Statement………………………………………….………...…EXHIBIT A

Adjustable Rate Note (Note)…………………………………………………...…...EXHIBIT B

Uniform Residential Loan Application…………………………………………...……...EXHIBIT C

Untitled (admission that loan has been sold)……………..…………………...……EXHIBIT D

SEC Excerpts……………………………………………………………………...……EXHIBIT E

Response to Plaintiff's QWR…………………………………………………..……...EXHIBIT F

Borrowers Initial Disclosure Statement………………………………………...……EXHIBIT G

Settlement Statement (HUD-1)………………………………………………..……EXHIBIT H

Closing Instructions…………………………………………………………..……EXHIBIT I

Buyer's /Borrower's Closing Statement—Estimated…………………………...……EXHIBIT J

Borrowers Initial Disclosure Statement ("Acting as Broker")…………………….……...EXHIBIT K

Multiple Department License Lookup…………………………………………..……EXHIBIT L

Dept. of Corp. Licensee Address………………………………………………………EXHIBIT M

Funding Control Sheet………………………………………………………...……EXHIBIT N

State of California Department of Real Estate………………………………………EXHIBIT O

DRE Public License Search Results…..………………………………………...……EXHIBIT P

Fair Lending Notice…………….…………………………………………………...…EXHIBIT Q

Notice of Default (NOD)…………………………………………………………..……EXHIBIT R

Substitution of Trustee (SubTrustee)………………………………………..……...EXHIBIT S

Deed of Trust (DOT)……………………………………………………………………EXHIBIT T

Assignment of Deed of Trust…………………………………………………………EXHIBIT U

Landmark National Bank v. Kesler……………………………………………...……EXHIBIT V

Notice of Trustee's Sale………………………………………………………………EXHIBIT W